# GROUP EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
**(Cite as: 1999 WL 787480 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
Helen UTOMI, Drunell Davis, Pauline Owusu &
Lynette Cook Plaintiffs,
v.
COOK COUNTY, owner and operator of Cook
County Hospital, Defendant.
**No. 98 C 3722.**

Sept. 24, 1999.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.

**\*1** Before the Court is the Defendant Cook
County's motion to dismiss Plaintiffs' Third
Amended Complaint ("Complaint"). Cook County
is the owner and operator of Cook County Hospital
("Hospital"). The plaintiffs, Helen Utomi, Drunell
Davis, Pauline Owusu and Lynette Cook, were em-
ployed as nurses or operating room technicians at
the Hospital.

In Counts I and II of their Complaint, the plaintiffs
allege that while employed at the hospital they were
subjected to race discrimination in violation of Title
VII and § 1981. Count VII is a retaliation claim,
and in Count VI, the plaintiffs allege harassment in
the form of a racially hostile work environment.
The plaintiffs also allege common law claims
against the defendant for breach of contract (Count
III), intentional infliction of emotional distress
(Count VIII), and negligent hiring and retention of
a supervisor (Count IX). Two plaintiffs raise indi-
vidual claims: Utomi alleges that she was defamed
in connection with a false allegation that she broke
into a co-worker's locker (Count IV), and Davis al-
leges discrimination under the Americans with Dis-
abilities Act ("ADA") based on her alleged disabil-
ity, asthma and chronic low back pain (Count V).

Cook County has moved to dismiss all of these
counts under Federal Rule of Civil Procedure
12(b)(6). After the defendant's motion was filed,
the plaintiffs agreed to voluntarily dismiss their in-
tentional infliction of emotional distress claim
(Count VIII).[FN1] Additionally, plaintiff Utomi
agreed to voluntarily dismiss her individual defam-
ation claim (Count IV). We therefore dismiss
Counts IV and VIII and address Cook County's re-
maining grounds for dismissal below.

> FN1. The Court has no jurisdiction over
> the plaintiffs' intentional infliction claim. It
> is preempted by the Illinois Human Rights
> Act because it is based entirely upon the
> alleged discriminatory conduct. *See* Cplt.
> ¶¶ 150-54; *Maksimovic v. Tsogalis,* 177
> Ill.2d 511, 519, 687 N.E.2d 21, 24 (1997)
> (where intentional infliction claim is
> "inextricably linked" to the plaintiffs' Title
> VII claim, the court lacks jurisdiction over
> that claim). Plaintiffs have therefore
> agreed to dismiss this claim, yet they re-
> quest that the Court remand it to the Com-
> mission. Without proper jurisdiction,
> however, the Court cannot consider the
> plaintiffs' remand request. That request is
> therefore denied as moot. *See, e.g., Paige
> v. Cisneros,* 91 F.3d 40, 42 (7th Cir.1996)
> (district court lacked authority to remand
> case to agency because it lacked subject
> matter jurisdiction over claim).

*Discussion*

A motion to dismiss a complaint under Rule
12(b)(6) does not test whether the plaintiffs will ul-
timately prevail on the merits. Dismissal is proper
only if it is clear that the plaintiffs can prove no set
of facts consistent with the complaint that would
entitle them to relief. *See Conley v. Gibson,* 355
U.S. 41, 45-46 (1957). Indeed, under the liberal no-
tice pleading requirements of the federal rules,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
**(Cite as: 1999 WL 787480 (N.D.Ill.))**

"[a]ll that's required to state a claim in a complaint filed in federal court is a short statement, in plain (that is, ordinary, nonlegalistic) English, of the legal claim." *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7 th Cir.1999); *see also* Fed.R.Civ.P. 8(a)(2). In deciding Cook County's motion, we assume all facts alleged in the complaint as true, construe the allegations liberally, and draw all reasonable inferences in the plaintiff's favor. *Sneed v. Rybicki,* 146 F.3d 478, 480 (7 th Cir.1998).

### 1. Defendant's Motion to Strike

We first address Cook County's argument that the allegations contained in paragraphs 35 and 65 of the Third Amended Complaint are time-barred. The applicable Title VII limitations period is 300 days prior to the date the EEOC charge was filed. *See Speer v. Rand McNally & Co.,* 123 F.3d 658, 662 (7 th Cir.1997). The plaintiffs filed their EEOC charges on November 28, 1997. Thus, claims that occurred prior to February 1, 1997 fall outside the applicable 300-day limitations period.

**\*2** In paragraph 35 Utomi alleges that her supervisor at Cook County Hospital, Susan Caldwell, had harassed and discriminated plaintiff from 1991-1993 while she was employed at *another* hospital, not Cook County. Although we are not sure how paragraph 35 relates to Utomi's Title VII claim against Cook County, we agree with the defendant that the allegation in this paragraph occurred outside the limitations period and to the extent that Utomi is making a Title VII claim based on this allegation, it is time-barred. We therefore strike paragraph 35 from Utomi's Title VII claims in the Third Amended Complaint. We note, however, that, if relevant, evidence supporting this allegation may be admissible at trial. *See, e.g., Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1349 (7 th Cir.1995) (acts occurring outside 300-day limitations period may be admissible for background purposes).

Cook County next argues that the allegation in paragraph 65 is time-barred. In that paragraph Davis claims that when she returned to work on May 14, 1996- after having been on disability leave for two years-she was assigned to the more stressful Main Operating Room instead of her former assignment in the Children's Operating Room. We agree with the defendant that as stated in paragraph 65 this allegation appears to have occurred prior to February 1, 1997. However, although plaintiff provides no response, we believe that the May 14, 1996 date in paragraph 65 was a typographical error. In paragraph 64 Davis alleged that she was off work for two years-from 1995 to 1997. So how could she have "returned back to work" on May 14, 1996? Moreover, in a memorandum attached to the Third Amended Complaint as Exhibit N, Davis' supervisor noted that Davis returned to work on June 13, 1997. Drawing all inferences in the plaintiff's favor, we believe that Davis returned to work in either May or June of 1997, well within the limitations period. Defendant's motion to strike paragraph 65 is denied.

### 2. Counts I and II-Race discrimination under Title VII and § 1981

The elements and methods of proof for Title VII and § 1981 claims are essentially the same. *Von Zuckerstein v. Argonne National Laboratory,* 984 F.2d 1467, 1472 (7 th Cir.), *cert. denied,* 510 U.S. 959 (1993). For example, under both theories of liability, plaintiffs must allege (1) an adverse employment action and (2) that similarly situated non-African-American employees received more favorable treatment. *See Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1032 (7 th Cir.1998). Cook County claims that the plaintiffs failed to plead both elements.

The plaintiffs allege that they were given heavier task and job assignments, less flexible work schedules, more shift changes and less "charges and hours" than similarly situated African-American employees at the hospital. As a result, they suffered

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
**(Cite as: 1999 WL 787480 (N.D.Ill.))**

a loss in income unequal pay, and had to endure heavier work loads. (Cplt.¶¶ 23-27, 30). Plaintiffs also allege that they worked in constant fear. Unlike white employees, they were constantly demeaned, reprimanded and cursed at by their supervisor Susan Caldwell at, at Caldwell's behest, taunted by co-workers. (Cplt.¶¶ 28-29, 31-32). The plaintiffs say that they developed headaches, high blood pressure, loss of self esteem, hypertension and other psychological symptoms. (Cplt.¶¶ 31-33). In addition to these common allegations, the plaintiffs have individually alleged discriminatory acts. (Cplt.¶¶ 52-53, 66-67, 86, 93, 99-100, 120).

**\*3** Cook County argues that the plaintiffs do not allege a "true" adverse employment action. (Mot. at 8). We disagree. Plaintiffs' allegations are sufficient to state a claim for race discrimination. The Seventh Circuit has defined adverse employment action broadly: "a wide variety of actions, some blatant, some subtle, can qualify." *See Bryson v. Chicago State University,* 96 F.3d 912, 916 (7 th Cir.1996); *see also Smart v. Ball State University,* 89 F.3d 437, 441 (7 th Cir.1996). The Seventh Circuit has also noted that it is important to consider the background of each situation when analyzing whether an adverse action is material. *See Bryson,* 96 F.3d at 916. We cannot conclude on the pleadings that the alleged unequal pay, inflexible schedules, denial of overtime, heavier work assignments, and having to work in constant fear do not constitute adverse employment actions. A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *See Bennett v. Schmidt,* 153 F.3d 516, 519 (7 th Cir.1998) ("Litigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's proof leads to windy complaints and defeats the function of Rule 8.") Taking all reasonable inferences in favor of the plaintiffs as we are required to do, we deny Cook County's motion to dismiss Counts I and II.

3. Count VI-Harassment

Plaintiffs may establish a Title VII harassment claim by proving that race discrimination created a hostile or abusive work environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67 (1986). To be actionable, the harassment must be sufficiently severe or pervasive "to alter the terms or conditions of employment." *Id.* Courts look at the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it reasonably interferes with the employee's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993); *Rogers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 674 (7 th Cir.1993). An employer is liable to a victimized employee for an actionable hostile environment created by a supervisor with immediate or higher authority over that employee. *See Faragher v. City of Boca Raton,* 524 U.S. 775 (1998).

Cook County says that the plaintiffs' harassment allegations "lack the quantity, frequency, and severity of racial slurs" that would create a racially hostile work environment and that the plaintiffs fail to allege "overt racial slurs" specifically directed against them. (Reply at 6). We disagree. Plaintiffs allege that Caldwell, their supervisor, frequently hurled racial slurs at them and other African-Americans. She called the plaintiffs "bitches" and "puppies," called African-American males "germs," addressed these plaintiffs and other African-Americans as "mother-fuckers," and has said that she was "coming to get rid of all niggers." Plaintiffs allege that she did not use similar derogatory terms toward white employees. (Cplt.¶¶ 19-20, 28). Caldwell also allegedly told plaintiff Owusu three times that if Owusu did not have a uniform to wear, she would "be running around [the hospital] naked" (a comment allegedly not made to white males and alleged to have been a "racial slur"). (Cplt.¶¶ 19, 90). The plaintiffs say that the "quantity, frequency and severity" of these racial slurs "changed the conditions of [their] employment." (Cplt.¶¶ 15, 19, 20, 22).

**\*4** We therefore find that the plaintiffs have suffi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
(Cite as: 1999 WL 787480 (N.D.Ill.))

Page 4

ciently alleged a hostile work environment. *See, e.g., Rodgers,* 12 F.3d at 675 (finding that supervisor's racial epithets and statements, including use of the word "nigger," constituted racial harassment creating a hostile work environment). Cook County's motion to dismiss Count VI is therefore denied.

### 4. Count VII-Retaliation

Cook County next asks the Court to dismiss Count VII because plaintiffs have failed to state a retaliation claim against it. To state a retaliation claim under Title VII, plaintiffs must allege (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and adverse action. *Reenie v. Dalton,* 3 F.3d 1100, 1109 (7 th Cir.1993), *cert. denied,* 510 U.S. 1111 (1994).

After reviewing the allegations in the complaint, we find that the plaintiffs have alleged the elements necessary to state a claim for retaliation. The plaintiffs say that they filed a grievance with hospital management in June 1997, and that in August 1997, they complained to the nursing director about Caldwell's mistreatment and the hostile work environment. (Cplt.¶¶ 57, 60, 72-73, 94-95, 121-122). These complaints are protected expressions. *See, e.g., Alexander v. Gerhardt Enterprises, Inc.,* 40 F.3d 187, 195 (7 th Cir.1994) (sending memorandum to management is a protected expression, sufficient to state a retaliation claim).

Defendant argues that the plaintiffs have not adequately alleged a causal link between these protected expressions and any alleged adverse employment action. (Reply at 6-7). Drawing all reasonable inferences in favor of the plaintiffs, we believe that they have. An adverse employment action on the heels of or proximate in time to the protected expression can demonstrate a causal link. *Id.* at 196. Although inartfully plead, the plaintiffs here have sufficiently alleged that their formal complaints were followed by adverse employment actions. For

example, Owusu alleges that after she complained in August, she suffered further harassment. She was allegedly accused of professional negligence and then suspended despite overwhelming evidence that a white nurse was responsible. (Cplt.¶ 96). Davis alleges that after she complained about Caldwell's discriminatory conduct, her schedule was reduced to only four hours. (Cplt.¶ 70). Cook and Utomi's allegations support the inference that shortly after they had complained, Caldwell refused to restore their schedules from eight hour to twelve hour shifts. Although this schedule change originally applied to everyone and was announced in July before the plaintiffs had formally complained, after they complained Utomi and Cooks' shifts remained at or were changed back to eight hours while white employees had their twelve hour shifts restored. (Cplt.¶¶ 47-51, 102-111). We therefore find that each of the plaintiffs have sufficiently alleged a causal link. Cook County's motion to dismiss Count VII is denied.

### 5. Count III-Breach of Contract

**\*5** Plaintiffs breach of contract claim is predicated on the defendant's alleged breach of its collective bargaining agreements with the Illinois Nurses' Association and with the General Service Employees Union Local 73. (Cplt. ¶ 23; Exhs. J & K). Since a union is normally the exclusive bargaining agent for union members, union members lack standing to sue for breach of a collective bargaining agreement unless they also claim that the union breached its duty of fair representation. *Cleveland v. Porca Co.,* 38 F.3d 289, 297 (7 th Cir.1994); *Shores v. Peabody Coal Co.,* 831 F.2d 1382, 1383 (7 th Cir.1987). The plaintiffs have not alleged that the unions here violated their duty of fair representation. We therefore agree with Cook County, the plaintiffs have no standing to sue for breach of these collective bargaining agreements. Plaintiffs' breach of contract claim fails.

In response to Cook County's motion to dismiss, the plaintiffs request leave to amend Count III so that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
(Cite as: 1999 WL 787480 (N.D.Ill.))

they can allege that their unions breached the duty of fair representation. However, even if the plaintiffs' alleged a proper breach of contract claim, amending the Complaint would be futile. Pursuant to the Illinois Public Labor Relations Act, 5 ILCS 315/5(a), the Illinois State Labor Relations Board ("ISLRB") has exclusive jurisdiction over this breach of contract claim. *See Carver v. Nall,* 172 F.3d 513, 516 (7 th Cir.1999) ("the ISLRB has exclusive jurisdiction to hear unfair labor practice grievances of Illinois state employees."); *Gantz v. McHenry County Sheriff's Deptartment Merit Commission,* 296 Ill.App.3d 335, 694 N.E.2d 1078 (1998) (where plaintiff alleged breach of duty of fair representation claim against union, that claim was under jurisdiction of ISLRB rather than the circuit court). Since plaintiffs' breach of contract claim against Cook County cannot be addressed without interpreting the collective bargaining agreements (Cplt. ¶ 23; Exhs. J & K), their claim belongs before the ISLRB. *See Cessna v. City of Danville,* 296 Ill.App.3d 156, 165-66. 693 N.E.2d 1264, 1270 (1998) (ISLRB had exclusive jurisdiction over breach of contract claim against city). Plaintiff's motion for leave to amend is therefore denied. *See Foman v. Davis,* 371 U.S. 178 (1962) (court can deny leave to amend when amendment would be futile).

6. Count V-Plaintiff Davis' ADA claim

Plaintiff Drunell Davis alleges that the defendant discriminated against her in violation of the ADA because the hospital failed to accommodate her disability (asthma and chronic lower back pain) and instead assigned her "heavy" tasks. (Cplt.¶¶ 64, 67, 140-142). In order to state a failure to accommodate claim, Davis must allege (1) a disability under the ADA, (2) that defendant was aware of her disability, and (3) that with or without an accommodation she was otherwise qualified for her job. *See Dalton v. Subaru-Isuzu Automotive, Inc.,* 141 F.3d 667, 674 (7 th Cir.1998).

*6 The defendant argues only that Davis has failed

to allege the first element. We therefore limit our discussion to whether Davis has alleged a disability that qualifies under the ADA. A disability is "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(j); *see also, Dalton,* 141 F.3d at 675.

Davis seems to allege that her asthma and chronic lower back pain are physical impairments that substantially limit her ability to perform the specific "heavy" tasks assigned to her at Cook County Hospital. (Cplt.¶¶ 65, 67). The inability to perform a single, particular job or task, does not constitute a substantial limitation on the major life activity of working. *See* 29 C.F.R. § 1630.2(j)(3)(i); *Padilla v. County of Cook,* No. 98 C 1363, 1999 WL 284359, at *3-4 (N.D.Ill. Apr. 28, 1999) (Manning, J.). Still Davis is entitled to have the allegations in her Complaint construed in her favor. She alleged that she was off work for two years because of her asthma and chronic lower back pain. (Cplt.¶ 64). Thus, it is possible to construe the Complaint as alleging that Davis' physical impairment prevented her from working at the hospital, not just in the particular job or task assigned. *See, e.g., Padilla,* 1999 WL 284359, at *4 (plaintiff sufficiently alleged a disability because it was possible to read into the complaint that the plaintiff's depression prevented him from "working in a hospital setting generally.") Under the liberal pleading requirements of the Federal Rules, we find that Davis has sufficiently alleged a disability under the ADA. Cook County's motion to dismiss Count V is denied.

7. Count IX-Negligent Hiring and Retention

The plaintiffs allege that Cook County Hospital was negligent in hiring and retaining supervisors like Caldwell who "engaged in harassment and other types of discrimination." (Cplt.¶ 168). In essence, that the hospital should have known that their su-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)
**(Cite as: 1999 WL 787480 (N.D.Ill.))**

pervisors had a propensity to discriminate. This negligent hiring and retention claim must be dismissed because it is preempted by the Illinois Human Rights Act.

In *Geise v. Pheonix Co. of Chicago,* 159 Ill.2d 507, 639 N.E.2d 1273 (1994), the plaintiff alleged that the employer should have known that the supervisor in question had a propensity to discriminate. This negligent hiring and retention claim was held to be preempted by the Illinois Human Rights Act ("IHRA") because the plaintiff had no basis for imposing liability other than allegations of discrimination. *Id.* at 517-18, 639 N.E.2d at 1277-78. The same is true here. The plaintiffs cannot establish the elements of their negligent hiring and retention claim independent of the legal duties created by the IHRA. Because this claim is "inextricably linked" to plaintiffs' discrimination claims, it is preempted by the IHRA, and this Court lacks subject matter jurisdiction over it. *See Maksimovic v. Tsogalis,* 177 Ill.2d 511, 519, 687 N.E.2d 21, 24 (1997) (where intentional infliction of emotional distress claim is "inextricably linked" to the plaintiffs' Title VII claim, the court lacks jurisdiction over that claim as it is preempted by the Human Rights Act). Count IX is therefore dismissed. *See, e.g., Ruhrgas AG v. Marathon Oil Co.,*-U.S. -, 119 S.Ct. 1563, 1569 (1999) ("subject-matter delineations must be policed by the courts on their own initiative ...").

### Conclusion

**\*7** For the reasons stated above, defendant Cook County's motion to dismiss is granted in part and denied in part. Paragraph 35 is stricken, and Counts III, IV, VIII, and IX are dismissed. Cook County's motion is otherwise denied. Cook County is directed to answer plaintiffs' remaining claims within 20 days from the date of this Order.

This case is set for a status hearing on November 3, 1999 at 9:30 for the purpose of setting a final discovery cut off date.

N.D.Ill.,1999.
Utomi v. Cook County
Not Reported in F.Supp.2d, 1999 WL 787480 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
W.D. Wisconsin.
U.S. PLASTIC LUMBER, LTD. and the
Eaglebrook Group, Inc., Plaintiffs,
v.
STRANDEX CORPORATION, Defendant.
CINCINNATI INSURANCE COMPANY, Inter-
vening Plaintiff,
v.
STRANDEX CORPORATION, U.S. Plastic Lum-
ber, Ltd., and the Eaglebrook Group, Inc., Defend-
ants in Intervention.
**No. 02-C-211-C.**

Feb. 7, 2003.

Gordon Davenport, for Plaintiff.

Richard G. Niess, Coyne, Niess, Schultz, Becker &
Bauer, Madison, WI, for Defendants.


OPINION AND ORDER

CRABB, J.

**\*1** In this civil action for monetary relief, plaintiffs
U.S. Plastic Lumber, Ltd. and The Eaglebrook
Group, Inc. seek damages for the alleged breach of
their licensing agreement with defendant Strandex
Corporation. The dispute arises out of problems
that plaintiffs experienced with defendant's formula
and process for making a wood fiber and plastic
composite building material, which plaintiffs used
to manufacture outdoor decks. Jurisdiction is
present. 28 U.S.C. § 1332(a)(1).

The case is presently before the court on defend-
ant's motion for summary judgment. At issue are
defendant's alleged breach of the provision in the li-
cense agreement warranting the accuracy of certain

information set forth in exhibits to the agreement
regarding the composite material's properties, de-
fendant's alleged breach of its agreement to provide
its "Know-How" to plaintiffs and defendant's al-
leged breach of the duty of good faith and fair deal-
ing implicit in any contract. I conclude that
plaintiffs waived their right to rescind the license
agreement because they agreed instead to amend
the agreement to provide substantial financial bene-
fits to plaintiff Eaglebrook and in any case waited
too long to seek rescission. In addition, I conclude
that when the parties agreed to amend the license
agreement in December 1998, the amendment oper-
ated as an accord and satisfaction of plaintiffs'
claim that defendant breached the warranty in the
license agreement regarding the properties of the
composite material. Therefore, defendant will be
granted summary judgment on that claim. Because
it is unclear on the present record whether plaintiffs
knew when they agreed to the December 1998
amendment that they had a claim for breach of the
know-how disclosure provision, a jury will have to
decide whether the parties intended the amendment
to be an accord and satisfaction of that claim as
well. To the extent defendant seeks summary judg-
ment on the merits of plaintiffs' know-how claim,
its motion will be denied. However, defendant will
be granted summary judgment on plaintiffs' claim
for breach of an implied duty of good faith and fair
dealing because I find that it is duplicative of their
claim for breach of the know-how provision. Fi-
nally, I conclude that the license agreement's exclu-
sion of liability for consequential damages prevents
plaintiffs from seeking to recover their equipment
costs as damages for the alleged breach of the
know-how provision, but that they may seek to re-
cover the cost of certain raw materials, fees and
royalties they paid defendant.

For the purpose of deciding the pending motion, I
find from the parties' proposed findings of fact that
the following facts are material and undisputed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

### UNDISPUTED FACTS

Plaintiff U.S. Plastic Lumber, Ltd. is a Delaware corporation with its principal place of business in Florida. Plaintiff The Eaglebrook Group, Inc. is a Delaware corporation with its principal place of business in Illinois. (Plaintiffs have not proposed any other facts describing plaintiff U.S. Plastic Lumber or the relationship between that entity and plaintiff Eaglebrook. At times plaintiffs refer in their proposed facts to plaintiff Eaglebrook; at other times they refer to plaintiff U.S. Plastic Lumber. From plaintiffs' amended complaint it appears that plaintiff U.S. Plastic Lumber's parent corporation acquired plaintiff Eaglebrook sometime in late 1998 or early 1999. Nevertheless, plaintiffs refer to these entities interchangeably at times in their proposed facts even when the fact proposed predates the acquisition. I will refer uniformly to plaintiff Eaglebrook unless it appears that a fact postdates the acquisition and thus pertains specifically to both plaintiffs.) Defendant Strandex Corporation is a Wisconsin corporation with its principal place of business in Wisconsin. At all times relevant to this action, Terry Laver was defendant's president and Al England was defendant's executive vice president. George Stauffer was defendant's chief executive officer and primary investor. Michael Dahl was plaintiff Eaglebrook's president for an 11-year period ending in August 2000.

**\*2** In the early 1990s, Terry Laver invented the "Strandex process," a method for manufacturing products from a wood fiber and plastic composite. The Strandex process involves mixing wood fiber, plastic and various other ingredients and then forcing the mixture through low-temperature extrusion equipment, through a system of dies and through supplementary cooling equipment to produce various products. The Strandex process is used to make products that have wood-like properties that can replace wood and other materials. Defendant employs fewer than 10 employees. It does not manufacture products, but licenses others to use the Strandex technology to manufacture and sell products to the licensees' customers.

On April 22, 1996, defendant and plaintiff Eaglebrook executed a license agreement. Paragraph eight of the license agreement provides that as the licensor, defendant shall

a. Disclose and make available to the Licensee the Know-How regarding the Licensed Process and Licensed Products (which will include a reasonable amount of Technical Assistance and other support related to Licensee's start-up of its manufacturing of the Licensed Products) at no charge to the Licensee. Such disclosure shall enable the Licensee to produce the Licensed Product using the Licensed Process during the Term of this agreement....

c. Provide the Licensee on an 'as needed basis,' with Technical Assistance during the Term of this Agreement. The Licensee shall, however, (except as set forth in Section 8.a. above) pay the Licensor its standard rates when applicable with regard to providing Technical Assistance, and shall pay all of the Licensor's reasonable expenses associated therewith....

"Know-How" is defined in the license agreement as "any information, including, without limitation ... research records and reports, development reports, experimental and other engineering reports ... or any other information or other know-how relating to or concerning the Licensed Products or the Licensed Process."

Paragraph 20 of the license agreement sets forth a warranty and disclaimer of product warranties. Paragraph 20 provides that with limited exceptions,

Licensor makes no warranties or representation whatsoever regarding the Licensed Products produced using the Licensed Process, either express or implied, arising by law or otherwise, including but not limited to, implied warranties of merchantability or fitness for a particular purpose. In no event shall the Licensor have any obligation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

or liability to the Licensee with respect to the production or use of the Licensed Products arising from tort, or for loss of revenue or profit, or for incidental or consequential damages. Subject to the warranties set forth in the next sentence, the Licensee hereby acknowledges and agrees that it is familiar with the Licensed Process and the Licensed Products and has conducted sufficient due diligence with respect thereto prior to entering into this Agreement to satisfy itself as to the utility and usefulness of the Licensed Process and the Licensed Products.

**\*3** Licensor hereby represents and warrants to Licensee the accuracy of the information set forth in Exhibits A and B, and the test data attached as Exhibit E [to the license agreement], and acknowledges that the Licensee has relied upon the accuracy of such information and test data, but Licensee acknowledges that such information and test data is based upon tests conducted on Licensed Product produced in Licensor's test facility and that many factors, including without limitation: the type and quality of raw materials; the type of mixing, extrusion and cooling equipment being used; the experience and expertise of equipment operators; and the shape/dimension of the profile being extruded, can have a significant impact on the physical properties and performance properties of the Licensed Product.

Michael Dahl was the individual at plaintiff Eaglebrook primarily responsible for negotiating the license agreement.

Exhibit A to the license agreement is a description of the "performance properties for Strandex." The performance properties described in Exhibit A are those of the "general purpose compound" set forth in Exhibit B. Each of the performance properties described in Exhibit A is set forth with the test method used to derive it. Exhibit A to the license agreement states that (1) under test method ASTM D-1037, the water absorption of Strandex material will be 0.7% and its thickness swell will be 0.2%, and (2) under test method ASTM D-790, the modu-

lus of elasticity will be 504,600 pounds per square inch. The specific test results from which these figures are derived are contained in Exhibit E to the license agreement. "ASTM" refers to the American Society for Testing and Materials and the test methods listed in Exhibit A for water absorption, thickness swell and modulus of elasticity are protocols published by that organization. Under the ASTM D-1037 test, ponderosa pine, a wood commonly used to make decks, absorbs 17.2% moisture by weight and swells 2.6%. Defendant did not expect moisture absorption or swelling to be a problem with decks made from its material because the ASTM D-1037 test results for Strandex were so much lower than the results for ponderosa pine. Defendant chose the ASTM D-1037 test because it was the standard used to compare the performance of wood composite materials to the expected long-term performance of wood.

Exhibit A specifically notes that the performance property values contained therein represent test results generated by Professional Service Industries, Inc., an independent laboratory, on a general purpose Strandex compound. The independent laboratory tested both a control Strandex product and a Strandex product that had undergone an accelerated aging process for water absorption and thickness swell. At the time defendant and plaintiff Eaglebrook entered into the April 22, 1996 license agreement, defendant believed that the test results from the independent laboratory, attached as Exhibit E to the licence agreement, were completely accurate. It had no test results or information that indicated otherwise. Plaintiff Eaglebrook's president, Michael Dahl, was not aware of the test procedure under ASTM D-1037 and did not seek outside assistance to interpret the ASTM tests noted on Exhibit A and Exhibit E.

**\*4** In spring 1995, Dahl contacted Laver, defendant's president, to discuss plaintiff Eaglebrook's interest in becoming a licensee of defendant's Strandex process. In a visit to defendant that spring, Dahl saw the Strandex process being run. Some

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
(Cite as: 2003 WL 23144861 (W.D.Wis.))

Page 4

time before May 5, 1995, Laver gave Dahl a copy of the physical properties of the Strandex product. Between April 1995 and April 1996, when the parties executed the license agreement, defendant provided plaintiff Eaglebrook with samples of product made using the Strandex process.

After plaintiff Eaglebrook and defendant signed the license agreement, defendant provided assistance to Eaglebrook in setting up the necessary extrusion equipment, including mixing and cooling equipment. Laver spent significant time at plaintiff Eaglebrook's facility as it developed its infrastructure to produce Strandex products. Defendant and plaintiff Eaglebrook conferred on almost a daily basis between April 1996 and late 1997.

Crane Plastics Company was another of defendant's licensees. Crane was defendant's first licensee and plaintiff Eaglebrook was its second. By letter dated July 17, 1996, Tanny Crane of Crane Plastics informed defendant's chief executive officer, George Stauffer, of possible moisture absorption concerns with the Strandex material. Defendant's vice president, Al England, worked at Crane at least three days a week for the entire time Crane was involved with defendant. He advised Crane that the tongue-and-groove deck design it used might be a cause of the swelling because water stood on the deck for long periods of time, but subsequent changes to the deck design did not help. In the summer of 1997, plaintiff Eaglebrook noticed cross-sectional swelling of deck planks on test decks that Eaglebrook had constructed with planks made using Strandex material. At an October 1997 trade show, Tanny Crane told Dahl that Crane had also experienced water absorption problems with deck planks made from Strandex material. When Tanny Crane told Dahl that there might be long-term absorption and swelling problems with Strandex material, Dahl immediately called Al England, defendant's vice president, who assured him that "there is no truth to that."

The first test deck that Crane built with Strandex material failed. (The parties do not agree on when

the failure occurred). It absorbed moisture and swelled, pulling loose from its substructure. The failed first test deck consisted of 12-inch wide, hollow tongue-and-groove boards. At some point, Crane informed defendant of the test deck's failure. After the failure of the test deck, Crane began developing its own proprietary immersion test to determine how much moisture absorption and swelling the Strandex material might experience over time. Crane later informed defendant that it had developed such a test. Crane's proprietary immersion test is not a "boiling test," in which a plank is placed in boiling water and which both Crane and defendant regard as unreliable. In July 1996, Crane wrote to defendant that its immersion test showed that the Strandex material "absorb[ed] significantly (12-15 %) more moisture at elevated temperatures than both Trex [a similar product] and Southern Pine." In February 1997, Crane concluded that even solid boards made with Strandex experienced swelling of more than 1% and absorbed 25% moisture by weight. After a full year of research, Crane concluded in February 1997 that the Strandex process would not work for a tongue-and-groove deck plank unless defendant changed its formula. When defendant missed a meeting in February 1997 with Tim Miller, Crane's vice president and general counsel, Miller sent defendant an update on the moisture problems he had intended to discuss at the meeting, noting that "since this issue may impact your other licensees or prospective licensees, I thought it would be prudent to send you the information now rather than wait until we next meet." Crane informed defendant in June 1997 of its belief that the use "of Strandex in product applications involving significant exposure to moisture can be inappropriate unless the material is painted, capped, coated, or otherwise clad."

**\*5** Like Crane, plaintiff Eaglebrook used a tongue-and-groove design for its deck planks. Plaintiff Eaglebrook also used a deep brushing process on its planks to make them appear more "wood like" and to reduce slipperiness. Defendant discouraged plaintiff Eaglebrook from using the tongue-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

and-groove design and the deep brushing technique because the design allowed water to stand on the deck, potentially creating water absorption problems, but defendant never told Eaglebrook not to use a tongue-and-groove design. Defendant knew that plaintiff Eaglebrook planned to produce a hollow, tongue-and-groove deck board similar to Crane's.

Plaintiff Eaglebrook began commercial production of decking material made with the Strandex process in approximately March 1997. Plaintiff Eaglebrook bought the type and quality of raw materials defendant told it to, used the mixing, extrusion and cooling systems that defendant had selected and used experienced equipment operators. Eaglebrook's first design was not tongue-and-groove, but after a test deck broke when someone jumped on it, Eaglebrook decided that safety concerns required a tongue-and-groove design to spread the impact on the boards so that they would not break under normal wear. The license agreement provides plaintiff Eaglebrook the right to make tongue-and-groove, hollow boards using defendant's process. In 1997, plaintiff Eaglebrook built test decks and observed some dimensional swell of the deck boards. In the summer of 1997, after plaintiff Eaglebrook asked about the swelling it had observed, Laver informed Dahl that Strandex deck boards may swell cross-sectionally up to 1.4%, rather than the 0.2% figure included in Exhibit A to the license agreement. Laver had hinted earlier that deck boards made with Strandex material may swell beyond 0.2% with a tongue and groove design. After defendant told plaintiff Eaglebrook that it might see cross-sectional swelling up to 1.4%, Eaglebrook undertook a costly redesign of its decks and its marketing and distribution strategy. The redesigned deck included spacing between the boards to accommodate the expected cross-sectional swell of 1.4%. In order to insure proper spacing during installation, plaintiff Eaglebrook had to limit distribution of its decking material to authorized, experienced deck builders, rather than selling the material to retail stores like

Home Depot. This change required plaintiff Eaglebrook to shift its marketing focus from homeowners to contractors.

When plaintiff Eaglebrook found in the summer of 1997 that its deck boards were showing a little swelling, defendant said the problem was that the tongue-and-groove design did not allow adequate draining and that the brushed surface retained water longer. Eaglebrook cut notches in the tongues and spaced the boards to allow draining, but problems persisted. Eaglebrook learned in 1998 that the Strandex material was swelling more than 5% in cross-section and 1.8% in length. In February 1998, Eaglebrook found that materials it made with the Strandex process were absorbing more than 10% moisture over 96 hours and over 16% moisture over 144 hours and that the materials were swelling to the point at which buckling deck boards "literally pulled the framing out of place." In early 1998, plaintiff Eaglebrook informed defendant that it was experiencing some deck failures as a result of swelling. At the time plaintiff Eaglebrook was experiencing water absorption problems, defendant advised it about different raw material formulations that it could use, including using talc in the formulation and increasing the amount of plastic in its mixture. The formula changes that defendant suggested had no data to support them and were merely "seat of the pants" attempts to find a quick solution.

**\*6** In a March 23, 1998 letter, defendant assured plaintiff Eaglebrook that plaintiff "had in no way been misled regarding the physical properties in Strandex" and that defendant was not "aware of any swell problems anywhere in the past other than when Crane boiled their deck planks for an extended period of time." On March 24, 1998, officials from defendant and plaintiff Eaglebrook met in an effort to resolve their outstanding differences. Stauffer, defendant's chief executive, and Dahl, plaintiff Eaglebrook's president, negotiated an agreement that both signed on March 24, 1998. The agreement provided for the waiver of the balance of the license fee plaintiff Eaglebrook owed defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

in the amount of $320,000; a refund to Eaglebrook through credits in the amount of $180,000, representing the portion of the license fee it had already paid to defendant; and a reduction of Eaglebrook's royalty payments. On behalf of plaintiff Eaglebrook, Dahl agreed that in exchange for receiving reductions in the royalty rates and license fees, Eaglebrook would redouble its efforts to make the Strandex process work. The agreement became an amendment to the license agreement on December 3, 1998. Paragraph four of the amendment provides that the financial relief plaintiff Eaglebrook received did not in any way "modify the disclaimers set forth in Section 20 of the License Agreement or any other part of Section 20 of the license agreement."

In the fall of 1998, plaintiff Eaglebrook decided to stop making deck boards with the Strandex process and to use that process only for deck railings and columns. The railings and columns were made with the formula that defendant said had improved moisture resistance. Defendant claimed that the problem with the deck boards was inadequate draining, and railings did not have that problem. Plaintiff Eaglebrook discovered after 1998 that even materials made with the improved formula were failing as a result of moisture absorption and swelling. In 1998, plaintiff Eaglebrook had just two warranty claims from customers whose decks failed due to water absorption. The number of claims increased sharply after that, with 55 new claims in 1999, 31 claims in 2000 and 41 claims in 2001. To date, plaintiffs have received 167 warranty claims since 1999. Plaintiffs abandoned the Strandex process altogether in September 2000. In the fall of 2000, plaintiffs wrote off their inventory of products made with the Strandex process and began trying to sell their equipment. In November 2001, plaintiffs wrote defendant that they would seek legal redress for the losses they suffered from defendant's alleged breach of warranty.

Plaintiffs paid defendant $266,923 in licensing fees and royalties for a process that ultimately had no

value to plaintiffs. Plaintiffs paid $2,721,401.98 (net of salvage value) for the equipment that defendant said was necessary to produce its material and for the leftover raw material that they had no use for after they stopped using the Strandex process.

OPINION

A. *Rescission of the License Agreement*

**\*7** The initial question on rescission is whether plaintiffs waited too long to exercise a right of rescission. In Wisconsin, "the right to rescind must be exercised within a reasonable time, or with 'reasonable promptness,' after discovery of the facts from which it arises." *McKearn v. Lerman Tire Service, Ltd.,* 32 Wis.2d 329, 337, 145 N.W.2d 731, 736 (1966) (quoting 17 *Am.Jur.2d* Contracts § 510); *see also Thompson v. Village of Hales Corners,* 115 Wis.2d 289, 319, 340 N.W.2d 704, 718 (Wis.1983); Michael B. Apfeld et al., *Contract Law in Wisconsin* § 14.23 (2d ed. 2002) ("A party seeking to rescind a contract must do so within a reasonable time or risk being found to have waived any right to rescind."). Waiver may also occur if the party seeking to rescind the contract "affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission." *Thompson,* 115 Wis.2d at 319, 340 N.W.2d at 718. If "the facts of a case are 'practically undisputed,' the question of waiver is one of law." *Grube v. Daun,* 213 Wis.2d 533, 551, 570 N.W.2d 851, 859 (1997).

It is undisputed that as early as the summer of 1997, after plaintiff Eaglebrook asked about the swelling it had observed in decks made with the Strandex material, defendant's president, Terry Laver, informed plaintiff Eaglebrook that deck boards made from Strandex might swell cross-sectionally up to 1.4%, rather than the 0.2% figure cited in Exhibit A to the license agreement. As a result, in December 1998, defendant and plaintiff Eaglebrook agreed to amend the license agreement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

to give certain financial benefits to plaintiff Eaglebrook. In short, when plaintiff Eaglebrook learned that the quality of the deck boards produced with the Strandex material did not meet what it understood to be the requirements of the license agreement, it opted to obtain concessions from defendant by negotiating an amendment to the license agreement instead of rescinding the agreement entirely. By "affirm[ing] the agreement after learning of the fraud or mistake giving rise to the right of rescision," plaintiffs waived that right. *Thompson,* 115 Wis.2d at 319, 340 N.W.2d at 718; *Grube,* 213 Wis.2d at 551-52, 570 N.W.2d at 859-60. "A party is bound by its election when the party is aware or should have been aware of the facts necessary to make a knowing election between executing and rescinding a contract." Apfeld et al., *Contract Law in Wisconsin* § 14.23 (2d ed.2002).

Plaintiffs argue that they also have an independent right to rescind the license agreement because of defendant's alleged intentional withholding of critical information, or "Know-How," pertaining to the suitability of the Strandex process for decking applications. As an initial matter, plaintiffs admit in their briefs that they knew before they agreed to the amendment to the license agreement that defendant "had lied about not knowing about" swelling problems in Strandex deck boards. Plts.' Br. in Opp'n to Dft.'s Mot. for Summ. J., dkt. # 48, at 23. They argue, however, that they did not know the depth and extent of defendant's alleged concealment and misrepresentation of facts. Even if I accept this argument, I would still conclude that plaintiffs waited too long to seek rescission on this basis. It is undisputed that plaintiffs abandoned the Strandex process altogether in September 2000. Nevertheless, plaintiffs waited more than a year, until November 2001, to notify defendant that they would seek legal redress for an alleged breach of warranty and they did not file this suit until April 2002. In *Thompson,* 115 Wis.2d 289, 340 N.W.2d 704, the Wisconsin Supreme Court considered the plaintiff's effort to rescind a lease for retail space that he used to operate a sandwich shop and video game arcade. A local

ordinance prohibited minors from playing coin-operated video games unless they were accompanied by an adult. The plaintiff alleged that when he entered the lease in January 1978, the defendant lessor had represented that there were no legal impediments to the operation of the arcade. The plaintiff did not learn of the ordinance until March 1978. Nevertheless, he reaffirmed the lease in July 1978 and then sought rescission of the lease in November 1978. The court held that the plaintiff had waived his right to rescind by failing to assert it for a full six months after he learned of the ordinance's existence and by subsequently affirming the lease. *Id.* at 318-319, 340 N.W.2d at 718. By comparison, plaintiffs failed to file suit for nearly 18 months after they finally abandoned the Strandex process, a delay three times longer than the six-month delay found unreasonable for rescission purposes in *Thompson.* "A party's right to rescind for fraud or mistake is waived if he unreasonably delays in asserting that right *or* affirms the agreement after learning of the fraud or mistake giving rise to the right of recision." *Id.* at 319, 340 N.W.2d at 718 (emphasis added); *see also Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 440 (7th Cir.1987) ("A prompt demand for rescission is important in allocating risk among parties. If the investor can wait before selecting the relief he wants, he can shift all of the ordinary investment risk to the defendant."). In this case, the 18-month delay by itself is enough to deny plaintiffs the remedy of rescission. Accordingly, I conclude that plaintiffs have waived their right to rescind the contract. Whether they have viable claims for breach of the contract is another question.

## B. *Accord and Satisfaction*

**\*8** Defendant argues that it is entitled to summary judgment because the December 3, 1998 amendment to the license agreement operated as an accord and satisfaction of plaintiffs' claims. In the amendment, the parties noted that plaintiff Eaglebrook had "experienced various problems with some of the Licensed Product it has manufactured" and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

granted Eaglebrook significant reductions in the royalty rates and license fees that it had agreed to pay defendant pursuant to the original agreement. "An 'accord and satisfaction' is an agreement to discharge an existing disputed claim; it constitutes a defense to an action to enforce the claim." *Flambeau Products Corp. v. Honeywell Information Systems, Inc.,* 116 Wis.2d 95, 112, 341 N.W.2d 655, 664 (1984). Accord and satisfaction "is a longstanding doctrine resting not only on principles of contract law but on principles of sound public policy, that is, interests of resolving disputes informally without litigation and of fairness." *Id.* at 110-11, 341 N.W.2d at 663. Plaintiffs argue that the amendment was not intended to discharge the particular claims at issue in this case, making the doctrine of accord and satisfaction inapplicable. *See Rusch v. Sentinel-News Co.,* 212 Wis. 530, 536, 250 N.W. 405, 407 (1933) (accord and satisfaction requires "a meeting of the minds of the parties"). "Whether, on a set of undisputed facts, the doctrine of 'accord and satisfaction' provides the basis for summary judgment[ ] presents an issue of law." *Zubek v. Edlund,* 228 Wis.2d 783, 788, 598 N.W.2d 273, 276 (Ct.App.1999). Therefore, I must determine whether the undisputed facts show that the parties intended the amendment to the license agreement to discharge the claims at issue in this case.

From the undisputed facts, I conclude that the amendment to the license agreement was intended to discharge any claim that defendant had breached the warranty established in paragraph 20 of the license agreement regarding the accuracy of the information set forth in Exhibits A, B and E to the agreement. Exhibit A to the license agreement is a description of the performance properties for Strandex; the performance properties described in Exhibit A are those of the "general purpose compound" set forth in Exhibit B; Exhibit A states that the water absorption of Strandex material will be 0.7%, and its thickness swell will be 0.2%; and the specific test results from which these figures are derived are contained in Exhibit E to the license agreement.

By the time the parties agreed to the amendment to the license agreement in December 1998, it is undisputed that all of the following had transpired: (1) plaintiff Eaglebrook knew that test decks it had built in 1997 showed some dimensional swell of the deck boards; (2) defendant had informed plaintiff Eaglebrook in 1997 that deck boards made with Strandex material could swell cross-sectionally up to 1.4%, rather than the lower 0.2% figure included in Exhibit A to the license agreement; (3) plaintiff Eaglebrook learned in early 1998 that the Strandex material was swelling more than 5% in cross-section and 1.8% in length; (4) in February 1998, plaintiff Eaglebrook found that materials it made with the Strandex process were absorbing more than 10% moisture over 96 hours and more than 16% moisture over 144 hours; and (5) plaintiff Eaglebrook observed Strandex decking materials swelling so much that buckling deck boards "literally pulled the framing out of place."

**\*9** In light of these undisputed facts, it is simply not credible for plaintiffs to argue that the amendment was not intended to compensate plaintiff Eaglebrook for defendant's failure to provide reliable information on the Strandex material's properties in the original license agreement. By the time the parties agreed to the amendment, they were well aware that the information detailing these properties in the original license agreement was at best misleading and at worst flatly inaccurate. In the amendment, defendant acknowledged the "various problems" with "the Licensed Product [that plaintiff Eaglebrook] has manufactured" and agreed to provide Eaglebrook with significant financial concessions by way of compensation. If plaintiffs could recover on a breach of contract claim stemming from the misleading information in the license agreement's exhibits even after extracting these concessions, they would be having their cake and eating it too. The only reasonable conclusion is that one purpose of the amendment was to discharge any claim stemming from the unreliable information in the original agreement. Accordingly, defendant will be granted summary judgment as to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

this claim.

That leaves plaintiffs' claim that defendant breached the express provisions of paragraph eight of the license agreement, involving disclosure of the "Know-How" relating to the Strandex process, by withholding from plaintiffs critical information pertaining to the suitability of the Strandex process for decking applications. The question is whether the amendment to the license agreement was intended to operate as an accord and satisfaction of this claim too. For the following reasons, I conclude that factual disputes do not allow this issue to be resolved on summary judgment.

Paragraph eight of the license agreement provides that defendant will "[d]isclose and make available to the Licensee the Know-How regarding the Licensed Process and Licensed Products." "Know-How" is defined in the license agreement as "any information, including, without limitation ... research records and reports, development reports, experimental and other engineering reports ... or any other information or other know-how relating to or concerning the Licensed Products or the Licensed Process." The undisputed facts show that in February 1997, another of defendant's licensees, Crane Plastics, concluded from its immersion test that the Strandex process would not work for a tongue-and-groove deck plank unless defendant changed its formula. Crane's general counsel told defendant of its conclusion (the parties dispute whether Crane disclosed only its conclusion or the actual test results as well), noting that "since this issue may impact your other licensees or prospective licensees, I thought it would be prudent to send you the information now rather than wait until we next meet."

Although defendant is seeking summary judgment on the ground that it disclosed all relevant information to plaintiffs, it has failed to demonstrate that it actually did so. This omission may be particularly relevant given that in March 1997, plaintiff Eaglebrook began manufacturing decking using the Strandex process and shortly thereafter began using

a similar tongue-and-groove design for its deck boards. Moreover, in June 1997, it is undisputed that Crane informed defendant of its belief that the use "of Strandex in product applications involving significant exposure to moisture can be inappropriate unless the material is painted, capped, coated, or otherwise clad." Again, there is no evidence that defendant told plaintiff Eaglebrook about Crane's belief. In October 1997, Crane's president told plaintiff Eaglebrook's president that Crane was experiencing water absorption problems with Strandex deck planks, but when plaintiff Eaglebrook asked defendant's vice president, Al England, about this, England assured Eaglebrook that "there is no truth to that." Finally, in a March 23, 1998 letter, defendant assured plaintiff Eaglebrook that it was not "aware of any swell problems anywhere in the past other than when Crane boiled their deck planks for an extended period of time," even though defendant knew that the information Crane had reported to it was a result of an immersion test, rather than the discredited boiling test.

**\*10** All of these facts suggest that plaintiffs are correct in contending that the parties did not intend the December 3, 1998 amendment to the license agreement to be an accord and satisfaction of claims stemming from defendant's failure to fulfill its obligations under the know-how provision. At the time plaintiff Eaglebrook agreed to the amendment, it was unaware of the information that defendant allegedly withheld. A party cannot reach an accord resolving claims of which it is unaware. However, there is one hitch: plaintiffs admit in their proposed findings of fact that on December 2, 1998, the day before the amendment to the license agreement was formalized, plaintiff Eaglebrook learned from Crane that "Crane had significant swelling problems that it had shared with Strandex" and that "Crane had developed swelling data that it shared with Strandex." Plts.' Proposed Findings of Fact, dkt. # 45, at ¶ 97. Thus, plaintiffs admit that "Eaglebrook did learn on December 2, 1998 that Strandex had lied about not knowing about other swelling problems." Plts.' Br. in Opp'n to Dft.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

Mot. for Summ. J., dkt. # 48, at 23. Therefore, a reasonable jury might conclude that plaintiffs were aware that defendant had violated its obligation to provide know-how and that the parties intended to address the claim in the amendment to the license agreement that was signed the next day. Plaintiffs counter this argument by maintaining that when Eaglebrook signed the amendment it was unaware of the *full extent* of defendant's alleged failure to provide know-how. Plaintiffs argue, for instance, that plaintiff Eaglebrook was unaware that Crane had informed defendant specifically that a tongue-and-groove design would not work unless defendant altered the original Strandex formula. As it now stands the record does not permit a determination of precisely what information plaintiff Eaglebrook and defendant each possessed when they signed the amendment on December 3, 1998. Neither party has made it clear what discussions they had and what information was disclosed regarding know-how before they signed the amendment. Accordingly, it will be necessary for a jury to decide whether the amendment to the license agreement constitutes an accord and satisfaction of plaintiffs' claims that defendant breached the agreement's know-how provision by withholding important information. *See Johann v. Milwaukee Electric Tool Corp.*, 264 Wis. 447, 454, 59 N.W.2d 637, 640 (1953) (question whether agreement amounted to accord and satisfaction is for jury where facts point in both directions).

### C. *Express Duty to Disclose Information*

Defendant argues that even if the amendment to the license agreement was not an effective accord and satisfaction, it is entitled to summary judgment on plaintiffs' claim that it breached its express promise to disclose know-how regarding the licensed process and products. As an initial matter, I note that plaintiffs' amended complaint does not contain a claim specifically alleging a breach of the know-how provision. Rather, in their amended complaint, plaintiffs refer to defendant's alleged failure to disclose information as a breach of an implied duty of good faith. However, plaintiffs' reliance on a new legal theory is unproblematic because they raised the issue of a breach of the express know-how provision clearly in their summary judgment brief. *See* Plts.' Br. in Opp'n to Dft.'s Mot. for Summ. J., dkt. # 48, at 8, 13-14 (plaintiffs "claim is that Strandex breached the *express* provisions of the contract, including the duty to disclose information about its process and products.") (emphasis in original); *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997) (noting that "a plaintiff may substitute one legal theory for another without altering the complaint" and "may supplement the complaint with factual narration in an affidavit or brief"). Defendant responded to plaintiff's new theory by arguing that the know-how provision's disclosure obligations were limited in scope and that in any case it had disclosed all relevant information to plaintiff Eaglebrook. *See* Dft.'s Reply Br. in Supp. of Summ. J. Mot., dkt. # 55, at 41-45.

**\*11** I will deny defendant's summary judgment motion on plaintiffs' claim for breach of the know-how provision. Summary judgment is inappropriate on the current record. As discussed earlier, paragraph eight of the license agreement provides that defendant will disclose know-how to plaintiffs, defined as "any information, including, without limitation ... research records and reports, development reports, experimental and other engineering reports ... or any other information or other know-how relating to or concerning the Licensed Products or the Licensed Process." Too many facts are disputed regarding precisely what information defendant received about the licensed process from its other licensees, when it received the information and to what extent it disclosed it to plaintiffs. Moreover, there exist undisputed facts that could lead a reasonable jury to conclude that defendant breached the know-how disclosure provision. For instance, for purposes of defendant's summary judgment motion, it is undisputed that in a March 23, 1998 letter, defendant assured plaintiff Eaglebrook that it was not "aware of any swell problems anywhere in the past other than when Crane boiled their deck planks for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

an extended period of time," even though defendant knew that the information Crane had reported resulted from an immersion test, rather than an unreliable boiling test. In addition, I find unpersuasive defendant's half-hearted argument that paragraph eight of the license agreement "seems to mean" that the parties limited the know-how disclosure provision's obligations to some undefined "start-up" period. Accordingly, trial will go forward on plaintiffs' claim that defendant breached the "Know-How" disclosure provision of the license agreement.

### D. *Implied Duty of Good Faith*

Plaintiffs maintain that in failing to disclose know-how regarding the licensed process and products, defendant breached an implied duty of good faith and fair dealing. Wisconsin common law reads a duty of good faith into every contract. *See Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 592 (7th Cir.1991). In other words, "a contract obligates the parties to cooperate in its performance in 'good faith' to the extent necessary to carry out the purpose of the contract." *Id.* at 596; *see also Wisconsin Natural Gas Co. v. Gabe's Construction Co., Inc.,* 220 Wis.2d 14, 21, 582 N.W.2d 118, 121 (Ct.App.1998) (a contract's express terms "must be performed subject to [the] implied covenant").

Plaintiffs' good faith claim is little more than a repackaging of their claim that defendant breached the know-how provision of the license agreement by failing to disclose information concerning the licensed process. Good faith " 'is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." ' *Market Street,* 941 F.2d at 595 (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990)). It applies most urgently to unforeseen circumstances that arise during the performance of a contract,

when "the explicit terms of the contract become progressively less apt to the governance of the parties' relationship." *Id.* at 595-96. Here, by contrast, the parties negotiated an explicit provision governing the disclosure of know-how. Plaintiffs maintain that defendant breached that provision. Defendant argues that it complied with it. Which party has the better of the argument remains to be determined, but there is no contractual gap to fill through application of the good faith doctrine. *See Kham & Nate's Shoes,* 908 F.2d at 1357. Any breach of contract might conceivably be viewed as a violation of the obligation to act in good faith, but that would rob the implied duty of good faith of any distinctive function and give "every plaintiff ... an incentive to include bad faith allegations in every contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 92 (3rd Cir.2000). As the Court of Appeals for the Seventh Circuit has explained, " '[i]nequitable conduct' in commercial life means breach *plus* some advantage-taking, such as the star who agrees to act in a motion picture and then, after $20 million has been spent, sulks in his dressing room until the contract has been renegotiated." *Kham & Nate's Shoes,* 908 F.2d at 1357. An obvious parallel would arise if plaintiffs were alleging that defendant withheld critical information concerning the suitability of the Strandex material for decking applications in an effort to force plaintiffs to agree to make higher royalty payments. But that is not the case. The dispute is whether defendant complied with the explicit know-how provision that the parties inserted into the license agreement. Accordingly, I will grant defendant's motion for summary judgment as to plaintiffs' good faith claim.

### E. *Damages Limitation*

**\*12** Defendant argues that regardless whether it breached the license agreement's know-how provision, it is entitled to summary judgment because all of the damages that plaintiffs seek to recover are excluded expressly by the terms of the agreement. Paragraph 20 of the license agreement provides that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
(Cite as: 2003 WL 23144861 (W.D.Wis.))

Page 12

defendant is not liable "to the Licensee with respect to the production or use of the Licensed Products arising from tort, or for loss of revenue or profit, or for incidental or consequential damages." The issue is whether plaintiffs' losses are appropriately characterized as "direct" damages rather than consequential ones and thus not excluded by the contract.

Two preliminary points. First, Wisconsin common law recognizes a distinction between direct and consequential damages. *See, e.g., Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 53, 288 N.W.2d 95, 112-113 (1980) (noting that in intentional misrepresentation case plaintiff may recover for indirect or consequential damages caused by misrepresentation in addition to or in lieu of direct damages); *Trio's Inc. v. Jones Sign Co., Inc.,* 151 Wis.2d 380, 381-82, 444 N.W.2d 443, 444 (Ct.App.1989) (noting that appeal covered only consequential damages rather than direct damages awarded by jury). Second, a disclaimer of consequential damages in a contract does not operate as a disclaimer of liability for direct damages as well. *See Turk v. H.C. Prange Co.,* 18 Wis.2d 547, 565, 119 N.W.2d 365, 376 (1963) (contractual exclusion of liability for consequential damages does not also serve to exclude liability for direct damages).

Assuming for the moment that the license agreement was breached, the question is whether the licensing fees and royalties plaintiffs paid and the money they spent on the equipment and raw materials are appropriately categorized as direct or consequential damages under Wisconsin law. In *Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.,* 286 F.3d 1001, 1004 (7th Cir.2002), the Court of Appeals for the Seventh Circuit noted that "[c]ontract law distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach." Direct damages are "utterly foreseeable" and an ordinary result of a breach, while consequential damages are less foreseeable. *Id.* Consequential dam-

ages arise from "special circumstances" and are typically unrecoverable unless the defendant was notified of their existence. *Evra Corp. v. Swiss Bank Corp.,* 673 F.2d 951, 955-56 (7th Cir.1982). *Rexnord* and *Swiss Bank* are cases applying Indiana and Illinois law, respectively, but the situation is no different in Wisconsin. "In the event that there are special circumstances surrounding the contract, and damages result in consequence of those special circumstances, such consequential damages are recoverable if, and only if, those special circumstances were communicated to or known by both parties to the contract at the time they entered into the contract." Apfeld et al., *Contract Law in Wisconsin* § 13.28. That is the rule of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854), which defendant labels "old and trite," but which nonetheless is adhered to by Wisconsin courts. *See, e.g., State Farm Mutual Automobile Insurance Co. v. Ford Motor Company.* 225 Wis.2d 305, 327, 592 N.W.2d 201, 210 (1999) (citing *Hadley* for proposition that "consequential damages such as lost profits[ ] must be a foreseeable result of a breach of the contract").

*13 Plaintiffs rely primarily on *Rexnord,* 286 F.3d 1001, a case that suggests that plaintiffs cannot recoup their entire investment in equipment and raw materials. *Rexnord* involved the breach of a contract between a manufacturer and a consulting firm. In the contract, the consulting firm promised the manufacturer that it would design and install effective management systems, train supervisors and determine optimal staffing requirements. The consulting firm estimated that its work would result in an annual savings to the manufacturer of four million dollars, but if these savings failed to materialize, the consulting firm agreed to refund a portion of its fees. The four million in savings never materialized because of the consulting firm's "breaches ... of specific promises in the" contract. *Rexnord,* 286 F.3d at 1003. Nevertheless, the firm refused to refund any part of its fee. *Id.* The court of appeals concluded that the consulting firm's refusal to refund any part of its fee was an example of direct damages, because it meant that the manufacturer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

had paid more for the consulting firm's services than it had agreed to in the contract. By contrast, the damages stemming from the firm's breach of the various promises in the contract (e.g., the consulting firm's failure to determine optimal staffing requirements) were consequential, because they were more difficult to foresee and "depended to a large extent on matters internal to the" manufacturer. *Id.* at 1004.

Similarly, plaintiffs cannot recoup their entire investment in equipment and raw materials because these damages do not flow directly from defendant's alleged breach of the license agreement's know-how provision and were thus not an entirely foreseeable result of that breach. Know-how is defined broadly in the license agreement as any information relating to the licensed process. No reasonable jury could conclude that at the time the parties entered into the license agreement they understood that if defendant failed at any time to disclose *any information* regarding the licensed process, defendant would be on the hook for the entire cost of plaintiffs' equipment and raw materials. *See* E. Allan Farnsworth, *Farnsworth on Contracts* § 12.14 at 257 (2d ed. 1998) ("The question is not what was foreseeable at the time of the breach, but what was foreseeable at the time of contracting."). Indeed, the equipment necessary to produce the Strandex material was not sold under the terms of the license agreement. Rather, the license agreement simply notes that it is up to plaintiff Eaglebrook to select the necessary equipment, albeit with defendant's assistance. For this reason, the full cost of the equipment and materials was not an "utterly foreseeable" result of the breach of the know-how provision and therefore cannot accurately be characterized as direct damages.

In addition, "the party seeking to establish damages has the burden to demonstrate that the damages were caused by the breach." Apfeld et al., *Contract Law in Wisconsin* § 13.27. There is no indication that plaintiff purchased any equipment *after* defendant allegedly breached the know-how provi-

sion. Accordingly, even if defendant had complied with the know-how provision, plaintiffs would still be stuck with the equipment that plaintiff Eaglebrook purchased to manufacture the licensed product. In this sense the know-how provision differs materially from the warranty established in paragraph 20 of the license agreement dealing with the Strandex material's physical properties. If, as plaintiffs allege, the Strandex process was incapable from the beginning of producing usable material of a quality consistent with the license agreement's warranty, plaintiffs would have a good argument that the money they spent on equipment and materials in reliance on the warranty is recoverable. However, as noted above, plaintiff Eaglebrook bargained away such a warranty claim when it agreed to amend the license agreement. By contrast, the know-how provision represents an ongoing obligation on the part of defendant to disclose a broad range of information. It was not breached until some time after plaintiff Eaglebrook purchased its equipment. According to plaintiffs' theory, any breach of this obligation, no matter when it occurred, entitles them to retroactively recover all of their initial investment in equipment. This theory ignores the requirement that plaintiffs are entitled to only those damages "necessarily flowing from the breach." *Denhart v. Waukesha Brewing Co.,* 21 Wis.2d 583, 595, 124 N.W.2d 664, 670 (1963). Plaintiffs cannot recover their manufacturing equipment costs because they did not purchase equipment as a result of defendant's alleged failure to disclose know-how.

**\*14** However, plaintiffs may be able to recover a limited amount of damages representing the cost of raw materials they purchased *after* the know-how provision was breached, if any. If a jury finds that defendant breached the know-how provision by failing to disclose information indicating that the Strandex material was not suitable for building decks, it could reasonably conclude that any money plaintiffs spent on raw materials following the breach is a foreseeable item of direct damage, because proper disclosure might have led plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)
**(Cite as: 2003 WL 23144861 (W.D.Wis.))**

Eaglebrook to halt production of the Strandex material.

Plaintiffs also seeks to recover the licensing fees and royalties they paid defendant. Unlike the equipment and raw materials, which were not sold under the license agreement, the licensing fees and royalty rate are described in detail in the agreement. Plaintiffs paid the fees and royalties partly in consideration for defendant's commitment to disclose know-how. Defendant's alleged failure to uphold its end of the bargain means plaintiffs paid for something that they did not receive. When, as a result of a seller's breach, a buyer pays more for a service than it agreed to in the contract, the overpayment is an item of direct damages. *Rexnord,* 286 F.3d at 1004. Accordingly, this item of damages is not excluded by the contract. In summary, plaintiffs are not precluded by the terms of the license agreement from seeking damages to compensate them for the raw materials they purchased following the alleged breach of the know-how provision and for the sums they paid to defendant in the form of royalties and licensing fees. This is not to say that plaintiffs are entitled to these damages. That is for a jury to decide.

### ORDER

IT IS ORDERED that

1. Defendant Strandex Corporation's motion for summary judgment on plaintiffs U.S. Plastic Lumber, Ltd.'s and The Eaglebrook Group, Inc.'s claim that defendant breached the warranty established in paragraph 20 of the license agreement regarding the accuracy of the information set forth in Exhibits A, B and E to the license agreement is GRANTED;

2. Defendant's motion for summary judgment on plaintiffs' claim for breach of the "Know-How" disclosure provision of the license agreement is DENIED; and

3. Defendant's motion for summary judgment on plaintiffs' claim that defendant breached an implied

duty of good faith and fair dealing is GRANTED.

W.D.Wis.,2003.
U.S. Plastic Lumber, Ltd. v. Strandex Corp.
Not Reported in F.Supp.2d, 2003 WL 23144861 (W.D.Wis.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Steveon HEGWOOD, Plaintiff,
v.
CANADIAN PACIFIC RAILWAY, Defendant.
**No. 07 C 5840.**

April 3, 2009.

West KeySummary
**Federal Civil Procedure 170A ⚖══2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
Genuine issue of material fact existed as to the truth of an employer's decision to discharge an employee for threatening a supervisor. Summary judgment was not appropriate in a Title VII discrimination case brought by a former employee who claimed he was terminated due to his race. A jury could reasonably have concluded that the service area manager, who terminated the employee, did not honestly believe the claims against the employee. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

Arthur R. Ehrlich, Jonathan C. Goldman, Goldman & Ehrlich, Chicago, IL, for Plaintiff.

David K. Schmitt, Laura A. Balson, Golan & Christie LLP, Chicago, IL, Thomas J. Conley, Minneapolis, MN, for Defendant.

***MEMORANDUM OPINION AND ORDER***

NAN R. NOLAN, United States Magistrate Judge.

**\*1** Plaintiff Steveon Hegwood has filed suit charging his former employer, Canadian Pacific Railway ("CPR"), with race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and CPR now seeks summary judgment on all of Mr. Hegwood's claims. For the reasons explained here, the motion is denied.

**BACKGROUND**

CPR is a railroad company operating in the United States and Canada. Mr. Hegwood (African-American) worked at CPR's Bensenville, Illinois rail yard from 1978 until he was discharged on March 24, 2006. (Def. Facts ¶¶ 3-5.) [FN1] At the time of his discharge, Mr. Hegwood held the position of Freight Carman/Welder/Truck Driver, and he also had been working as a member of the derailment crew since 1998. (*Id.* ¶ 6.)

    FN1. Defendant's Statement of Material Facts is cited as "Def. Facts ¶ ___."

**A. The Collective Bargaining Agreement**

CPR is a unionized employer with collective bargaining agreements governing the terms and conditions of employment for non-management employees. At all relevant times, Mr. Hegwood was a member of the Brotherhood of Railway Carmen Division of the Transportation Communications International Union ("TCIU"), and was subject to the collective bargaining agreement between TCIU and CPR (the "TCIU Agreement"). (*Id.* ¶¶ 7, 8.) The TCIU Agreement governs, among other things, assignments, seniority and discipline, and it contains an exclusive grievance and arbitration procedure guaranteeing employees a full investigative hearing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

for any formal disciplinary action taken by CPR. ( *Id.* ¶¶ 9, 10.) The grievance investigations allow employees to (1) testify on their own behalf; (2) have union representation; (3) call and cross-examine witnesses; (4) provide documentary evidence; and (5) appeal any disciplinary decision rendered to final resolution before a three-person arbitration panel with a Neutral Chair selected through the National Mediation Board. (*Id.* ¶ 10.)

**B. CPR's Workplace Policies**

In addition to the TCIU Agreement, CPR has written policies governing issues such as Equal Employment Opportunity/ Anti-Discrimination/Affirmative Action; Workplace Harassment; and Violence in the Workplace. CPR distributes these policies, which outline procedures for reporting discrimination and harassment, to all new employees, and mails them additional copies every year thereafter. (*Id.* ¶¶ 11-13.) The Violence in the Workplace policy defines a "violent act" as "one which causes or is likely to cause physical harm to persons." A "threat" may include, but is not limited to "any act, gesture or statement that may reasonably be interpreted as potentially violent." (Ex. 8 to Def. Mem., at 2.) The policy provides that "[a]cts of violence are unacceptable, and where identified will lead to discipline up to and including termination and/or criminal charges." (Def. Facts ¶ 14 .)

**\*2** On January 2, 1996, CPR implemented a Positive Behavior & Performance Development ("PB & PD") Policy creating a two-phase procedure for addressing employee performance and behavior issues. The first phase consists of informal and formal coaching and counseling between the supervisor and the employee. In the second phase, formal discipline, CPR conducts a hearing (called a "formal investigation") to determine the facts and circumstances surrounding an employee's alleged violation of Company rules or procedures. The hearing is conducted in accordance with the terms of the employee's collective bargaining agreement and re-

quires that a "conducting officer" listen to witness testimony; observe witness demeanor; make credibility determinations regarding witnesses; and consider any documentary evidence. At the conclusion of the formal investigation, the conducting officer prepares a written recommendation based on the hearing testimony and the employee's past discipline and performance history. The conducting officer is not, however, the final decisionmaker as to what discipline is imposed, if any. (*Id.* ¶¶ 15-18.)

**C. Mr. Hegwood's Performance**

CPR claims that Mr. Hegwood's performance problems date back to March 1982 when he was terminated for fighting with another employee on company property. (*Id.* ¶ 20; Service Record, Ex. 10 to Def. Facts.) Mr. Hegwood first objects that Exhibit 10 constitutes inadmissible hearsay and should be stricken. The court disagrees. CPR has submitted an affidavit from Terri Revell, CPR's Employee Relations Advisor, who has confirmed that disciplinary records such as Mr. Hegwood's Service Record are (1) maintained in employee personnel files; (2) created at or near the time of the occurrence "by or from information transmitted by a person with knowledge of the events in question"; and (3) kept in the ordinary course of regularly conducted business activity. (Revell Aff., Ex. C to Response to Motion to Strike.) CPR's Exhibit 10, consisting of Mr. Hegwood's Service Record, thus qualifies as a business record and is admissible under FED.R.EVID. 803(6) and 902(11). *See Thanongsinh v. Board of Educ.,* 462 F.3d 762, 777 (7th Cir.2006); *Arrington v. La Rabida Children's Hosp.,* No. 06 C 5129, 2008 WL 5388717, at \*1 (N.D.Ill.Dec.22, 2008). That said, the court does agree with Mr. Hegwood that the Service Record contains no indication as to the reason for his termination in 1982. This portion of the motion to strike is therefore granted.[FN2]

> FN2. The court also grants the motion to strike ¶ 19, which lacks any supporting citation. *See Smith v. Lamz,* 321 F.3d 680,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

682 (7th Cir.2003) (Local Rule 56.1 requires that facts include "citations to admissible evidence.")

In any event, a Public Law Board reinstated Mr. Hegwood on November 11, 1983 "with seniority rights unimpaired." (Def. Facts ¶ 20; Ex. 10 to Def. Facts, at SOO 00004.) Between 1993 and 2003, Mr. Hegwood received at least six warnings for issues such as excessive absences and substandard work performance. (*Id.* ¶ 21; Ex. 10 to Def. Facts.) Then on September 17, 2003, Mr. Hegwood became angry when his supervisor, James Selover (Caucasian), directed him to perform an assignment despite the existence of an allegedly "hazardous condition," which resulted in Mr. Hegwood sustaining a fall. (*Id.* ¶ 22; Pl. Facts ¶ 22; Pl. Facts ¶¶ 7, 8.) [FN3] Mr. Hegwood went to Mr. Selover's office to confront him about the incident, and stood in the doorway using an "elevated" voice. Mr. Hegwood admits that he "came on pretty strong" and that Mr. Selover felt threatened by his behavior. (*Id.* ¶ 22; Pl. Fact Resp. ¶ 22; Hegwood Dep., at 81-82.)

> FN3. Plaintiff's Response to Defendant's Rule 56.1(a) Statement of Material Facts is cited as "Pl. Fact Resp. ¶ ___." Plaintiff's Rule 56.1(b)(3)(C) Additional Statement of Material Facts is cited as "Pl. Facts ¶ ___."

**\*3** Mr. Selover reported the incident to his manager, Mike Urfer, stating that he thought Mr. Hegwood was going to hit him. Mr. Selover also reported that Dan Rossi, another CPR employee, had witnessed Mr. Hegwood's threatening behavior. (Pl. Facts ¶¶ 10, 11.) Mr. Urfer did not believe that Mr. Hegwood would actually hit Mr. Selover, but as a result of this incident, CPR initiated the formal discipline process under the PB & PD policy. Mr. Hegwood and Mr. Selover both testified at a hearing on October 29, 2003; Mr. Rossi was not called as a witness. (*Id.* ¶ 11; Ex. C to Pl. Facts.) On November 12, 2003, Mr. Hegwood received a 10-day suspension for "inapprop[riate] comments/

threatening behavior" towards his supervisor. (Def. Facts ¶ 23; Ex. 10 to Def. Facts, at SOO 00008.) Mr. Hegwood appealed his suspension to a Public Law Board, which found that he was "abrupt, loud, swearing and aggressive" during the encounter, and that "there was ... no excuse for [his] behavior." The Board reduced Mr. Hegwood's suspension to five days, but warned that "there are correct ways to handle such situations [and Mr. Hegwood] had better find these ways in the future if he values his employment." (*Id.* ¶ 24; Ex. 11 to Def. Facts, at 2-3.)

On November 1, 2004, Mr. Hegwood was disciplined for excessive absenteeism and failure to complete his assigned tour of duty on five separate occasions. (*Id.* ¶ 26.) Mr. Hegwood waived the formal investigation and received a five-day suspension. According to the PB & PD policy, an employee who waives his right to a hearing "must accept responsibility for the violation." (*Id.*; Ex. 9 to Def. Facts, at 9.)

In July 2005, Mr. Hegwood was disciplined again for unexcused tardies, absences and failure to protect his assignment in accordance with job requirements. Specifically, Mr. Selover informed Service Area Manager James P. Johnson that Mr. Hegwood had been absent and tardy on several dates in April and May 2005 without giving prior notice (Pl. Facts ¶ 12.) At a July 14, 2005 investigative hearing into the matter, however, Mr. Selover testified that, in fact, Mr. Hegwood did give him advance notice of all of the absences and tardies at issue with the exception of two, which occurred when Mr. Selover was not at work. (*Id.* ¶ 13; Def. Fact Resp. ¶ 13; Ex. E to Pl. Facts, at SOO 0385.) [FN4] Mr. Hegwood tendered a closing statement claiming that the investigation "could be [perceived] as harassment, biased discrimination in an effort to unfairly, adversely affect my employment." He further stated that if he could not achieve a satisfactory resolution, "I am putting all of you on notice that I plan to notify my attorney and EEOC to initial [sic] action to resolve this problem for me immediately." (Ex. E

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

to Pl. Facts, at SOO 000400-01; Pl. Fact Resp. ¶ 40.) Mr. Johnson reviewed the hearing transcript when he received it in 2005, but took no action relating to Mr. Hegwood's complaint of discrimination. (Pl. Facts ¶¶ 37, 38; Def. Fact Resp. ¶¶ 37, 38; Johnson Dep., at 34.)

> FN4. Defendant's Response to Plaintiff's Statement of Additional Material Facts is cited as "Def. Fact Resp. ¶ ___."

**\*4** On August 1, 2005, Mr. Hegwood was suspended for 10 days in connection with the allegedly unexcused absences and tardies, though it appears this was subsequently changed to "no discipline." (Def. Facts ¶ 27; Pl. Fact Resp. ¶ 27; Johnson Dep., at 55.) Mr. Hegwood blamed Mr. Selover for the suspension, noting that Mr. Selover complained of absences he knew were justified, including a bereavement day following the funeral of Mr. Hegwood's mother, and a weekend when Mr. Hegwood was out of town visiting his wife. (Pl. Facts ¶¶ 16, 17.) In Mr. Hegwood's view, Mr. Selover was always "keep[ing] a close eye" on him. (Def. Facts ¶ 27.)

**D. Mr. Hegwood's Discharge**

One of Mr. Hegwood's responsibilities at CPR was to complete and submit certain paperwork in a timely fashion to ensure proper train car movement in the rail yard. (Id. ¶ 28.) On January 12, 2006, Mr. Selover approached Mr. Hegwood in the break room following a routine safety meeting and asked him to submit some overdue paperwork. (Id.) Instead of responding to Mr. Selover, Mr. Hegwood said nothing and intentionally ignored him. Mr. Selover became angry, at which point Mr. Hegwood started walking out of the break room and into the locker room. (Id. ¶ 29; Hegwood Dep., at 59-61.) Mr. Hegwood claims that he only walked away after Mr. Selover spoke to him in a "very degrading manner" and tried to provoke an incident. (Pl. Fact Resp. ¶ 29.) Mr. Hegwood also contends that Mr. Selover stepped in his path and got up into his face, at which point he threw up his hands to

avoid any contact with Mr. Selover. (Id.; Pl. Facts ¶ 29; Hegwood Dep., at 61, 65.)

At a formal investigation/hearing on March 2, 2006, Mr. Selover testified that when he asked Mr. Hegwood for the paperwork, Mr. Hegwood stated in a raised voice, "if you want the paperwork you come and get it." (Def. Facts ¶ 30; Ex. 12 to Def. Facts, at 16.) Mr. Selover claimed that in response, he said that it was Mr. Hegwood's responsibility to bring the paperwork to the office, prompting Mr. Hegwood to stand up and say, "you don't fucking tell me what to do." According to Mr. Selover, Mr. Hegwood called him a "fucking fat boy" and "was gritting his teeth, his fists were clenched and he told me to ... get out of his way because he is going to bite my fucking head off." (Id.; Pl. Facts ¶ 21.)

Mr. Hegwood denies this account, noting that none of the four individuals present during the encounter saw him threaten Mr. Selover. Earnest Jones, Jerry Landerholm, William Raia and Carlos Guzman all testified that they did not hear Mr. Hegwood use any profanity. Mr. Landerholm further stated that there was nothing unusual in Mr. Hegwood's tone of voice. (Pl. Facts ¶¶ 22-25.) Mr. Hegwood testified that Mr. Selover was "pushing his buttons" and that he was trying to keep "the old Steve" down and "not be aggressive and not lash out at" Mr. Selover. (Def. Facts ¶ 31.) Notably, Mr. Jones and Mr. Guzman both stated that Mr. Selover specifically moved into Mr. Hegwood's path, got into his face, tried to block him from leaving the break room, and then followed him into the locker room. (Pl. Facts ¶ 27.)

**\*5** Mr. Hegwood also stresses that CPR's private police officer, James Tubbs, who arrived on the scene shortly after the encounter and obtained statements from the relevant parties, testified at the hearing that when he questioned Mr. Selover at the scene, Mr. Selover said that Mr. Hegwood "told him he didn't have [the paperwork] but he would get it to him, if he wanted it he could come and get it himself." (Ex. 12 to Def. Facts, at SOO 00280; Def. Fact Resp. ¶ 28.) Officer Tubbs agreed that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

Mr. Hegwood was trying to get away from the encounter with Mr. Selover, and he confirmed that Mr. Jones and Mr. Landerholm were consistent in their written and oral statements to him. (*Id.* at SOO 00285; Def. Fact Resp. ¶ 30; Pl. Facts ¶ 31.)

Despite these inconsistencies, the parties do agree that Mr. Selover never tried to touch Mr. Hegwood, and that Mr. Hegwood called him a "fat boy." (Hegwood Dep., at 51-52, 66.) In addition, it is undisputed that although Mr. Hegwood claims that he had already submitted the paperwork to the second shift supervisor the previous night, he never said as much to Mr. Selover. (Pl. Facts ¶¶ 19, 20; Pl. Fact Resp. ¶ 28; Hegwood Dep., at 59-60.) At the conclusion of the March 2006 hearing, conducting officer Robert Ryde determined that Mr. Hegwood had violated CPR's Violence in the Workplace policy and recommended that he be discharged. (Def. Facts ¶ 35; Ex. 13 to Def. Facts.)

On March 24, 2006, Service Area Manager Johnson sent Mr. Hegwood a formal notification terminating his employment. Mr. Johnson stated:

As a result of the facts developed at the investigation, I find that the hearing did establish that your behavior was inappropriate toward your Supervisor James Selover, which included making threatening comments to him. As a result, you are hereby dismissed from service effective immediately for violation of Canadian Pacific Railway's Company policy on Violence in the Workplace.

(Def. Facts ¶ 36; Ex. 14 to Def. Facts.) Mr. Hegwood finds it significant that Mr. Johnson and Mr. Urfer both allowed him to continue working under Mr. Selover's supervision between January 12 and March 24, 2006 despite his allegedly threatening conduct towards Mr. Selover. (Pl. Fact Resp. ¶ 30; Pl. Facts ¶¶ 33, 34.) CPR explains that, under the collective bargaining agreement, Mr. Hegwood had the right to continue working pending an investigation into the incident. (Def. Fact Resp. ¶¶ 33, 34; TCIU Agreement, Ex. 5 to Def. Facts, at 15.)

Mr. Hegwood appealed his termination through the union grievance process. On October 3, 2008, a Public Law Board denied the appeal, finding "ample evidence of record to persuade [the Board] that Claimant was guilty as charged." (Def. Facts ¶ 37; Ex. 15 to Def. Facts, at 3.) In reaching this conclusion, the Board found it "likely" that Mr. Selover "kept instigating" the encounter and that Mr. Hegwood was trying to get away. (Ex. 15 to Def. Facts, at 4; Pl. Fact Resp. ¶ 37.) Nevertheless, the testimony confirmed that Mr. Selover gave Mr. Hegwood an instruction, and, "[r]emoving issues of threat or swearing, the record confirms a denial of the request." (*Id.*) The Board upheld Mr. Hegwood's discharge, finding "sufficient proof that the Claimant in some manner refused to properly respond to a Supervisor," and that Mr. Hegwood admitted calling Mr. Selover a "fat boy." (*Id.*)

**E. Mr. Hegwood's Charge of Discrimination and Complaint**

**\*6** On April 26, 2006, Mr. Hegwood filed a charge of discrimination with the EEOC alleging race discrimination and retaliation. (Def. Facts ¶ 38.) In that charge, Mr. Hegwood alleged, among other things, that between 1998 and 2006, CPR employees Bruce Axelson and Jerry Meyers (both white) referred to him and other black employees as "squirrel" and "buckwheat" on six or seven occasions. He also claimed that white employees who berated their supervisors were not assessed similar discipline. (*Id.* ¶ 39.) With respect to the retaliation claim, Mr. Hegwood alleged that he complained to Mr. Johnson about the name-calling by Mr. Meyers [FN5] in March 2001, and admits that after Mr. Johnson looked into it, Mr. Meyers stopped the behavior. (*Id.* ¶¶ 40, 41; Hegwood Dep., at 19, 21.) Mr. Hegwood also stated that he complained to Mr. Johnson about alleged discrimination in late 2005 or early 2006, and again following the January 12, 2006 altercation that led to his discharge. (*Id.* ¶ 40; Hegwood Dep., at 47.)

FN5. Mr. Hegwood testified that he did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

complain about Mr. Axelson because he worked with him and "wanted to try to keep peace ." (Hegwood Dep., at 21.)

Mr. Hegwood filed this federal lawsuit on October 16, 2007, alleging similar claims of race discrimination and retaliation.

### DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Argyropoulos v. City of Alton,* 539 F.3d 724, 732 (7th Cir.2008). The nonmoving party, however, "must do more than raise some metaphysical doubt as to the material facts; [he] must come forward with specific facts showing that there is a genuine issue for trial." *Argyropoulos,* 539 F.3d at 732 (quoting *Keri v. Board of Trustees of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir.2006)). Courts find a genuine issue for trial "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Id.* (quoting *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir.2007)).

Mr. Hegwood claims that CPR discriminated against him on the basis of his race when it terminated his employment on March 24, 2006. He also claims that CPR discharged him in retaliation for complaints he made about unlawful discrimination. The court addresses each argument in turn.

### A. Race Discrimination

Mr. Hegwood first argues that CPR discharged him

because of his race. Mr. Hegwood may establish discrimination under Title VII using either the direct or indirect method of proof. Under the direct method, Mr. Hegwood must "introduce evidence showing that the decision to terminate him was motivated by animus based upon his race." *Henry v. Jones,* 507 F.3d 558, 566 (7th Cir.2007). This does not require a "near-admission" of improper motivation, but includes "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Id.* (quoting *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1052 (7th Cir.2006)).

**\*7** In this case, Mr. Hegwood has chosen to proceed under the familiar *McDonnell Douglas* burden-shifting analysis. He must first establish a prima facie case of discrimination by proving that (1) he is a member of a protected class; (2) he was performing at a level that met CPR's legitimate job requirements; (3) he was subject to an adverse employment action; and (4) he was treated differently than similarly situated employees outside the protected class. *Tyson v. Gannett Co.,* 538 F.3d 781, 783 (7th Cir.2008). If Mr. Hegwood succeeds in making out a prima facie case, the burden shifts to CPR to articulate a legitimate, nondiscriminatory explanation for the adverse employment action. If such a reason is offered, Mr. Hegwood "must present evidence that would allow the trier of fact to conclude that [CPR's] proffered reason is pretextual." *Goodwin v. Board of Trustees of Univ. of Ill.,* 442 F.3d 611, 617-18 (7th Cir.2006).

CPR does not dispute that Mr. Hegwood is within the protected class or that his discharge constitutes an adverse employment action. CPR insists, however, that (1) Mr. Hegwood was not meeting the Company's legitimate business expectations; (2) no similarly-situated employees outside the protected class received more favorable treatment; and, in any event, (3) Mr. Hegwood cannot demonstrate that CPR's legitimate, nondiscriminatory explanation for discharging him is a pretext for discrimination.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

**1. Legitimate Job Expectations**

CPR argues that Mr. Hegwood was not meeting its legitimate expectations, as evidenced by the counseling he received for threatening behavior, absenteeism and failure to follow instructions between 2003 and 2005, and his violation of CPR's Violence in the Workplace policy in January 2006. (Def. Mem., at 5.) [FN6] Mr. Hegwood denies the validity of these disciplinary actions and insists that "there is enough evidence to raise a genuine issue of fact that Plaintiff met the legitimate expectations of his job." (Pl. Resp., at 8.) [FN7]

> FN6. Defendant's Memorandum of Law in Support of Motion for Summary Judgment is cited as "Def. Mem., at ___."

> FN7. Plaintiff's Response to Defendant's Motion for Summary Judgment is cited as "Pl. Resp., at ___."

In this case, "the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because [CPR] maintains that the discharge was based on its reasonable belief that [Mr. Hegwood] was not performing in an acceptable manner." *Mihal v. St. Vincent Carmel Hosp., Inc.*, No.1:06-cv-482-SEB-JPG, 2007 WL 4256607, at *8 (S.D.Ind. Nov.30. 2007) (quoting *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir.1996)). "[B]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test, it is therefore simpler to run through that analysis only once." *Hague v. Thompson Distribution Co.,* 436 F.3d 816, 823 (7th Cir.2006) (quoting *Rummery v. Illinois Bell Tel. Co.,* 250 F.3d 553, 556 (7th Cir.2001)). Thus, the court will proceed with an analysis of Mr. Hegwood's showing of pretext, "while keeping in mind that if [Mr. Hegwood] did not present sufficient evidence of a pretext, [he] also did not show that [he was] meeting [CPR's] expectations." *Id.*

**2. Similarly-Situated Employees**

**\*8** Before turning to pretext, the court first addresses CPR's additional argument that Mr. Hegwood's prima facie case fails because he cannot identify any similarly-situated employees outside the protected class who were treated more favorably. To be similarly situated, an employee "need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].' " *Amrhein v. Health Care Serv. Corp.,* 546 F.3d 854, 860 (7th Cir.2008) (quoting *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir.2008) ). *See also Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 791 (7th Cir.2007).

Mr. Hegwood first claims that when a derailment occurred, CPR often did not inform him but, instead, called Dave Skrzypic, a white employee with less seniority, to work the scene and earn the overtime pay. (Pl. Facts ¶ 2.) Mr. Hegwood also claims that on numerous occasions, Mr. Skrzypic called Mr. Selover a "fat ass" and stated that "I am not doing ... shit" when given an assignment. Mr. Selover, however, never took any disciplinary action against Mr. Skrzypic. (*Id.* ¶ 3.) Another white employee, Ricky Baker, allegedly shoved a car down the track in a derailment, and "went off," "sweared" and "cussed" at Mr. Selover, but received no discipline. (*Id.* ¶ 4.) Mr. Baker and a third employee, "Pete," also allegedly were allowed to keep their cars in a certain parking location on one occasion in 2003, while Mr. Selover directed Mr. Hegwood to move his car from the same location. (*Id.* ¶ 6.)

CPR claims that Mr. Hegwood failed to show that these individuals engaged in similar conduct, and had similar discipline histories and circumstances. (Def. Reply, at 4.) [FN8] CPR correctly notes that Mr. Hegwood bears the burden of proving this element of his prima facie case, and that he has not provided any evidence regarding these employees'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

job descriptions, work performance or disciplinary histories. *See Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 546 (7th Cir.2002)* ("The burden is on [the plaintiff] to establish the similarity between himself and the proposed comparable employees.") Nor has he indicated exactly when most of these alleged events occurred.

> FN8. Defendant's Reply Memorandum in Support of Summary Judgment is cited as "Def. Reply, at ___."

Nevertheless, Mr. Skrzypic and Mr. Baker arguably engaged in similar conduct by swearing at Mr. Selover and refusing to follow an order, yet they received different discipline than Mr. Hegwood. CPR denies the truth of these allegations, but offers nothing to refute them. CPR also makes a general assertion, without any supporting evidence, that Mr. Hegwood is not similarly situated to these men in any relevant respect. (*See, e.g.,* Def. Fact Resp. ¶¶ 3, 4; Def. Reply, at 4.) This is insufficient for purposes of summary judgment. *See Vardon Golf Co. v. Karsten Mfg. Corp.,* No. 99 C 2785, 2000 WL 1304999, at *6 (N.D.Ill. Sept.13, 2000) (a "bald assertion ... is not proper or sufficient support for a motion for summary judgment.") CPR does insist that neither Mr. Skrzypic nor Mr. Baker threatened his supervisor. (Def. Mem., at 7.) As discussed below, however, there is a question of fact as to whether Mr. Hegwood did, either. Drawing all reasonable inferences in Mr. Hegwood's favor, the court concludes that a jury could find that Mr. Skrzypic and Mr. Baker are similarly situated to Mr. Hegwood.[FN9]

> FN9. To the extent Mr. Hegwood cannot identify "Pete's" last name and has provided no evidence regarding his interactions with Mr. Selover, Pete is not a viable comparable in this case. *See Cooper v. Potter,* No. 02 C 7341, 2004 WL 524446, at *4 (N.D.Ill. Feb.24, 2004) (declining to address two employees who were allegedly similarly situated to the plaintiff where the plaintiff "identifies these employees by

first name only and fails to offer any specifics of their job performance."). *See also Lucas v. Chicago Transit Authority,* 367 F.3d 714, 730 n. 16 (7th Cir.2004) ( "[C]onclusory statements do not satisfy [the plaintiff's] burden to put forth a similarly situated employee who is directly comparable in all respects and was treated more favorably.")

**3. Pretext**

*9 CPR argues that summary judgment is nonetheless appropriate because Mr. Hegwood cannot demonstrate that the Company's proffered reasons for terminating his employment-his violation of the Violence in the Workplace policy and his reaching the termination stage of the PB & PD policy-were a pretext for unlawful discrimination. "Pretext" means "a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 642 (7th Cir.2008) (quoting *Hague,* 436 F.3d at 823). "Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Id.* (quoting *Filar v. Board of Educ. of City of Chicago,* 526 F.3d 1054, 1063 (7th Cir.2008)). "Evidence that an employer made a mistake or that the decision was ill-advised cannot meet this burden." *Ellis v. United Parcel Serv., Inc.,* 523 F.3d 823, 828 (7th Cir.2008).

Mr. Hegwood concedes that he was suspended in 2003 for confronting Mr. Selover about an allegedly hazardous assignment, and again in 2004 for excessive absenteeism. He denies that he threatened Mr. Selover in 2003, and stresses that Operations Manager Michael Urfer did not believe he would actually hit his supervisor. A Public Law Board found, however, that even assuming Mr. Hegwood was correct about the safety matter, he was "abrupt, loud, swearing and aggressive" during the encounter, and "there was ... no excuse for [his] behavior." (Def. Facts ¶ 24; Ex. 11 to Def. Facts, at 2-3.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

More questionable is Mr. Hegwood's discipline in July 2005 for unexcused tardies, absences and failure to protect his assignment in accordance with job requirements. Mr. Selover told Mr. Johnson that Mr. Hegwood had been absent and tardy on several dates in April and May 2005 without giving prior notice. At the July 14, 2005 investigative hearing, however, Mr. Selover admitted that Mr. Hegwood actually did give him advance notice of all of the absences and tardies at issue with the exception of two, which occurred when Mr. Selover was not at work. Nevertheless, on August 1, 2005, Mr. Hegwood was suspended for 10 days. CPR apparently changed the suspension to "no discipline," but this is not reflected in Mr. Hegwood's Service Record. Moreover, it appears that conducting officer Robert Ryde did not know about this change when he recommended that Mr. Hegwood be discharged in March 2006. (Johnson Dep., at 55.)

With respect to the 2006 policy violation regarding Mr. Selover's request for paperwork, Mr. Hegwood admits that he called Mr. Selover a "fat boy," that he initially ignored Mr. Selover, and that he never told Mr. Selover that he had already turned in the paperwork to the second shift supervisor. Mr. Hegwood's speculation that Mr. Selover nonetheless knew this fact is insufficient for purposes of summary judgment. *See Jones v. IKEA Illinois, LLC,* No. 07 C 3725, 2008 WL 5169749, at *3 (N.D.Ill.Dec.4, 2008) (citing *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994)) (" 'Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors,' as discrimination law would be unmanageable if disgruntled employees could defeat summary judgment on mere speculations about the defendant's motives.")

*10 At the same time, Officer Tubbs testified that when he questioned Mr. Selover at the scene of the incident, Mr. Selover said that Mr. Hegwood "told him he didn't have [the paperwork] *but he would get it to him* ..." (Ex. 12 to Def. Facts, at SOO 00280) (emphasis added). Moreover, it appears that

Mr. Selover-who appears to have wrongly accused Mr. Hegwood of unexcused tardies and absences in 2005-instigated the confrontation and tried to provoke Mr. Hegwood when requesting the paperwork, only to turn around and accuse Mr. Hegwood of threatening him. (Pl. Resp., at 7.) Indeed, the October 3, 2008 Public Law Board found it "likely" that Mr. Selover "kept instigating" the encounter and that Mr. Hegwood was trying to get away. The Board did uphold the discharge, but not on the basis that Mr. Hegwood threatened his supervisor. Rather, the Board stated, "[r]emoving issues of threat or swearing," there was "sufficient proof that the Claimant in some manner refused to properly respond to a Supervisor" and called Mr. Selover a "fat boy."

Viewing the facts in a light most favorable to Mr. Hegwood, there is a question of fact as to the truth of CPR's decision to discharge him for threatening Mr. Selover. There is also a question of fact as to whether this constituted Mr. Hegwood's "third violation in a 24-month period, which justifie [d] termination under CPR's progressive discipline policy." (Def. Reply, at 5.) As noted, the July 2005 discipline was largely unsupported and ultimately withdrawn.

CPR stresses that Mr. Johnson, and not Mr. Selover, made the decision to discharge Mr. Hegwood, and suggests that there is no basis to question Mr. Johnson's motive or intent in that regard. (Def. Reply, at 5.) Mr. Hegwood counters that Mr. Selover influenced the termination decision and injected discriminatory animus. (Pl. Resp., at 10 (citing *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir.1994)) ("Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment decision.").) To the extent that (1) the 2003, 2005 and 2006 disciplinary proceedings occurred solely based on Mr. Selover's accusations; (2) Mr. Johnson reviewed the 2005 hearing transcript and knew

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

that Mr. Selover had made inaccurate statements about Mr. Hegwood in the past; (3) Mr. Johnson knew that none of the witnesses to the 2006 encounter supported Mr. Selover's version of events; and (4) Mr. Johnson knew that conducting officer Ryde was not aware in March 2006 that the 2005 suspension had been withdrawn, a jury could reasonably conclude that Mr. Johnson did not honestly believe that Mr. Hegwood had threatened Mr. Selover or that he had reached the termination stage under CPR's PB & PD policy. *See, e.g., Kodl v. Board of Educ. School Dist. 45, Villa Park,* 490 F.3d 558, 562 (7th Cir.2007) ("The only concern in reviewing an employer's reasons for termination is the honesty of the employer's belief."); *Pleniceanu v. Brown Printing Co.,* No. 05 C 5675, 2007 WL 781726, at *8 (N.D.Ill. Mar.12, 2007) ("[A]n employer may be liable for a discrimination where it acts as a conduit for another employee's bias.")

**\*11** For these reasons, summary judgment is not appropriate on Mr. Hegwood's race discrimination claim. *See Rudin v. Lincoln Land Community College,* 420 F.3d 712, 726 (7th Cir.2005) (quoting *Courtney v. Biosound, Inc.,* 42 F.3d 414, 423 (7th Cir.1994)) ("[I]f there is a question of fact as to the believability of an employer's purported reasons for an employment decision, then, 'even if the evidence presented by the [plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its ... decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion."); *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417 (7th Cir.2006) (if employer's stated reason for a decision is "not the true ground, the employer may still be innocent of discrimination .... But the case could not be resolved on summary judgment, because a trier of fact (judge or jury) would be entitled to infer a discriminatory motive from the pretextual character of the employer's ground.")

**B. Retaliation**

Mr. Hegwood also argues that CPR terminated his

employment in retaliation for complaints he made about discrimination. As with his discrimination claim, Mr. Hegwood may establish a prima facie case of retaliation using the direct or indirect method of proof. *Benders v. Bellows and Bellows,* 515 F.3d 757, 764 (7th Cir.2008). Mr. Hegwood makes a cursory argument that he has direct evidence of retaliation, which requires a showing of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Amrhein,* 546 F.3d at 858. "Undeveloped arguments," however, "need not be considered by the court." *Stocker v. Kalahari Dev., LLC,* No. 06-C-366-C, 2007 WL 1140246, at *6 (W.D.Wis. Apr.16, 2007) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc.,* 181 F.3d 799, 807 (7th Cir.1999)) ("Arguments not developed in any meaningful way are waived.")

The court thus proceeds to Mr. Hegwood's indirect evidence of retaliation, which requires him to show that he (1) engaged in statutorily protected activity; (2) met CPR's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Amrhein,* 546 F.3d at 859. The burden then shifts to CPR to produce a nondiscriminatory explanation for its action. If it does so, then the burden shifts back to Mr. Hegwood, who must demonstrate that CPR's proffered reason is pretextual. *Id.* at 859-60.

CPR claims that Mr. Hegwood cannot establish his prima facie case or demonstrate that its stated reasons for his discharge are a pretext for retaliation. The parties' analysis of these issues is largely the same as discussed above in connection with Mr. Hegwood's race discrimination claim. Thus, summary judgment is appropriate on the retaliation claim only if Mr. Hegwood did not engage in protected activity.

**1. Protected Activity**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)
**(Cite as: 2009 WL 928929 (N.D.Ill.))**

**\*12** Mr. Hegwood claims that he complained to Mr. Johnson of discrimination on three separate occasions: (1) in March 2001; (2) in late 2005/early 2006; and (3) after the January 12, 2006 incident with Mr. Selover. The March 2001 complaint concerned the white employee who referred to Mr. Hegwood and other black employees as "buckwheat" or "squirrel" on six or seven occasions starting in 1998. (Pl. Facts ¶ 1; Def. Fact Resp. ¶ 1.) When Mr. Hegwood complained, Mr. Johnson looked into it and the employee stopped the behavior. (Def. Facts ¶¶ 40, 41; Hegwood Dep., at 19, 21.) Regardless, this arguably was protected activity. *See Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1274 (7th Cir.1991) (recognizing the nickname "Buckwheat" as a "racial taunt."); *Sanders v. Mid City Salon Resources, LLC,* No. 06 C 3971, 2008 WL 244292, at \*11 (N.D.Ill. Jan.23, 2008) (indicating that "complaining to upper management that [a co-worker] had made a racial slur" was protected activity).

The late 2005/early 2006 complaint consists of Mr. Johnson's review of the July 2005 hearing transcript, in which Mr. Hegwood stated that the investigation "could be [perceived] as harassment, biased discrimination in an effort to unfairly, adversely affect my employment," and warned that if he could not achieve a satisfactory resolution, he was "putting all of you on notice that I plan to notify my attorney and EEOC to initial [sic] action to resolve this problem for me immediately." (Ex. E to Pl. Facts, at SOO 000400-01; Pl. Fact Resp. ¶ 40.) CPR claims that this is not protected activity because Mr. Hegwood "did not complain that the harassment resulted from his membership in a protected class." (Def. Mem., at 11.)

"To constitute protected expression, '[a] complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of [discrimination or] harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.' "

*Kodl,* 490 F.3d at 563 (quoting *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663 (7th Cir.2006)). When Mr. Hegwood complained about "harassment" and "biased discrimination," he did not claim that it resulted from his race. Nevertheless, Mr. Hegwood did threaten to file a complaint with the EEOC, which would certainly be a protected activity under Title VII. *See, e.g., Chism v. Kennall Mfg. Co.,* No. 06 C 3374, 2008 WL 506115, at \*13 (N.D.Ill. Feb.15, 2008). Thus, Mr. Hegwood's July 2005 complaint satisfies the first prong of his prima facie case.[FN10]

> FN10. The parties have not provided any details regarding Mr. Hegwood's third alleged complaint of discrimination in March 2006, and the court need not address it here.

**2. Pretext**

CPR again cites Mr. Hegwood's violation of the Violence in the Workplace policy and reaching the termination stage of the PB & PD policy as legitimate, nondiscriminatory reasons for his discharge. (Def. Reply, at 6.) Having determined that a reasonable jury could find these explanations pretextual, CPR's motion for summary judgment on the retaliation claim must be denied.

***CONCLUSION***

**\*13** For the reasons stated above, Canadian Pacific Railway's motion for summary judgment [Doc. 42] is denied. Hegwood's motion to strike [Doc. 50] is granted in part and denied in part, as stated in this opinion.

N.D.Ill.,2009.
Hegwood v. Canadian Pacific Ry.
Not Reported in F.Supp.2d, 2009 WL 928929 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Lori CORBETT, Plaintiff,
v.
CYTYC CORP. and Cytyc L.P. (now known as
Hologic L.P.), Defendants.
**No. 07 C 4768.**

Nov. 7, 2008.

West KeySummary
**Civil Rights 78 ⚎1247**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1247 k. Discharge or Layoff. Most
Cited Cases
An employer was not entitled to summary judgment
on a terminated employee's claims of retaliation un-
der Title VII. The employee asserted that she com-
plained of disparate treatment, named the male em-
ployees she felt were being treated more favorably,
and told a manager that she would go to human re-
sources with the complaints. Additionally, the em-
ployee alleged that the manager solicited e-mails
from other employees regarding any complaints
about her and then arranged a meeting with human
resources the following day. Civil Rights Act of
1964, § 706, 42 U.S.C.A. § 2000e-5.

Erika E. Pedersen, Jill S Weinstein, Pedersen &
Weinstein LLP, Chicago, IL, for Plaintiff.

Jody A. Boquist, Marissa Ross Ingley, Raven A.
Winters, Littler Mendelson, P.C., Chicago, IL, for
Defendants.

***MEMORANDUM OPINION AND ORDER***

MATTHEW F. KENNELLY, District Judge.

**\*1** Lori Corbett has sued Cytyc Corporation and
Cytyc L.P. (collectively, Cytyc), asserting a claim
for gender discrimination and a claim for retaliation
under Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e-5. Cytyc has moved for summary
judgment on all of Corbett's claims. For the follow-
ing reasons, the Court denies Cytyc's motion.

**Facts**

Because Cytyc has moved for summary judgment,
the Court views the facts in the light most favorable
to Corbett and draws reasonable inferences in her
favor. *See, e.g., Nat'l Athletic Sportswear, Inc. v.
Westfield Ins. Co.,* 528 F.3d 508, 512 (7th Cir.2008).

Corbett began working for Cytyc in June 2005 as a
Professional Medical Representative (PMR). Cytyc
sells medical devices and diagnostic equipment. As
a PMR, Corbett was essentially a sales representat-
ive for Cytyc. She worked in tandem with a Territ-
ory Manager (TM) to sell Cytyc products to doc-
tor's offices and hospitals in the Chicago area.
Corbett was charged with selling Cytyc's NovaSure
device and procedure, an endometrial ablation sys-
tem used to treat women with heavy menstrual
bleeding. The device has both sterile and nonsterile
components. Though TMs are authorized to train
doctors on the NovaSure procedure, known as
"covering a case," PMRs are not.

During her employment, Corbett worked under
three different District Sales Managers: Jamie
Goetz, followed by Whitney Parachek and Michael
Rodriguez. Corbett had a good relationship with
Parachek and often received praise from her and
others for her work. Corbett's relationship with Mi-
chael Buhle, the TM with whom she worked, was
not as positive. Buhle also had trouble making sales
quotas. Cytyc management placed Buhle on a per-
formance improvement plan in 2004, and Parachek

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

issued a Letter of Concern in June 2006 for poor performance.

In August 2006, Rodriguez replaced Parachek as DSM for Chicago. Shortly afterwards, Buhle told Rodriguez about issues he had with Corbett. Buhle reported that he did not get along well with Corbett and that he thought she was difficult to work with. He also told Rodriguez about a recent incident. In late 2005 or early 2006, Buhle said, he told Corbett that a doctor had complained that she had missed appointments and asked that she not return to the doctor's office. Some time later, Corbett returned to the doctor's office, and a staff member called Buhle to complain that Corbett argued with the doctor's staff in front of patients. The customer also said that Corbett spoke negatively about Buhle in front of staff and patients.

On August 23, 2006, Corbett called Rodriguez to discuss issues relating to the territory. She told him that Buhle had missed several cases and that doctors were upset with him. Corbett contends that Rodriguez told her she was being too emotional. Rodriguez asserts that Corbett was overly confrontational, bordering on insubordinate, but he cannot recall telling her she was being emotional. After Rodriguez ended the phone call so that he could board an airplane, Corbett called him again. Though Rodriguez claims he counseled her on learning boundaries and self-awareness, Corbett denies that he did so. Following this conversation, Rodriguez took three weeks off to get married and go on his honeymoon. Shortly after Rodriguez returned to work, Buhle resigned.

**\*2** In the third week of September 2006, Corbett contacted Chris Gormley, a Surgical Sales Specialist (SSS), to cover a NovaSure case. After he did so, the office manager asked Gormley to notify Cytyc management that Corbett was overly pushy and that the office did not want to work with her anymore. Gormley reported the complaint to Rodriguez.

Around the same time, Rodriguez began investigat-

ing potential replacements for Buhle. Corbett submitted a letter of interest to Rodriguez along with two recommendation letters from doctors with whom she had worked. Jay Malayny, a male SSS who had been working for Cytyc for nine months, also expressed interest in the position. Cytyc materials describe the qualifications for the TM position as including a minimum of five years of sales experience.

Rodriguez discussed the candidates with Brooks Edlund, his superior. Edlund was generally aware of some complaints about Corbett's behavior, and Rodriguez told him of Buhle's and Gormley's complaints. Rodriguez also told Edlund about the telephone conversation he had with Corbett in August 2006. After this discussion, Rodriguez decided that he would not interview Corbett for the TM position. Rodriguez did not inform Corbett about this decision and failed to return Corbett's calls and e-mails regarding the possible promotion.

In early October 2006, Rodriguez interviewed Malayny for the TM position at a sales meeting in Arizona. Malayny had a positive NovaSure sales record, even though he had worked for Cytyc for only nine months. There were no reports of issues with Malayny's behavior or with his ability to get along with co-workers.

On October 10, 2006, Rodriguez set up a lunch meeting with Corbett for the next day. In an e-mail, Rodriguez informed Corbett that he wanted to discuss goals for the next quarter, the transition of the new TM, and Corbett's carreer development path. Rodriguez contends that he sought advice on how to deal with Corbett. He testified that he left a voice message for Anne-Marie Hodkinson at Cytyc's human resources department (HR) that same day. Hodkinson could not, however, confirm that Rodriguez called her or left her a message that day.

Before the lunch meeting the following day, Corbett called Melissa Climaco, another TM, for help with a situation at a doctor's office. Climaco thought that Corbett was "covering a case," *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
(Cite as: 2008 WL 4855073 (N.D.Ill.))

*supra* at 2, in violation of company policy. Although Corbett attempted to explain that she was not covering a case, Climaco reported her opinion to Rodriguez Shortly afterwards, Rodriguez went to the lunch meeting.

At the lunch meeting, Rodriguez informed Corbett that Malayny had been promoted to TM. Corbett asked Rodriguez why she had not been interviewed; he responded that he did not think she was ready to become a TM. Rodriguez contends that he discussed Corbett's customer issues and teamwork difficulties as reasons why she was not promoted. Corbett denies that Rodriguez said these things. Instead, she recalls that the only reason Rodriguez gave for not promoting her was that her former managers had reported that she was not ready. Though Corbett claims that she questioned Rodriguez calmly, he contends that she was confrontational and unruly. Rodriguez claims that he discussed problems with her covering a case that morning, but Corbett denies that he ever mentioned this.

*3 Corbett claims that she complained to Rodriguez about gender discrimination. Although she admits that she never used the words gender, sex, or discrimination, she complained that Rodriguez favored Buhle over her, ignored her phone calls and e-mails about the promotion, and promoted Malayny, a less qualified male, instead of her. She then told Rodriguez that she would go to HR with this issue. At that point, she claims, Rodriguez threatened that he would go to HR himself. Rodriguez contends that Corbett threatened to go to HR and that he responded that he was happy to include HR and had already contacted HR.

That evening, Corbett called Rob Anderson, a Cytyc SSS, and asked Anderson to send him an e-mail detailing any incidents or problems with Corbett. Anderson sent an email describing his first meeting with Corbett, in which, he said, she claimed to be awaiting a promotion to TM and told Anderson he should do as she said. Anderson also recalled in the e-mail that Corbett had left boxes containing sterile equipment at a coffee shop when he was late meeting her to pick up the equipment. When Anderson finally picked up the equipment, he said, the boxes were stained with coffee. Anderson's e-mail mentioned a few other issues, including customer complaints regarding Corbett and Anderson's claim that Corbett had screamed at him over the phone.

Rodriguez also received an e-mail from Climaco that evening. Climaco detailed the situation from earlier in the day when Corbett called her for help. Climaco noted that Corbett reacted in a confrontational way when Climaco told Corbett that she could have been liable if something had gone wrong.

Rodriguez received another email early the next morning from Gormley, a Cytyc SSS. Although Gormley had previously reported the customer complaint about Corbett from late September, Rodriguez asked him to document it in an e-mail. Gormley stated that Rodriguez may have asked him to send the e-mail on October 11, 2006.

On October 12, Rodriguez and HR representative Hodkinson spoke about Corbett. Based on the complaints Rodriguez presented and other complaints Hodkinson had recently heard, Hodkinson determined that she had never seen so many complaints related to one person. Neither Hodkinson nor Rodriguez contacted Corbett to discuss any of the complaints.

In the following days, Hodkinson and Rodriguez also discussed with Edlund, Rodriguez's manager, the complaints against Corbett. By October 20, Rodriguez, Edlund, and Hodkinson had decided to terminate Corbett. On October 23, Rodriguez forwarded to Hodkinson the e-mails he had received from Climaco, Anderson, and Gormley.

On October 25, 2006, Rodriguez, Edlund and, via telephone, Hodkinson met with Corbett to break the news of her termination. As the reasons for the termination, they offered the recent complaints from customers and Cytyc staff about difficulties work-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

ing with Corbett and the incident Anderson reported in which Corbett had left medical equipment unattended at a coffee shop. The managers knew of the incident reported by Climaco regarding Corbett possibly covering a case but did not mention it.

**\*4** Cytyc ultimately terminated Corbett on October 25, 2006. Rodriguez, Edlund, and Hodkinson informed Corbett that she was being terminated because she was unprofessional and had left medical devices in an unsecured location. On the termination form, filed out by Hodkinson, the stated reason for Corbett's termination was performance, not misconduct.

Corbett filed suit on August 23, 2007, asserting a claim for gender discrimination for failure to promote and a claim for retaliation in violation of Title VII.

### Discussion

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### A. Failure to promote

Claims for discrimination under Title VII "may be proved either directly ... or indirectly under the burden-shifting method established in *McDonnell Douglas*." *Scaife v. Cook County*, 446 F.3d 735,

739 (7th Cir.2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Corbett attempts to establish her claim for failure to promote using both methods. Because she survives summary judgment via the direct method, the Court need not address the indirect method.

Under the direct method, a plaintiff can avert summary judgment by presenting enough evidence of discriminatory intent to create a genuine issue for trial. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000). The plaintiff may proceed under the direct method through the use of either direct or circumstantial evidence, "which suggests discrimination albeit through a longer chain of inferences." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir.2007) (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir.2006)). A fact-finder may infer discriminatory intent from three types of circumstantial evidence: (1) suspicious timing, ambiguous statements leading to an inference of discriminatory intent, (2) statistical evidence of systematically disparate treatment, and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of ... a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir.2005).

Corbett contends that several items of circumstantial evidence give rise to the inference that Cytyc, specifically through Rodriguez's actions, discriminated against her when it promoted Malayny instead of her to the open TM position. First, Corbett points to statistics showing that more men than women occupy the TM position and that proportionally more men than women are promoted from PMR to TM. Although this kind of evidence may be used to support a claim under the direct method, "[s]tatistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination." *Radue*, 219 F.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

618-19 (internal quotation marks and citations omitted). Corbett's statistics do not appear to take account of a nondiscriminatory explanation for the disparity-more men than women, and more male PMRs than female PMRs, applied for TM positions. The Court cannot say that a reasonable jury could find that this evidence, by itself, "strongly suggests" that her failure to attain the promotion "was a result of intentional discrimination." *Id.* at 619 (holding that plaintiff's failure to rule out nondiscriminatory explanations precluded plaintiff from proving discrimination using only the statistical evidence).

**\*5** Corbett has, however, produced other evidence that a reasonable jury could find suggests a discriminatory motive. First, Corbett asserts that Rodriguez failed to respond to her requests for information about the open position and told her that the position was still open, even after he had decided to hire Malayny. Though Rodriguez denied lying to Corbett about the status of the promotion, a jury reasonably could credit Corbett's testimony and conclude that Rodriguez lied.

In addition, a jury reasonably could find that Cytyc has offered at least four different explanations for not promoting Corbett: Corbett's former manager, Whitney Parachek, told Rodriguez that she was not ready for the job; Corbett had previously turned down a different promotion; Buhle's and Gormley's reports about Corbett's behavior; and Malayny was the most qualified applicant for the position. Corbett has offered evidence arguably undercutting several of these proffered explanations. First, Corbett disputes that Parachek ever told Rodriguez that she was not ready to be TM, asserting that Rodriguez never discussed her performance with Parachek while he was considering candidates for the position. Next, Corbett argues that Cytyc's second reason, offered to the EEOC in a letter prepared by Hodkinson after Corbett's termination, is false. Cytyc asserts that its position statement should not be given substantial weight. *McCoy v. WGN Cont'l Broad. Co.,* 957 F.2d 368 (7th

Cir.1992). Although the Seventh Circuit declined to hold that any explanation contradicting a position taken before an administrative agency is *per se* pretextual, it did not foreclose the consideration of an EEOC position statement as circumstantial evidence of discrimination. Cytyc does not contest that Corbett's allegation that Cytyc's explanation in the position statement was false.

Finally, Corbett contends that Malayny failed to meet the minimum qualifications for the TM position, but she exceeded them. Cytyc lists "[a] minimum of 5 years of demonstrated successful sales performance with current and previous employers, including success as a medical/surgical sales representative," as part of its "preferred experience and skills" for the TM position. Pl.Ex. 25. Malayny had no medical sales experience except for his nine months at Cytyc. In contrast, Corbett had six years of medical sales experience including about sixteen months with Cytyc. Furthermore, Cytyc's policy of internal promotions stated that to be eligible for a position, an employee should be in his or her "current position for at least [twelve] months." Pl.Ex. 26. As noted earlier, Malayny had worked at Cytyc for only nine months.

Corbett asserts that this evidence, considered as a whole, is sufficient to allow an inference of discrimination.[FN1] Though it is a close call, the Court agrees. Although Cytyc offers explanations for its arguably shifting reasons for not promoting Corbett and asserts that the requirements for the TM position are generally relaxed for internal hires, the Court must look at the evidence in the light most favorable to Corbett. Through this lens, the Court concludes that a reasonable jury could infer a discriminatory intent from Rodriguez's alleged misrepresentations on the status of the promotion, Cytyc's shifting explanations for not promoting Corbett, and Malayny's promotion in spite of the fact that he arguably fell short of the specified qualifications.

> FN1. Corbett also contends that Cytyc "grooms" male employees and that it groomed Malayny by placing him in De-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

troit, a high sales area. These claims are pinned entirely on a single ambiguous statement in Malayny's deposition testimony. Malayny said, "[so] what they decided to do is to show that I could put up good results, hopefully, for future opportunities." Pl.Ex. 7 at 66. Without more, this speculative statement is insufficient to support a reasonable inference that Cytyc was "grooming" Malayny or any other male.

## B. Retaliation

**\*6** "Title VII makes it unlawful for an employer to discriminate against any of his employees" because the employee has opposed an unlawful employment practice. *Brewer v. Bd. of Trs. of Univ. of Illinois*, 479 F.3d 908, 923 (7th Cir.2007) (internal quotation marks and citations omitted). Like failure to promote claims, retaliation claims may be proven either directly or indirectly. *See Lewis*, 496 F.3d at 655.

Under the direct method, Corbett must show that she "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir.2006). Because it is undisputed that Corbett suffered an adverse employment action when she was terminated on October 25, 2006, the only elements at issue in the present case are the first and the third.

To satisfy the first element, "a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a reasonable belief she was challenging such conduct." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1147 (7th Cir.1997). She must communicate her complaint directly to her employer. *Id.* Corbett contends that she complained to Rodriguez during their lunch meeting on October 11, 2006, that he hired Malayny, a less qualified male, instead of her and that he treated male employees more favorably than

he treated her. Cytyc argues that Corbett's conversation with Rodriguez did not constitute protected activity because she never complained of discrimination based on sex or gender. Cytyc's assertion that Corbett must use the magic words "sex" or "gender" ignores important case law on the subject. "An employee, of course, need not use the words '[sex] discrimination' to bring her speech within Title VII's retaliation protections." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir.2000). She need only say something to indicate that she is being treated less favorably than others based on her gender. *See id.* Viewing the evidence in the light most favorable to Corbett, a reasonable jury could find that she did just that. Corbett asserts that she complained of disparate treatment, named the male employees she felt were being treated more favorably, and told Rodriguez that she would go to HR with the complaints. Although Rodriguez's and Corbett's accounts differ as to exactly what was said, that poses a credibility issue inappropriate for summary judgment.

Turning to the third element, temporal proximity alone is typically insufficient to show that an adverse employment is causally connected to the protected activity. *Lewis*, 496 F.3d at 645. An employee "must also put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination and termination." *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 759 (7th Cir.2006). Corbett points to Rodriguez's solicitation of e-mails from Climaco, Gormley, and Anderson just hours after his October 11 meeting with Corbett, at which she made the complaint about differential treatment. Rodriguez then arranged a meeting with Hodkinson at HR the following day. Though Rodriguez contends that he contacted Hodkinson on October 10, before his meeting with Corbett, Hodkinson testified that she did not hear from Rodriguez until October 11, suggesting that he did not contact Hodkinson until after his meeting with Corbett. This evidence would allow a jury to infer that Rodriguez arranged the meeting Hodkinson because of his encounter with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4855073 (N.D.Ill.)
**(Cite as: 2008 WL 4855073 (N.D.Ill.))**

Corbett, planning seek her termination, and that he specifically solicited complaints about her to influence Hodkinson.

**\*7** Cytyc argues that Corbett was terminated because she displayed so many behavioral problems in a short period of time. Hodkinson testified that she had never seen so many problems relating to a single employee. A reasonable jury could find, however, that Rodriguez orchestrated this by soliciting the e-mails and then giving them to Hodkinson all at once. Cytyc also highlights the incident in which called Climaco to help troubleshoot a case, asserting that it represented a severe breach of company policy. None of the managers cited that incident to Corbett, however, when they discussed the reasons for her termination. In any event, Corbett produced evidence that many other employees with conduct problems received progressive discipline, such as performance improvement plans and letters of concern. In contrast, Cytyc never took disciplinary action before terminating Corbett in October 2006. This, combined with the circumstances of Rodriguez's alleged arrangement of the meeting with Hodkinson and his solicitation of adverse e-mails just after Corbett complained about differential treatment, provides the additional evidence necessary to support a finding of retaliation.

Because Corbett's retaliation claims survive summary judgment under the direct method of proof, the Court need not address the indirect method.

### Conclusion

For the foregoing reasons, the Court denies defendant's motion for summary judgment [docket no. 76]. The case is set for a status hearing on November *24*, 2008 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

N.D.Ill.,2008.
Corbett v. Cytyc Corp.
Not Reported in F.Supp.2d, 2008 WL 4855073

(N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Robert W. CHISM, Plaintiff,
v.
KENALL MANUFACTURING COMPANY, De-
fendant.
**No. 06 C 3374.**

Feb. 15, 2008.

Michael T. Smith, Michael T. Smith & Associates,
Roselle, IL, for Plaintiff.

Richard James Puchalski, Law Offices of Richard J.
Puchalski, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

MARTIN C. ASHMAN, United States Magistrate
Judge.

**\*1** Defendant, Kenall Manufacturing Company
("Kenall"), moves for summary judgment on all
counts against Plaintiff, Robert W. Chism
("Chism"), who alleges employment discrimination
and breach of contract. The parties have consented,
pursuant to 28 U.S.C. § 636(c) and Local Rule
73.1, to have this Court decide any and all matters
in this case, including the entry of final judgment.
For the reasons that follow, Kenall's motion is gran-
ted.

### I. *Background*

Before setting out the undisputed material facts that
form the basis for its decision, the Court must ad-
dress an issue relating to the parties' factual submis-
sions in this case. On October 31, 2007, Kenall no-
ticed its "Motion to Strike Plaintiff's Opposing Af-

fidavits in Opposition to the Motion for Summary
Judgment." However, the motion that was actually
filed in conjunction with that notice was a duplicate
of Kenall's motion for summary judgment. No
"Motion to Strike Plaintiff's Opposing Affidavits"
was ever filed with the Court. Consequently, Chism
filed what he titled a "Motion in Limine," arguing
that his affidavits should not be stricken because no
motion to that effect had been properly filed. Be-
cause Kenall filed a notice without an underlying
motion, that notice is superfluous and is hereby
stricken. Consequently, Chism's "Motion in
Limine" is denied as moot.

In examining the briefs, statements of fact, and
evidence of record, the Court has discovered anoth-
er issue relating to the parties' factual submissions
that must be addressed at this point: Chism's objec-
tions to many of Kenall's statements of undisputed
fact are not in compliance with Local Rule 56.
l(b)(3)(B)'s requirement of "specific references to
the affidavits, parts of the record, and other sup-
porting materials." For example, in response to
Kenall's statement that the employment contract
between Chism and Kenall was never modified in
writing (Def.'s LR 56.1 Stmt., ¶ 5), Chism states
simply: "Objection as an incorrect statement &
taken out of context." This objection is vague and
does not specify the factual basis of any disagree-
ment. The Court also notes that many of Chism's
references to the factual record in his objections fail
to comply with Local Rule 56.1(b)(3)(B) because
they do not actually state the factual basis of the
objection. For example, Chism's objection to ¶ 15
of Kenall's Local Rule 56.1 statement reads
"Objection & denied, see PSAF 7, PSAF 8, PSAF
9, PSAF 32 & PSAF 40." "PSAF" refers to Chism's
Local Rule 56.1(b)(3)(C) statement of additional
facts. The PSAF, in turn, contains statements of a
general nature, such as "Plaintiff made contribu-
tions to Kenall strategic objectives [sic]," and cites
a string of depositions with page and line numbers
but no actual quotations. (Pl.'s LR 56.1 Stmt. of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

Add'l Facts, ¶ 9.) Therefore, in order to ascertain Chism's position on the factual assertions he denies, the Court is forced to consult first the objection, then the Local Rule 56.1(b)(3)(C) statement, and finally the depositions to determine what they actually say. As the Seventh Circuit has stated, "[j]udges are not like pigs, hunting for truffles buried in the record," *Albrechtsen v. Bd. of Regents of the Univ. of Wisconsin Sys.,* 309 F.3d 433, 436 (7th Cir.2002). Chism's failure to follow the Local Rules is not merely a breach of a formality, but a serious inconvenience to the Court as it attempts to triangulate between Chism's LR 56.1(b)(3)(B) and (C) statements and the record in order to locate Chism's position on the facts.

**\*2** Finally, the Court notes that many of Chism's objections are frivolous. It appears that, rather than acknowledging "damaging" facts, Chism's strategy has been to object based on a series of blind citations to affidavits, depositions, and other documents. In many cases, the evidence-once it is located-does not contradict the statement objected to in any way. For example, ¶ 50 of Kenall's statement of undisputed facts states: "Hawkins and the plaintiff met again on August 16, 2005. Given the diminishing role of the plaintiff's position ... Hawkins indicated that the position was going to be eliminated." (Def.'s LR 56.1 Stmt., ¶ 50.) Chism replies: "Denied, see PSAF 8; PSAF 28, PSAF 30 & PSAF 32." But three of the paragraphs cited are completely irrelevant. PSAF 8 states "[George] Ryder believed that when Hawkins made Plaintiff Senior Advisor to the President, it was a promotion." (Pl .'s LR 56.1 Stmt. of Add'l Facts, ¶ 8.) PSAF 30 states that "[a]s the second oldest employee at Kenall ... Plaintiff was well qualified for his position at Kenall." (*Id.,* ¶ 30.) PSAF 32 declares that "Plaintiff was conscientious & passionate about accomplishing Kenall corporate objectives [sic]." (*Id.,* ¶ 32 .) PSAF 28 comes closest to being relevant, but still fails to contradict Kenall's statement. In PSAF 28, Chism states that his job responsibilities were not eliminated and that they were assumed by various employees after Chism's

termination. (*Id.,* ¶ 28.) However, there is no actual contradiction, since Kenall is asserting that Chism's position was eliminated, not that his job functions were eliminated. (Def.'s LR 56.1 Stmt., ¶ 50.) Therefore, not only is the objection improper in its form, as discussed above, but completely without merit. The Court's attempt to ascertain which operative facts are not genuinely in dispute has been seriously hampered by this confusing and at times misleading presentation of the facts.

The Court is entitled to demand strict compliance with the Local Rules governing summary judgment. *See Carlson v. Wal-Mart Stores, Inc.,* No. 06 C 4318, 2007 WL 4569867, at \*1 n.1 (N.D.Ill. December 21, 2007); *Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir.2004). When a party fails to comply with Local Rule 56.1, particularly when the failure is egregious, the Court has discretion to disregard that party's factual submissions and rely on the opponent's statement of material facts in determining whether to grant summary judgment. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir.2006) (district court had discretion to rely on defendants' statement of facts alone where plaintiff's statement was "filled with irrelevant information, legal arguments, and conjecture."). The Seventh Circuit has stated that "it is a reasonable judgment ... that strict, consistent, 'bright-line' enforcement is essential to obtaining compliance" with the Local Rules. *Koszola,* 385 F.3d at 1109 (quoting *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir.1995)). Therefore, the Court would be justified in disregarding Chism's non-conforming factual submissions. However, in the interest of adjudicating this case on its merits, the Court has not done so. The Court has attempted to ascertain which facts are genuinely disputed based on actual evidence in the record; the facts set forth below are the result of this effort. Some facts that the Court has accepted as undisputed are objected to in Chism's responses, The Court has found that these objections are without merit; because the meritless objections are so numerous, the Court will not discuss each one individually.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

### Undisputed Facts

**\*3** Kenall is a corporation headquartered in Gurnee, Illinois, that manufactures lighting fixtures. (Def.'s LR 56.1 Stmt., ¶ 2.) Chism was employed by Kenall beginning in 1978. (*Id.,* ¶ 4.) When he began working for Kenall, Chism signed a written employment contract with Kenneth Hawkins, the founder and then-president of Kenall (*Id.*) The contract stated that Chism would be employed as "vice-president of finance and administration," (*Id.,* Ex. A, art. 1.) The contract specified that "the employment hereunder shall be for the term of one (1) year," and provided that it could only be amended or modified in writing. (*Id.,* Ex. A., arts. 3, 11.) There was never a written modification of the contract, nor did Chism and Kenall enter into a new written employment agreement, although Chism asserts that the agreement was "replaced by a 1979 implied verbal integrity career employment contract." (Def.'s LR 56.1 Stmt., ¶ 5; Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 1.) Chism continued to be employed at Kenall after the expiration of the term provided for in the 1978 employment contract. In 1983, Chism became Kenall's Vice President of Marketing and Sales. (Def.'s LR 56.1 Stmt., ¶ 6.) In 1997, Chism became the Executive Vice President of Sales and Corporate Development. (*Id.*) In 2000, his duties changed once more and his title was changed to Executive Vice President of Corporate and Strategic Development. (*Id.*) These changes in title reflected the fact, denied by Chism but uncontroverted in the factual record, that Chism's job responsibilities were diminished over the years as a result of perceived deficiencies in his performance. (Def.'s LR 56.1 Stmt., ¶ 15; Hawkins Aff., ¶ 4.) While Jim Hawkins, Kenall's current president and CEO, did not refer to these changes in title as demotions in his deposition testimony, he indicated that Chism was stripped of his marketing duties in 1997 because he "had not performed ... adequately." (Hawkins Dcp. at 94-95.) Similarly, Chism's sales duties were reassigned in 2000 because Hawkins felt another employee was capable of leading the department and "didn't feel [Chism]

was [capable]." (*Id.* 98.)

While the record suggests a gradual decline in Chism's job performance (at least as it was perceived by his employer), it appears that the series of events that ultimately lead to the termination of Chism's employment with Kenall began in 2004. In July 2004, an incident occurred between Chism and Adrienne Cramer, Kenall's human resources manager, Cramer alleges that she was in Chism's office when he leered at her chest inappropriately and said, "By the way, nice knit," which she interpreted as having an inappropriate sexual connotation. (Def.'s LR 56.1 Stmt., ¶ 19; Cramer Aff., ¶ 5.) Chism vehemently denies that this occurred, pointing out that he was "friendly and complimentary to females and males," and alleging that Cramer was known to have a "perverse mind and vengeful attitude." (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶¶ 10, 11, 13.) However, both sides agree that Cramer reported this alleged harassment to William Hartwig, her supervisor and a vice-president of the company. (Def.'s LR 56.1 Stmt., ¶ 20.) Although Hartwig stated at the time that he would discuss the matter with Chism, it is unclear whether he did so, (*Id.*) Cramer testified that she confronted Chism herself on August 3, 2004, telling him that she found his conduct inappropriate and threatening to file a formal complaint if Chism behaved inappropriately again. (*Id.,* ¶ 21.)

**\*4** In the fall of 2004, Chism's conduct led to problems with another female employee, Holly Rodgers, who was an office manager at Kenall. (Def.'s LR 56.1 Stmt., ¶ 22.) Rodgers alleges that while she was in Chism's office one day, he made a remark about the sweater she was wearing that made her "uncomfortable." (*Id.;* Rodgers Aff., ¶ 3.) Rodgers reported the incident to Cramer, the human resources manager, Hartwig, the vice-president, and Jim Hawkins, Kenall's president. (Def.'s LR 56.1 Stmt., ¶¶ 23, 24.) When Rodgers reported the incident to Hawkins, she asked to be reassigned so that she would no longer work under Chism's direction. (*Id.,* ¶ 24.) It is not clear whether this request for re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

assignment was caused by the alleged sexual harassment; in her deposition, Rodgers testified that it was not. (Rodgers Dep. at 14-15.) However, it is undisputed that during the meeting Rodgers informed Hawkins about the "sweater" comment and stated that Chism had a tendency to make what Rodgers perceived as inappropriate comments with sexual connotations, such as "it's just a quickie." (Def.'s LR 56.1 Stmt ., ¶ 24.) While the incident allegedly occurred in the fall of 2004, Rodgers apparently did not report the incident to Cramer, Hartwig, and Hawkins until late February 2005. (Rodgers Aff., ¶¶ 4, 5.)

A third female employee of Kenall, Kelly Mueller, also alleged a series of inappropriate encounters with Chism. One of the alleged incidents, involving an unexpected and unwanted kiss from Chism at a co-worker's wedding reception, occurred in August 2001 and was reported to Cramer, the human resources manager, at that time. (Def .'s LR 56.1 Stmt., ¶ 26; Mueller Aff., ¶ 5.) In December 2001, Mueller reported to Cramer that Chism had followed her around at the company Christmas party, asking her to dance and stating "you can run, but you can't hide," which she found inappropriate. (Def.'s LR 56.1 Stmt., ¶ 27; Mueller Aff, ¶ 6.) On both occasions, Mueller declined to make a formal complaint. (Mueller Aff., ¶¶ 5, 6.) A third incident occurred in late 2004 or early 2005, when Mueller alleges that Chism "unexpectedly peered at me through some plants on a wall divider ... stared at my shirt and made a comment." (Def.'s LR 56.1 Stmt., ¶ 28; Mueller Aff., ¶ 7.) Mueller informally reported this incident to Cramer a lew days later. (Def.'s LR 56.1 Stmt. ¶ 28.)

These alleged incidents of harassment became a major issue in Chism's employment relationship with Kenall on January 17, 2005, when Cramer had a conversation with Hawkins regarding difficulties in her working relationship with Chism. During the course of this conversation, Cramer told Hawkins about the July 2004 incident in which she claims Chism ogled her chest while making a suggestive

remark about her sweater. (Def.'s LR 56.1 Stmt., ¶ 29; Cramer Aff ., ¶ 14; Hawkins Aff., ¶ 5.) The following day, Hawkins had a meeting with Chism in which he asked about Cramer's allegations. (Def.'s LR 56.1 Stmt., ¶ 30.) Chism vehemently denied that his statement had. any sexual connotation and attacked Cramer's credibility and character. (*Id.;* Pl.'s LR 56.1 Stmt. of Add'l Facts, Ex. D.) Hawkins told Chism that he was obligated to follow up on Cramer's report and that he could not draw any conclusions about the incident because the only evidence was the statements of the individuals involved. (Def.'s LR 56.1 Stmt., ¶ 31.) Hawkins instructed Chism to keep the incident and the meeting confidential and warned him not to engage in undermining activity against Cramer as retribution for making the report. (*Id.,* ¶ 32.)

**\*5** On February 7, 2005, Hawkins and Chism met again, this time to discuss Chism's 2004 performance review. (Def.'s LR 56.1 Stmt., ¶ 33.) The topic of harassment arose again in this conversation when Hawkins informed Chism that the decision on his pay raise was being postponed for 90 days, in part because Hawkins wanted to investigate the allegations against Chism more fully. (*Id.,* at ¶ 34, Ex. H; Chism Dep. at 30.) Hawkins also required Chism to take a sexual harassment training course; Chism acquiesced and took the course. (Def.'s LR 56.1 Stmt., ¶ 35; Hawkins Aff., ¶ 11; Chism Dep. at 29-30.) Hawkins requested that Chism keep the sexual harassment allegations and the contents of their meeting confidential. (Hawkins Aff., ¶ 11.) After this meeting, Hawkins learned of the accusations made against Chism by Mueller and Rodgers. (Def.'s LR 56.1 Stmt., ¶ 40.) Hawkins also learned that Chism was talking to other Kenall employees about his sexual harassment training, stating that he had been "rehabbcd." (*Id.,* ¶ 41.) Chism was also talking to fellow employees about his conflict with Cramer, asking employees to take sides in the dispute, and spreading rumors about conflicts between Cramer and other employees, (*Id.,* ¶ 42; Hawkins Aff., ¶ 15.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

Hawkins and Chism met again on May 11, 2005, after the 90-day review period they discussed on February 7 had passed. Hawkins recorded the contents of that meeting in a memorandum. (Def.'s LR 56.1 Stmt., ¶ 45.) According to the memorandum, Hawkins informed Chism that additional incidents of alleged sexual harassment had come to light since their last meeting. (*Id.,* ¶ 43.) Hawkins also indicated that he was dissatisfied with Chism's performance, particularly his "belligerent" and "vengeful" attitude towards members of the management team. (Def.'s LR 56.1 Stmt., Ex. J.) Hawkins stated that Chism seemed to be following his own agenda rather than the agenda established by the company, particularly when he went outside the normal chain of command to send a "caustic" email to Kenall's sales representatives. (*Id.*) Hawkins was critical of Chism's treatment of his subordinates, noting that Holly Rodgers had demanded a transfer and that managers had to be called in to "settle down" other employees after they had upsetting meetings with Chism. (*Id.*) Hawkins expressed his concern that Chism was displaying bad judgment regarding confidentiality and the priorities of the company. (*Id.*) Hawkins informed Chism that, based on this review, he was not going to receive a raise for 2005. (Def.'s LR 56.1 Stmt., ¶ 46.) Hawkins and Chism agreed to meet again in three months to discuss Chrism's performance issues. (*Id.,* Ex. J.)

In the months that followed his May 2005 meeting with Chism, Hawkins spoke to several members of Kenall's managerial team who were critical of Chism's abilities and performance, (Def.'s LR 56.1 Stmt., ¶ 47.) In July, Hawkins learned that Chism had told Holly Rodgers that Adrienne Cramer was "out to get her." (*Id.,* ¶ 48.) Nonetheless, as Chism points out, Hawkins sent Chism a note in the summer of 2005 congratulating him on completing twenty-seven years of employment with Kenall and thanking him for his contribution to the company. (Pl.'s LR 56.1 Stmt, of Add'l Facts, Ex. VV.) When Hawkins and Chism met on August 16, 2005, however, Hawkins told Chism that his position was

being eliminated. (Def.'s LR 56.1 Stmt., ¶ 50.) Hawkins offered Chism an early retirement or separation package, which was eventually reduced to a writing dated August 23, 2005, with the title "Special Offer." (*Id.,* ¶¶ 51, 52, Ex. B.) The agreement provided that Chism would continue in his current position through the end of 2005, and continue to be employed by Kenall until he turned sixty-five in 2007. (*Id.,* Ex. B.) The agreement also stated that Chism would receive a positive employment reference and that his personnel file would reflect that the charges of harassment against him were unproven. (*Id.*) The final clause of the agreement was a release of all potential claims, including claims of employment discrimination, against Kenall. (*Id.*)

**\*6** Chism accepted the terms of the agreement and signed it on August 23, 2005. (Def.'s LR 56.1 Stmt., ¶ 52.) The agreement provided that his acceptance could be revoked within seven days of signing; Chism exercised this power of revocation in a letter dated August 26, 2005. (*Id.,* Ex. C) Chism's letter indicated that he had a number of reservations regarding the agreement. In particular, he was unhappy that "false and defamatory allegations" would remain in his personnel record, and expressed concern that signing the agreement and becoming a "goodwill ambassador" for Kenall:

would not allow me The Court of Public Opinion'; EEOC investigation of age discrimination, propriety of the alleged sexual harassment investigation and qualified privilege to make defamatory comments in 2004 performance review; civil action against ASC [apparently, Adrienne Cramer], WFH [apparently, William Hartwig], and Kenall.

(Def.'s LR 56.1 Stmt., Ex. C.) In addition to the revocation of the August 23 agreement, Chism's letter contained a counter-offer proposing that all references to harassment in bis file be deleted and demanding an additional $250,000 in compensation. (*Id.*) It was also on August 26 that Holly Rodgers informed Hawkins about a private investigator hired by Chism who had contacted her at home in order

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to gather information about Adrienne Cramer. (*Id.*, ¶ 54 .) In fact, Chism had hired an investigator to investigate all five incidents of alleged harassment reported by Cramer, Rodgers, and Kelly Mueller. (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 23.)

On August 31, 2005, Hawkins sent Chism a letter informing him that "your Notice of Revocation ... has compelled us to conclude that it would be best for all parties if your employment with Kenall were not unnecessarily extended." (Def.'s LR 56.1 Stmt., ¶ 56, Ex. M.) The letter stated that Chism's employment was terminated effective August 31, 2005, and demanded that Chism cease his efforts to contact Kenall employees and investigate the claims against him. (*Id.*, Ex. M.) In the letter, Hawkins also wrote that Kenall would still consider making an agreement with Chism that would implement some of the terms of the original "Special Offer." (*Id.*) Chism filed a charge of discrimination on December 1, 2005, and received his Notice of Right to Sue from the EEOC on April 28, 2006. On June 21, 2006, Chism initiated the instant lawsuit. Chism's complaint alleges four bases of discovery: age discrimination in violation of the ADEA; retaliatory discharge as a result of Chism's threat to make a report to the EEOC, in violation of the ADEA; a "hostile work environment" based on Chism's age, in violation of the ADEA; and breach of contract, Kenall has moved for summary judgment on all counts. The motion was fully briefed and was orally argued before the Court on January 9, 2008.

## II. *Discussion*

### A. Summary Judgment Standard

Summary judgment is appropriate when, after construing all the facts of record in the light most favorable to the nonmoving party, the Court finds that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrell,*

477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" when, under the relevant legal standard, its existence or nonexistence could impact the ultimate disposition of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, the Court will grant a motion for summary judgment when "a rational trier of fact could not find for the non-moving party," *Williams v. OSI Educ. Serv., Inc.,* 505 F.3d 675, 678 (7th Cir.2007) (quoting *Turner v. J.V.D.B. & Assocs., Inc.,* 330 F.3d 991, 995 (7th Cir.2003)). A party cannot avoid summary judgment with mere pleadings or allegations; rather, the non-movant must rely on "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago,* 496 F.3d 645,651 (7th Cir.2007).

### B. Age Discrimination

**\*7** Count I of Chism's complaint alleges that Kenall terminated him as a result of age discrimination. Under the Age Discrimination in Employment Act ("ADEA"), it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(l). An ADEA plaintiff must show that age was a determining factor in the adverse employment action that gives rise to his claim. *See Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 393 (7th Cir.1998) (although age need not be the sole reason for the discharge, the claimant must show that "but for his employer's motive to discriminate against him on the basis of his age, he would not have been discharged."). In other words, Kenall is entitled to summary judgment on this count unless there is some evidence to show that invidious age-based discrimination was a "but-for" or necessary cause of Chism's dismissal. *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 483 (7th Cir.1996). There are two ways for Chism to make the necessary showing. Under the "direct method" of proof, he can

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

present "direct or circumstantial evidence ... that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose." *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir.2003). Chism may also use the indirect burden-shifting method originally developed in the context of Title VII and later adopted in ADEA cases. *Oxman v. WLS-TV,* 846 F.2d 448, 452 (7th Cir.1988). Chism claims that there is sufficient evidence for him to survive Kenall's motion for summary judgment under both the direct and the indirect method of proof.

### 1. *Direct Method of Proof*

In order to avoid summary judgment under the direct method of proof, Chism must have some direct or circumstantial evidence that suggests a discriminatory motivation for Kenall's decision to terminate him. *Cerutti,* 349 F.3d at 1061. Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* The Seventh Circuit has explained that the paradigmatic example of direct evidence is a statement such as "I fired you because of your age." *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir.2000) (internal citation omitted). The Seventh Circuit has also recognized that such direct inculpatory evidence will rarely, if ever, be found. *See Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1420 (7th Cir.1992) (stating that direct evidence will "rarely" be found). A plaintiff can also prevail under the direct method of proof by providing circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker. *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). Circumstantial evidence may include evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group"; evidence that employees who were similarly situated to the plaintiff but who were not members of the protected class systematically received better treatment; or evidence that the plaintiff was qualified for a job but was replaced by someone

outside the protected class. *Id.* Chism can avoid summary judgment by constructing a "convincing mosaic" of circumstantial evidence "from which a rational trier of fact could reasonably infer" that he was discriminated against. *Id.* at 737.

**\*8** Viewing the facts in the light most favorable to Chism, his evidence is not sufficient to create a triable issue under the direct method. Chism has no direct evidence of age discrimination: Kenall certainly does not admit to discriminating against Chism based on his age, and there is no evidence in the record of any direct admission of discriminatory intent by a decision-maker. Moving on to circumstantial evidence, Chism cites a combination of factors to show that he has enough evidence to avoid summary judgment, including "ageist remarks by decision makers along with Chism never receiving fair treatment in some alleged sexual harassment claims and a biased investigation and bogus employee review show[ing] that he was never given consideration to maintain his employment at Kenall based on his age." (Pl.'s Br. at 5.) Chism also argues that the "direct promotion upon the termination of Chism to Michals a younger worker to replace Chism is a direct material fact of discrimination." (*Id.* at 7.) These arguments fail to show that Chism has created a genuine issue of material fact under the direct method of proving age discrimination.

Simply put, Chism has no evidence. At the summary judgment stage, a party cannot rest on mere pleadings or allegations; rather, a party seeking to avoid summary judgment must rely on evidence of a type that would be admissible at trial. *Lewis,* 496 F.3d at 651. Chism alludes to "ageist remarks" in his brief, but has no proof of such remarks in the form of affidavits or deposition testimony. Similarly, Chism's assertions that he "never receiv[ed] fair treatment," was subjected to a "biased investigation," and received performance reviews that were "bogus," may reflect his subjective feelings, but do not provide a factual foundation that would allow a neutral fact-finder to understand the bias, unfair-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

ness, and bogusness Chism alleges. Without admissible factual evidence to relate Chism's subjective beliefs to objective reality, there is no genuine issue of material fact. As the Seventh Circuit has observed, "if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mlynczak v. Bodman,* 442 F.3d 1050, 1058 (7th Cir.2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 841-42 (7th Cir.1996)).

Chism's assertion that he was replaced by the thirty-eight year-old David Michals is at least factual in the sense that it can be verified or disproved. Furthermore, Chism is correct that evidence showing that he was qualified for his position and was performing satisfactorily, only to be replaced by a younger employee who was not a member of the ADEA's protected class, could be evidence of age discrimination. However, Chism is undermined by the fact that Michals did not "replace" him, formally or informally. First, as discussed in Section I above, Chism was not formally replaced by anyone because his position, Executive Vice President for Corporate and Strategic Development, was eliminated and was not re-staffed with another employee. To the extent that he was informally replaced because his duties were assumed by other employees, Chism's own statement of facts shows that Michals took on only a part of Chism's duties. (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 28.) Other employees who took on Chism's duties included Jim Hawkins (fifty-four years old and therefore within the ADEA's protected class), Holly Rodgers (forty-seven years old), William Hartwig (fifty-three), Adrienne Cramer (fifty-four), George Ryder (fifty-three), and [unknown first name] Pichietti (thirty-nine). (*Id.,* ¶¶ 28, 30.) Therefore, not only was Chism not replaced by an employee outside the protected class, but five out of the seven employees who took on his duties after he was terminated were within the protected class. In light of these undisputed facts, Chism's "convincing mosaic" of evidence is re-

duced to a single, broken tile, and would not permit a reasonable jury to find in his favor under the direct method of proof.

### 2. Indirect Method of Proof

**\*9** Chism's attempt to rely on the indirect method of proof fares no better. To establish an age discrimination claim using the indirect method of proof, Chism must follow the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff using the burden-shifting approach has the initial burden of proving a prima facie case of age discrimination by showing that (1) he is a member of the protected class of workers over forty years of age; (2) he performed reasonably well on the job in accordance with his employer's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the employer. *Roszkowiak v. Vill. of Arlington Heights,* 415 F.3d 608, 614 (7th Cir.2005). Once a plaintiff successfully makes a prima facie case of age discrimination, the burden shifts to the employer to articulate a non-discriminatory reason for its actions. *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 696 (7th Cir.2006). If the employer is able to meet its burden of production by articulating a legitimate reason for the employment action, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual. *Id.* A pretext is a "deliberate falsehood," *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 419 (7th Cir.2006), and the focus is on whether "the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir.2000). In other words, even an erroneous belief is not a pretext if it is sincere.

Chism has established the first and third elements of the prima facie case, as it is undisputed that Chism is over forty years of age and that his em-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

ployment was terminated. However, Chism's case falters on elements two (satisfactory performance) and four (similarly situated employees were treated more favorably). First, all of the competent evidence of record indicates that Chism was not performing his job in a reasonably satisfactory manner. On the contrary, the memorandum in which Hawkins detailed his May 11, 2005, meeting with Chism clearly shows that Hawkins was dissatisfied with Chism's work performance. (Def.'s LR 56.1 Stmt., Ex. J.) In the meeting, Hawkins indicated that he was displeased with Chism's "belligerent" and "vengeful" attitude towards members of the management team. (*Id.*) Hawkins was critical of Chism for following his own agenda rather than the agenda established by the company and also noted Chism's poor treatment of his subordinates. (*Id.*) As discussed in Section I above, the record also indicates that Chism's performance had been unsatisfactory for years, a fact that was reflected in the paring away of his job responsibilities. Finally, it is undisputed that Chism was accused of sexual harassment by several employees and that, by hiring a private investigator and talking about the accusations in the office, Chism failed comply with Hawkins's request to keep the harassment claims confidential. (Hawkins Aff., ¶¶ 8, 15, 24.)

**\*10** Chism counters this evidence with his own assertions that he was performing adequately and that he "was conscientious and passionate about accomplishing Kenall corporate objectives [sic]." (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 32.) To the extent that Chism attempts to create an issue of material fact based on his personal perception of his job performance, this information is irrelevant; it is the perception of the decision-maker, not the employee, that is significant. *See Adreani,* 154 F.3d at 398; *Jackson v. E.J. Brack Corp.,* 176 F.3d 971, 985 (7th Cir.1999) ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability.") (internal quotes and citation omitted). Like his perception that Kenall was biased against him, Chism's perception of his performance is inconsequential

when not supported by any objective facts. The facts that Chism does muster do not create a genuine issue of fact regarding his performance. He points to his compensation in past years as evidence that his performance was satisfactory. Assuming for the sake of argument that compensation necessarily correlates with performance, the fact that Chism may have performed well in the past does not mean that he was doing so when he was terminated. *See Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991) (previous years' performance reviews did not prove later satisfactory performance). It is also odd that Chism would rely on compensation as a proxy for performance, since the last compensation decision affecting Chism was the decision to deny his yearly raise.

Finally, Chism relies on two notes from Hawkins that congratulate him on completing another year of work at Kenall and praise his contribution to the company in general terms, as well as Hawkins's memorandum announcing Chism's termination, in which he expresses regret at Chism's departure. (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 40.) Chism's argument appears to be that Hawkins would not have thanked him for his "loyalty, commitment, and contribution" to Kenall or told his remaining employees "with regret" that Chism was leaving unless Chism was performing his job in a satisfactory manner. The Court finds this inference unreasonable. To assign any probative value to these innocuous, pro-forma statements would be to abandon all sense of context and convert meaningless pleasantries into damning admissions of fact. *See C & F Packing Co., Inc. v. Doscocil Companies, Inc.,* 126 F.R.D. 662, 687-88 (N.D.Ill.1989) (emphasizing that pleasantries between judge and attorneys, such as saying "good luck" to counsel, must be interpreted in light of context and common sense). In the workplace, as in other areas of life, people often say things out of a sense of politeness or a desire to avoid uncomfortable situations that do not express their true feelings. A short note to an employee on the anniversary of his employment thanking him for his hard work is customary in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
(Cite as: 2008 WL 506115 (N.D.Ill.))

many workplaces; it does not prove that the employer is satisfied with the employee any more than a polite "thank you" card to a gift-giver proves that the recipient is delighted with her gift. *See also Blood v. MTP, Inc.*, No. 02 C 50029, 2002 WL 31949885, *1 (N.D.Ill. January 14, 2002) (declining to give legal effect to "boilerplate and prefatory pleasantries" in an employee handbook). Similarly, Hawkins's "regret to inform you" statement announcing Chism's departure was clearly a figure of speech rather than an expression of true regret: if he so regretted Chism's departure, Hawkins could have avoided it by not firing him. The court will not belabor this fairly obvious point; even if the statements at issue have some minor probative value, they ultimately do not help Chism, because only evidence that would allow a reasonable jury to find for Chism can create a genuine issue of material fact. In light of the overwhelming evidence that Kenall was dissatisfied with Chism's performance, no reasonable jury could find in his favor based on a few superficial remarks.

**\*11** Even assuming that he could show satisfactory job performance, Chism would also have to prove that he was treated differently than a similarly situated employee outside of the protected class in order to prevail using the indirect method of proof. This he cannot do. As discussed above, five of the seven employees that Chism identifies as having taken on his job duties after his dismissal are over the age of forty and therefore are within the ADEA's protected class. Furthermore, employees are not similarly situated unless they are directly comparable in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002). Employees are not similarly situated merely because they perform the same task; rather, the burden is on the plaintiff to show that there are no differentiating circumstances that could cause an employer to treat them differently for legitimate reasons. *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir.2005). Chism seems to assert that a younger co-worker, Michals, was treated more favorably because he was retained by Kenall and given some

of Chism's responsibilities. (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 31.) However, Chism has not shown that Michals or any other employee of Kenall was "similarly situated," i.e., that there were no significant differentiating circumstances surrounding their employment. In Chism's case, the circumstances that could legitimately affect his employment relationship with Kenall included a history of declining performance, admonishments for surly behavior toward subordinates and for disregarding company protocol, accusations of sexual harassment, and the retention of a private investigator to contact employees regarding alleged incidents of sexual harassment. Chism has not identified any employee who had all of these attributes, was under the age of forty, and was treated more favorably. Because he cannot show that his job performance was satisfactory or that a similarly situated employee was treated more favorably than he was, Chism cannot establish a prima facie case of age discrimination using the indirect burden-shifting approach.

Finally, even assuming that Chism could establish a prima facie case of age discrimination, Kenall would still be entitled to judgment as a matter of law because it has proffered a non-discriminatory explanation for Chism's termination and Chism has produced no evidence to indicate that this explanation is a pretext for unlawful discrimination. In the context of the indirect burden-shifting method of proving age discrimination, a "pretext" is a "lie, specifically a phony reason for some action." *Suhlett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir.2006). An employer's mistaken belief that a plaintiff's conduct merited termination does not render the employer's explanation pretextual so long as the belief was honestly held. *Ptasznik*, 464 F.3d at 696; *see also Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir.2001) (plaintiff's pretext argument failed where the employer mistakenly, but honestly, believed that the plaintiff had been late for work). As discussed above, Kenall's stated reasons for discharging Chism include diminished responsibility, performance deficiencies, behavioral issues, allegations of harassment, and re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

taliation against other employees. There is no evidence in the record, other than Chism's naked allegations, to suggest that Kenall's motives were not genuine. The Court has no doubt that Chism disagrees with Kenall's assessment of him as an employee. However, this Court is not a "super personnel department" that rules on the wisdom of an employer's employment decisions. *Ajayi v. Aramark Bus. Serv., Inc.,* 336 F.3d 520. 532 (7th Cir.2003). The relevant inquiry is whether Kenall's nondiscriminatory explanation for its treatment of Chism is genuine. As far as this Court is concerned, it must be so, because Chism has no competent evidence to the contrary.

**\*12** Although it is unclear exactly where this argument fits in, Chism appears to argue in his brief that a jury could infer pretext in this case because Kenall relied on a violation of an ill-defined policy in terminating him. (Pl.'s Br. at 8-9.) The case Chism relies on, *Gordon v. United Airlines, Inc.,* 246 F.3d 878 (7th Cir.2001), is easily distinguished. In *Gordon,* the plaintiff, a probationary flight attendant, was terminated for making an "unauthorized deviation" from his flight schedule. *Id.* at 881-82. United's definition of an unauthorized deviation was unclear and was explained inconsistently throughout the litigation by various United employees. *Id.* at 889-90. Therefore, a jury could have found that the policy was not the true reason for the plaintiff's termination, particularly because the rule's enforcement was "almost unprecedented." *Id.* at 890. In the instant case, by contrast, Kenall did not discharge Chism for violating some esoteric, ill-defined rule; the stated reasons for his termination were his declining performance, attitude problems, failure to adhere to protocol, and disregard for Hawkins's request to keep the sexual harassment allegations confidential. Chism cannot seriously argue that he was unaware that Kenall required employees to perform well, treat other employees respectfully, follow company rules and procedures, and obey requests from supervisors. Even if he had been unaware of these fairly obvious requirements, which are common to almost all employment rela-

tionships, he was put on notice in February and May 2005, months before his termination, when Hawkins met with him and articulated his concerns about Chism's work and behavior. Therefore, in contrast to *Gordon,* there is no basis in this case for a jury to conclude that Kenall's reasons for terminating Chism were an ex-post fabrication designed to mask a discriminatory motive. Because there is no genuine issue of material fact that would allow a jury to find that Kenall's non-discriminatory justification for Chism's firing was a pretext, Kenall is entitled to summary judgment on Chism's claim of age discrimination using the indirect method of proof.

## C. Retaliation

Count III of Chism's complaint alleges that Kenall violated the ADEA by firing him in retaliation for his opposition to Kenall's allegedly discriminatory practices.[FN1] In order to establish a prima facie case of retaliation, Chism must show that he "engaged in a protected activity, that [he] suffered an adverse employment reaction, and that there is a causal relationship between the two." *Ajayi,* 336 F.3d at 533. While both the direct and indirect methods of proof discussed in the previous section are applicable to retaliation claims, *Sublett,* 463 F.3d at 740, the indirect method can be rejected out of hand because the Court has already concluded that Chism cannot identify a "similarly situated" employee that was treated more favorably than he was. Therefore, he must proceed under the direct method of proof by producing direct or circumstantial evidence to show that he engaged in a protected activity and suffered an adverse employment action as a result. *Id .*

> FN1. Chism's brief in opposition to the motion for summary judgment actually argues that Kenall violated Chism's rights under Title VII. (Pl.'s Br. at 11.) Title VII has no application in this case because Chism alleges only age discrimination. Retaliation is unlawful under both the ADEA

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

and Title VII. *Racicot v. Wal-Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir.2005).

**\*13** It is undisputed that Chism's employment was terminated, satisfying the requirement of an "adverse employment action." *See Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465-66 (7th Cir.2002) (adverse employment actions include termination of employment, demotion, decrease in salary, and loss of benefits). However, there is no evidence from which a jury could conclude that Chism engaged in a "protected activity" that resulted in his termination. While it is difficult to discern from his brief, Chism identifies the factual basis for his retaliation claim in his complaint, alleging that "KENALL has intentionally retaliated against CHISM based upon his statement to KENALL of his filing complaints with the EEOC or Illinois Department of Human Rights." (Compl., ¶ 16.) (caps in original). It is undisputed that Chism threatened, at least implicitly, to file a complaint with the EEOC in the same letter that revoked his acceptance of Kenall's proposed separation agreement. In that letter, dated August 26, 2005, Chism wrote that being a "goodwill ambassador" for Kenall "would not allow me ... EEOC investigation of age discrimination." (Def.'s LR 56.1 Stmt., Ex. C.)

Reporting discrimination to the EEOC would certainly be a protected activity under § 623(d) of the ADEA. *See* 29 U.S.C. § 623(d). However, Chism cannot establish the requisite causal connection between the protected activity and his termination. Kenall informed him that his position was being eliminated on August 16, 2005. On August 23, 2005, Kenall made him a written offer to continue his employment for a definite period of time under a separation or early retirement agreement.[FN2] After that date, the proverbial ball was in Chism's court. His threat to take his grievances to the EEOC took place after Kenall decided to eliminate his job and after Kenall's early retirement offer. Chism's threat was conveyed at the same time that he rejected Kenall's offer and made a counteroffer requesting an additional 250,000 dollars. From this chro-

nology, it is clear that Kenall's decision to eliminate Chism's position could not have been a response to his threatened EEOC complaint. Nor did Kenall withdraw its offer as a result of the threatened complaint, since Chism had already rejected the separation agreement and made a counteroffer. In fact, Kenall reiterated its willingness to reach an agreement with Chism even as it notified him of his termination on August 31, 2005. Therefore, Chism was in no worse position after his threat to go to the EEOC than he was before it: the elimination of his position had already been decided, and his failure to come to an agreement with Kenall is attributable only to his own conduct. Kenall cannot be deemed to have "retaliated" merely because it failed to accede to Chism's demand for an extra 250,000 dollars.

> FN2. Although Chism would have continued working at Kenall until he turned sixty-five had he accepted the separation agreement, precedent suggests that the adverse action in this case occurred when Kenall decided to eliminate his position. For example, the Seventh Circuit has noted that courts dealing with academic tenure situations have held that the relevant date of termination is the date of the decision not to grant tenure to the employee, since "termination of employment ... is a delayed, but inevitable, consequence of the denial of tenure." *Benders v. Bellows and Bellows,* Nos. 06-1487 & 06-2716, slip op. at 8 (7th Cir. February 12, 2008) (quoting *Delaware State College v. Ricks,* 449 U.S. 250, 257-58, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). The instant case is analogous because the end of Chism's employment was inevitable once the decision was made to eliminate his position-accepting the separation agreement would merely have postponed this result. Thus the separation agreement is like the "terminal" contracts offered to the employees in the tenure cases "with explicit notice that employ-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

ment would end upon its expiration." *Benders,* slip op. at 9, Ultimately, the distinction between the elimination of Chism's position and the termination of his employment is immaterial, since Kenall did not withdraw its offer as a result of Chism's threat to go to the EEOC.

Finally, even assuming that Chism had some evidence to establish a prima facie case of retaliation, this would merely shift the burden of production to Kenall, forcing Kenall to articulate a non-discriminatory justification for Chism's termination. As discussed in the previous section, Kenall has provided a legitimate, non-discriminatory basis for its decision: Chism's declining performance, behavior towards peers, failure to follow company policies, and behavior in connection with the allegations of sexual harassment against him. The Seventh Circuit has "consistently held that an employee's insubordination toward supervisors and co-workers, even when engaged in a protected activity, is justification for termination." *Kahn v. U.S. Sec'y of Labor,* 64 F.3d 271, 279 (7th Cir.1995). Chism has no evidence to suggest that Kenall's explanation is pretextual. Because Chism cannot establish a prima facie case of retaliation or meet his burden of showing that Kenall's explanation for his discharge is a pretext for unlawful discrimination, Kenall is entitled to summary judgment on Chism's retaliation claim.

**D. Hostile Work Environment**

**\*14** Count II of Chism's complaint alleges that Kenall discriminated against Chism by creating a hostile work environment based on his age. As a threshold matter, it is not clear that "hostile work environment" claims, which originated in the context of Title VII, are available to plaintiffs like Chism who allege only age discrimination under the ADEA. The Seventh Circuit has assumed, but never decided, that hostile environment claims are cognizable under the ADEA. *See, e.g., Racicot,* 414 F.3d at 678; *Bennington v. Caterpillar Inc.,* 275

F.3d 654, 660 (7th Cir.2001). The Supreme Court has noted that the ADEA and Title VII, while addressing different types of employment discrimination, contain nearly identical language, and that they have often been interpreted consistently. *See Smith v. City of Jackson, Miss.,* 544 U.S. 228, 233-34, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). However, the Supreme Court has acknowledged that the age discrimination addressed by the ADEA has historically been different in intensity and scope from the types of discrimination addressed under Title VII. *Id.* at 240-41. The Court has also observed that Congress did not prohibit disparate treatment as completely under the ADEA as it did under Title VII. *Id.* at 240. This is relevant because the Supreme Court's recognition of "hostile work environment" claims under Title VII was based on Congress's intent "to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotes omitted). In light of the Supreme Court's recognition that there are differences in the historical and social contexts of the ADEA and Title VII, as well as possible differences in their intended scope, it may be a mistake to assume uncritically that every cause of action recognized under Title VII is necessarily available under the ADEA.

Assuming that Title VII-style hostile work environment claims are cognizable under the ADEA, Chism's claim is doomed because he has no evidence to support a prima facie case. The Seventh Circuit has held that "[i]n order to succeed on a hostile work environment claim, 'the environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.' " *Bennington,* 275 F.3d at 660 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). In determining whether conduct is so offensive as to create a hostile environment, courts must consider the frequency and duration of the conduct, its severity, and whether it is physically threatening or humiliat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

ing. *Id.* Furthermore, it is not enough that the conduct is offensive; the plaintiff must be "subjected to unwelcome harassment *on the basis of*" a protected characteristic-in this case, age. *Kriescher v. Fox Hills Golf Resort and Conference Ctr.,* 384 F.3d 912, 915 (7th Cir.2004) (emphasis added). Finally, even if the environment is hostile, an employer will be liable only if the harasser is a supervisor, *Huff v. Sheahan,* 493 F.3d 893, 900 (7th Cir.2007), or if the harasser is a co-worker and the employer has notice of the harassment but fails to act reasonably to stop it. *Bernier v. Morningstar, Inc.,* 495 F.3d 369, 373 (7th Cir.2007).

**\*15** Chism's complaint alleges that Kenall "intentionally created a hostile environment ... based upon filing complaints by Chism for discrimination for failure to investigate charges of discrimination against him, for allowing an environment riddled with slander and suspicion of Chism personally [sic]." Parsing this language, it is not clear whether Chism is alleging that Kenall's top management was harassing him or that Kenall failed to prevent harassment by his co-workers, who were creating an environment of "slander and suspicion." In either case, Chism's claim would fail. There is no evidence of harassment by Hawkins, who, as President, was Chism's supervisor. It is clear that Chism was subjectively offended when Hawkins asked him about the allegations of sexual harassment, ordered him to take a sexual harassment training course, and criticized some aspects of his performance. However, these actions were not objectively unreasonable or offensive. A reasonable person under the circumstances would understand that a supervisor, faced with poor performance and accusations of sexual harassment, would need to address those issues with the employee. Indeed, as discussed above, an employer that failed to take steps to address allegations of co-worker harassment might expose itself to a hostile environment claim by the accusing employee. *See Bernier,* 495 F.3d at 373 (an employer's legal duty in co-employee harassment cases is discharged if it takes reasonable steps to discover and rectify sexual harassment by

its employees). In light of the undisputed fact that Hawkins was aware of several allegations against Chism, it was eminently reasonable for him to address the issue with Chism. *See Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995) (finding that an employer responded appropriately to a charge of harassment by confronting the accused, warning him, and suspending his pay raise and bonus).

To the extent that Chism may be alleging that his co-workers created a hostile environment by slandering him with their sexual harassment allegations, he cannot show a basis for Kenall's liability. First, assuming that the accusations were false, all of the evidence indicates that it was Chism rather than Kenall or his accusers that publicized them in the workplace. Second, there is no indication that Kenall knew or had reason to believe that the reports were false. Third, an employer is liable for coworker harassment only if it fails to take "reasonable steps" to address the situation. Kenall did take reasonable steps by investigating the other workers' claims about Chism. Had Kenall failed to investigate, it could have been liable to the complaining co-workers for allowing a hostile work environment of sexual harassment. Had Kenall somehow punished the co-workers for accusing Chism of harassment, Kenall's actions might have been viewed as retaliation against employees who were opposing an unlawful activity. Under the circumstances, it is obvious that Kenall responded appropriately.

**\*16** Finally, even if Kenall and/or Chism's co-workers were engaging in objectively offensive conduct, Chism has no evidence at all that these actions occurred "because of" his age. As the Seventh Circuit has observed, employment laws like Title VII and the ADEA are not a "code of general civility" for the American workplace: they do not prohibit all rudeness, only objectively offensive harassment that occurs because of prohibited animus. *See Moser v. Indiana Dept. of Corr.,* 406 F.3d 895, 903 (7th Cir.2005) (collecting cases). In this case,

· © 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

Chism has no evidence to show a causal connection between his age and the alleged harassment. Because Chism has no evidence that his supervisor engaged in objectively offensive conduct, or that Kenall was aware of and failed to address co-worker harassment, or that any harassment was related to his age, Kenall is entitled to summary judgment on his hostile work environment claim.

### E. Breach of Contract

The fourth and final count of Chism's complaint alleges a breach of contract by Kenall. The complaint literally states that Chism is suing for "Failure to Abide by Severance Agreement," but this cannot be the case, as Chism does not dispute that he accepted the severance agreement on August 23, 2005, and then revoked his acceptance on August 26, 2005. Kenall's only action in connection with the severance agreement was to make the offer; the contract could not have been breached, as it was never formed. As the litigation has progressed, however, Chism has indicated that he believes Kenall is liable for breaching an employment contract with him. It is undisputed that Kenall originally hired Chism in 1978 under a written employment contract, which specified that it was valid for one year. Chism argues that after this contract expired, it was "replaced by a 1979 implied verbal integrity career employment contract." (Pl.'s LR 56.1 Stmt. of Add'l Facts, ¶ 1.) The Court has gleaned from Chism's written submissions and statements of counsel at oral argument that Chism believes Kenall became obligated at some point to employ him for the duration of his career, even though there was no written agreement between the parties after 1978.

Under Illinois law, an employment relationship without a fixed duration is presumed to be at will, and is terminable by either party with or without cause. *Robinson v. Ada S. McKinly Cmty. Serv.,* 19 F.3d 359, 360 (7th Cir.1994) (citing *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 489, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987)). This presumptive rule of at-will employment may, of course, be overcome by evidence that the parties agreed otherwise. *McInerney v. Charter Golf Inc.,* 176 Ill.2d 482, 485, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1349 (1997). In Illinois, oral contracts for employment are viewed more skeptically than written contracts, *Smith v. Bd. of Educ. of Urbana Sch. Dist. No. 116 of Champaign Cty.,* 708 F.2d 258, 263 (7th Cir.1983), and the analysis of such contracts is "more scrutinizing." *Maher v. Con-Way Intermodal, Inc.,* No. 92 C 2863, 1993 WL 243319, at *6 (N.D.Ill. June 30, 1993).

*17 In order for an employee to prove the existence of a binding oral contract for permanent employment, the employee must prove that the employer made clear and definite oral promises as to the terms of employment, and that there was sufficient consideration for the promise, *See McInerney,* 176 Ill.2d at 485, 223 Ill.Dec. 911, 680 N.E.2d at 1349; *see also Eastman v. Chicago, Cent. & Pac. R.R. Co.,* 930 F.2d 1173, 1177 (7th Cir.1991). In this context, the term "permanent employment" is not limited to offers for lifetime employment; it also includes employment agreements that provide that the employee may work as long as she wishes or as long as she performs the job adequately. *See, e.g., Martin v. Fed. Life Ins. Co. (Mut.),* 268 Ill.App.3d 698, 699, 701-02, 205 Ill.Dec. 826, 644 N.E.2d 42, 44-45 (1994) (using the term "permanent employment" to describe an offer that employee "could have a job as long as he wanted"); *Wilder v. Butler Mfg. Co.,* 178 Ill.App.3d 819, 821-22, 128 Ill.Dec. 41, 533 N.E.2d 1129, 1131 (1989) (treating promise that an employee would have a job "as long as [she] produced" as a promise of permanent employment).

In light of this legal framework, it is clear that Chism's contract claim must fail The record discloses no evidence of a "clear and definite" oral promise; the evidence that comes closest to a promise of employment is Chism's testimony that Kenneth Hawkins told him "if I can trust you, you can trust me and we can trust each other. So, we're not going to have an Employment Agreement. We're just going to go forward from here without it. But

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

what we've talked about here is in place." (Chism Dep. at 27-28.) The conversation that Chism recalls is too vague to be the basis for an employment contract, and is better classified as an "informal expression[ ] of good will and hope," which is not sufficiently clear and definite under Illinois law to overcome the presumption of at-will employment. *See Wilder,* 178 Ill.App.3d at 822, 128 Ill.Dec. 41, 533 N.E.2d at 1130-31 (statements by the employer that the employee would be employed permanently and that she would never be laid off if she continued to do her job were not sufficiently clear and definite).

Beyond the fatally indefinite terms of Chism's alleged oral contract for lifetime employment, the agreement lacks adequate consideration. The Seventh Circuit has noted that Illinois courts will enforce an oral promise to employ a person for life or some other equally indefinite length of time only where the employee makes some sacrifice that he probably would not have made without a guarantee of continued permanent employment. *See Smith,* 708 F.2d at 263. Generally, the mere agreement to continue working in the present job at the present level of effort is insufficient consideration for such a promise. Compare *Smith,* 708 F.2d at 263, and *Lamaster v. Chicago & N.E. Illinois Dist. Council of Carpenters Apprentice and Trainee Program,* 766 F.Supp. 1497, 1501 (N.D.Ill.1991) ("a mere promise to perform the services of employment alone cannot support a contract for permanent employment"), with *McInerney,* 176 Ill.2d at 488, 223 Ill.Dec. 911, 680 N.E.2d at 1350-51 (finding sufficient consideration where employee gave up a lucrative job offer in exchange for lifetime employment). At best, Chism has provided evidence that would allow a jury to conclude that Kenneth Hawkins, acting as Kenall's president, offered him lifetime employment under the same conditions provided in the written agreement. Chism does not claim to have given up any concrete offers of employment elsewhere or allege any other type of additional consideration. Therefore, Chism has no evidence of a sufficiently specific exchange of promises and no evidence of consideration to sup-

port his claim that he had a lifetime employment contract with Kenall. Because there is no evidence upon which a reasonable jury could find in Chism's favor, Kenall is entitled to summary judgment on Chism's claim for breach contract.

**\*18** Parts of Chism's written submissions suggest that Kenall's sexual harassment policy created a duty on Kenall's part to investigate the claims of sexual harassment against Chism more thoroughly. Under Illinois law, it is possible for a written employee handbook to create enforceable contractual rights between an employer and employee. *See Kiddy-Brown v. Blagojevich,* 408 F.3d 346, 364 (7th Cir.2005). However, in order for a "handbook or other policy statement" to create enforceable rights, it must "contain a promise clear enough that an employee would reasonably believe that an offer has been made." *Id.* (citing *Duldulao,* 115 Ill.2d at 490-92, 505 N.E.2d 318-19). Here, Chism seems to claim the right to have harassment claims against him investigated thoroughly, i.e., beyond interviewing the accuser and accused, which was the extent of Kenall's probe. However, Kenall's policy states with respect to claims of harassment:

Any reported allegations ... will be investigated promptly. The investigation *may* include individual interviews with the parties involved and, when necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

(Pl.'s LR 56.1 Stmt. of Add'l Facts, Ex. R.) (emphasis added). This written policy, particularly in light of the permissive "may," cannot reasonably be interpreted to promise any specific procedural or investigative measures. Furthermore, Chism has no evidence that the procedures provided for were not followed: it is undisputed that after he was accused, Hawkins spoke to him and his accusers. There is no evidence to suggest that any third parties had relevant information. Therefore, any contractual entitlement to an investigation Chism may have had was honored. Chism may feel that he was entitled to additional process in order to clear his name, but his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)
**(Cite as: 2008 WL 506115 (N.D.Ill.))**

position has no legal basis, and Kenall is entitled to summary judgment.

### III. *Conclusion*

For the reasons discussed above, there is no genuine dispute of material fact in this case and Kenall is entitled to summary judgment on all counts. Therefore, Kenall's motion for summary judgment is granted.

N.D.Ill.,2008.
Chism v. Kenall Mfg. Co.
Not Reported in F.Supp.2d, 2008 WL 506115 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.