## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

KEVIN LOUDERMILK,

                Plaintiff,

    v.

BEST PALLET COMPANY, LLC, and
DAN LYONS, individually,

                Defendants.

No. 08 CV 6869

Judge Reinhard
Magistrate Judge Mahoney

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' 56.1(a)(3) STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S 56.1(b)(3) STATEMENT OF MATERIAL FACTS

Plaintiff Kevin Loudermilk ("Loudermilk"), by and through his attorneys, Caffarelli & Siegel Ltd., hereby responds to Defendants' Rule 56.1 Statement of Material Facts and submits his Local Rule 56.1(b)(3) Statement of Additional Undisputed Material Facts as follows:

### GENERAL OBJECTIONS TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS

An admission herein ("**ADMITS**") does not constitute an admission for purposes of trial, but merely indicates that Plaintiff does not contest that particular stated fact for purposes of the instant Motion for Summary Judgment. Similarly, a denial herein ("**DENIES**") does not constitute a denial for purposes of trial, but merely indicates that Plaintiff contests Defendants' description of that particular stated fact as uncontested by the Defendants, and indicates that the fact is indeed contested for purposes of the instant Motion for Summary judgment, with citations to the record, if appropriate.

Plaintiff further **OBJECTS** to certain paragraphs of Defendants' Local Rule 56.1 Statement of Facts on the grounds that those paragraphs are improperly argumentative, state

legal conclusions, and/or cite to improper evidence. Specifically, paragraphs 26, 29, 33, 34, 37, and 40 contain, in full or in part, arguments and/or legal conclusions as opposed to facts. Plaintiff also **OBJECTS** to paragraph 39 because the statements contained in paragraph 39 on their own demonstrate a genuine issue of material fact. For this reason, the enumerated paragraphs should be stricken and disregarded by the Court. However, should this Court choose not to disregard those paragraphs, Plaintiff has provided a response to those paragraphs while noting his objections.

### PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' RULE 56.1 STATEMENT OF FACTS

1.      Jurisdiction is proper under 28 U.S.C. §§1331 & 42 U.S.C. §2000e-5(f).

**RESPONSE:** Plaintiff **ADMITS** the statement contained in paragraph 1.

2.      Best Pallet Company, LLC ("Best") makes pallets in Loves Park, IL. ¶8 Ex.A.

**RESPONSE:** Plaintiff **ADMITS** the statement contained in paragraph 2.

3.      During his employment from 6/1/05 until 4/26/06, Plaintiff worked on Best's pallet teardown machine. Plaintiff also worked on a log shaver for 2 days in April 06. Ex.A¶10; Loudermilk Dep.,Ex.B, p.7,1.21-p.9,1.5;p.11,1.2-9;p.118,1.3-6.

**RESPONSE:** Plaintiff **ADMITS** that he worked on the pallet teardown machine during his employment. Plaintiff also **ADMITS** that he worked on a log shaver for 2 days in April 06. Plaintiff **DENIES** that the pallet teardown machine and log shaver were the only two machines that he worked on during his employment. (Ex. H – Loudermilk Dep. at 8.07-9.05.)

4.      Dan Lyons was Best's V.P. of Business Operations. Ex.A¶8.

**RESPONSE:** Plaintiff **ADMITS** the statement contained in paragraph 4.

5.      Reno Joseph was Best's Chief Operations Officer. Joseph Dep.,Ex.C,p.10,1.9-14.

**RESPONSE:** Plaintiff **ADMITS** Reno Joseph was Best's Chief Operations Officer beginning in January 2006. Plaintiff **DENIES** that Reno Joseph was Best's Chief Operations Officer prior to January 2006. (Ex. E – Joseph Dep. at 12.08-12.11.)

6.      Brad Huber was Best's Operations Manager and ran the plant. Lyons Dep.,Ex.D,p.73,1.20-21;Huber Dep.,Ex.E,p.11,1.24-p.12,1.4.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 6.

7.      Juan Campos was Plaintiff's supervisor with authority to discipline him. SmytheDep.,Ex.F,p.26,1.21-22;p.38,1.17-19;CamposDep.,Ex.G,p.25,1.22-24;Ex.E,p.56,1.7-20;RodriguezDep.,Ex.H,p.26,1.5-6;p.98,1.10-13;p.102,1.24-p.103,1.2;p.105,1.9-p.108,1.7.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 7.

8.      Kim Rodriguez is Best's office manager, whose responsibilities include payroll and personnel files. Ex.H,p.10,1.15-17;p.15,1.12-p.16, 114;p.39,1.4-9.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 8.

9.      Steve Smythe was a laborer who worked on the floor with Plaintiff until being promoted in late 05 or early 06. Ex.F,p.10,1.25-p.11,1.18. Smythe talked to Plaintiff regularly and observed him at the tear down machine daily, and for part of the day after being promoted. Ex.F,p.29,1.10-p.30,1.24;p.63,1.7-p.64,1.22;p.65,1.17-p.66,1.3;p.105,1.14-21;p.137,1.24-p.135,1.15.

**RESPONSE:** Plaintiff **ADMITS** Smythe worked on the floor until being promoted in late 2005 or early 2006. Plaintiff also **ADMITS** that Smythe talked to Plaintiff regularly and observed him at the tear down machine. Plaintiff **DENIES** that he worked with Smythe because Smythe never worked on, or supervised, the tear down machine or the Baker band saw machine. (Ex. M – Smythe Dep. at 150.16-151.03.) Plaintiff also **DENIES** that Smythe observed him or

his co-workers at the tear down machine throughout the entire day since Smythe never worked on, or supervised the tear down machine. (Ex. M – Smythe Dep. at 150.16-151.03; 154.22-155.03.)

10.     Glen Jones is Black and a friend of Plaintiff who worked on the tear down machine with him until going on sick leave in December of 05. Ex.B.p.172,l.14-16;JonesDep.Ex.J,p.12,l.14-17;p.38,l.18-25;p.41,l.11-p.42,l.9;p.42,l.23-p.43,l.3;p.47,l.4-p.51,l.6;Ex.F,p.131,l.19-p.132,l.6. When Jones returned in February of 06 he worked outside where he couldn't see what was happening inside, except during a period 1 – 1 ½ weeks. Ex.J,p.51,l.7-20;p.52,l.2-18;p.67,l.18-24;p.71,l.1-p.72,l.17.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 10.

11.     Plaintiff did not meet Best's performance standards because he allowed boards to pile up despite receiving help from co-employees who had to slow the process and for whom Plaintiff didn't reciprocate. Ex.F,p.24,l.17-p.28,l.1;p.85,l.5-14;p.87-88,l.6;Ex.G,p.43,l.22-p.44,l.7;Ex.E,p.45,l.11-23. Plaintiff wandered around complaining about his job while his boards were falling. Ex.F,p.105,l.7-107,l.1. Campos often caught Plaintiff sitting down watching his boards fall while others did his job, and warned him in writing and verbally many times. Ex.G,p.45,l.4-9;p.46,l.5-11;p.47,l.1-13;p.65,l.11-22;p.66,l.1-22;p.180,l.11-13;p.203,l.20-24. Huber agreed Plaintiff was always told he wasn't keeping up, his boards would pile up, and other employees were able to keep up. Ex.E.,p.46,l.10-21;p.67,l.18-22;p.68,l.13-14;p.176,l.8-17.

**RESPONSE:** Plaintiff **ADMITS** that Campos gave him a written warning and verbally warned him. Plaintiff **DENIES** that the warnings from Campos were warranted. (Ex. H – Loudermilk Dep. at 150.17-151.17; Ex. O – Disciplinary Notice dated 3/9/06 for Loudermilk –

BP001.)  Plaintiff **ADMITS** that Huber agreed Plaintiff was always told he wasn't keeping up, his boards would pile up, and other employees were able to keep up.  Answering further, Plaintiff states that Huber also testified that Plaintiff's performance met the Company's standards.  (Ex. C – Huber Dep. at 51.17-52.07.)  Plaintiff **DENIES** all remaining statements contained in paragraph 11.  (Ex. C – Huber Dep. at 51.17-52.07; Ex. Q – Pl.'s 3rd Am. Objections and Ans. to Defs.' Interrog. No. 1.)

12.     At Plaintiff's request Campos assigned him to the log shaver, but because he couldn't keep up he shortly thereafter returned to the teardown machine. Ex.J,p.75,l.7-p.76,l.18;p.77,l.22-p.78,l.7;p.85,l.11-l.22;Ex.G,p.97,l.3-22; p.108,l.21-p.109,l.10. When Plaintiff complained about working on the teardown machine Campos assigned him to the notcher, but he was too slow, said he didn't like, it and voluntarily returned to the teardown machine. Ex.G,p.110,l.1-11;p.111,l.20-p.112,l.12.

**RESPONSE:**  Plaintiff **DENIES** that he was too slow and could not keep up on the log shaver.  (Ex. H- Loudermilk Dep. at 120.05-121.10, 258.15-258.20)  Plaintiff **DENIES** ever working on the notcher.  (Ex. H – Loudermilk Dep. at 8.08-9.20, 118.03-118.06)  Plaintiff **ADMITS** the returning to the tear-down machine after working on the log shaver.

13.     When Plaintiff told Campos he couldn't pickup boards because his back hurt, at Plaintiff's request Huber attempted to assign him to fork lift jobs, but Plaintiff refused. Ex.G,p.115,l.14- p.119,l.2;Ex.F,p.107,l.14-p.108,l.8;Ex.D,p.200,l.17-24. Although Plaintiff asked to build pallets, once he learned how physically demanding it was he voluntarily returned to the teardown machine. Ex.G,p.119,l.2-p.120,l.4.

**RESPONSE:** Plaintiff **DENIES**  the statements made in paragraph 13.  (Ex H – Loudermilk Dep. at 98.20-102.10.)

14.     Given his back problem, Campos once assigned Plaintiff to sweep the shop floor rather than sort heavy pallets when his machine was broken and Plaintiff didn't want to leave and give up his hourly pay. Ex.G,p.166,l.5-p.167,l.14.

**RESPONSE:** Plaintiff **ADMITS** that Campos assigned him to sweep the shop floor and that he did not want to give up his hourly pay.  Plaintiff **DENIES** all remaining statements in paragraph 14.  (Ex. H – Loudermilk Dep. at 102.11-105.07.)

15.     On 3/9/06 Plaintiff received a Disciplinary Notice for refusing to do his job correctly and insulting his foreman.  Plaintiff's Response to Requests to Admit, Ex.K, # 12&13;Ex.B,p.149,l.2-p.150,l.21; Ex.L,3/9/06 Notice.  Lyons saw this Notice within about a week after it was issued. Ex.D,p.98,l.17-p.100,l.2.

**RESPONSE:** Plaintiff **ADMITS** that he received a Disciplinary Notice on March 9, 2006, and that Lyons saw the Notice.  Plaintiff **DENIES** that he refused to do his job correctly and that he insulted his foreman.  (Ex. H – Loudermilk Dep. at 150.19-151.17; Ex. F – Campos Dep. at 61.13-61.19; Ex. O – Disciplinary Notice dated 3/9/06 for Loudermilk – BP001.) Plaintiff also **DENIES** that Gutierrez was his foreman.  (Ex. C – Huber Dep. at 55.16-56.02.)

16.     On 4/25/09 Plaintiff took unauthorized pictures of machinery and young co-workers, and both Lyons and Huber confronted him about it. Ex.B,p.193,l.24-p.195,l.1;p.195,l.22-p.197,l.14; Ex.E,p.55,l.3-12;p.57,l.20-p.59,l.15. Plaintiff was written-up for this incident the next day. Ex.K,Rsp.#22;Ex.M,4/26/06 Notice.    Lyons saw the Notice prior to talking to Plaintiff on 4/26/06. Ex.D,p.108,l.6-23.

**RESPONSE:** Plaintiff **ADMITS** that he took pictures of machinery and co-workers on April 25, 2006 for the purpose of demonstrating to the EEOC how the Company discriminated against him with respect to work assignments, and that Lyons confronted him about the picture

taking.  Plaintiff also **ADMITS** that Lyons was aware of the picture taking incident prior to talking to Plaintiff on April 26, 2006.  Plaintiff **DENIES** all remaining statements in paragraph 16.  (Ex. H – Loudermilk Dep. at 193.18-193.23, 260.13-260.15; Ex. V – Pl.'s 3rd Am. Objections and Ans. to Defs.' 1st Set of Requests to Admit No. 21.)

17.     On 3 or 4 occasions beginning in February or March of 06, Huber complained to Lyons that Plaintiff wasn't doing his job and couldn't keep up regardless of what he did, and that he should be terminated. Ex.F,p.142,l.18-p.146,l.5;Ex.E,p.7,l.8-11;p.228,l.10-23. Lyons, who had no dislike for Plaintiff, believed he was not meeting Best's performance expectations based on Huber's complaints, as well as conversations with Smythe, Rodriguez and Campos, and because he witnessed Plaintiff wandering around doing nothing.  Ex.D,p.58,l.13-p.59,l.23;p.200,l.5-p.202,l.1;p.202,l.24-p.203,l.1.

**RESPONSE:**  Plaintiff **DENIES** the statements contained in paragraph 17.  (Ex. C-Huber Dep. at 51.17-52.07, 53.08-53.13; Ex. D – Company's 30(b)(6) Dep. at 211.13-214.03)

18.     In February of 06 Joseph was brought in to turn Best around because it was loosing money.  Ex.N,Joseph Affidavit;Ex.C,p.12,l.8-p.13,l.21; Ex.F,p.39,l.24-p.40,l.7. Joseph conducted an analysis and developed a plan to shift from selling rebuilt pallets to new pallets, requiring less employees. Ex.N;Ex.C,p.26,l17-p.28,l.16;p.45,l.12-18;Ex.F,p.43,l.21-25;p.123,l.1-11. In mid-March, 06 Joseph determined that 15 laborers should be terminated in phases, as his plan was implemented, starting with 5 laborers.  Ex.C,p.46,l.1-p.47,l.21;p.55,l.24-p.56,l.2;p.99,l.13-18;p.110,l.5-13;p.142,l.10-18;Ex.N; Ex.E,p.81,l.14-18. Joseph discussed his plan with Lyons, Huber and Smith, and instructed Lyons and Huber to review laborers for seniority and performance, to determine candidates for termination. Ex.N;Ex.C,p.47,l.22-p.49,l.3;Ex.F,p.44,l.23-p.45,l.20;p.124,l.22 p.126,l.20; Ex.D,p.167,l.9-19. The plan decreased the

need for the tear down machine by 75-80%. Ex.F,p.123,l.12-21. Lyons attended the March 06 meeting with Joseph, Huber and Smythe, during which they decided to implement the work force reduction pursuant to Joseph's plan and because labor costs were too high considering Best's work load. Ex.N.;Ex.F,p.42,l.6-22;p.44,l.1-25;p.46,l.3-18;p.124,l.1-10; Ex.D,p.37,l.25-p.38,l.25;p.53,l.1-5;p.55,l.15-20;p.166,l6-24.

**RESPONSE:** Plaintiff **DENIES** that Best Pallet implemented the work force reduction plan described in paragraph 18 because it continued to hire employees during the relevant time period and only identified three employees to the EEOC as being laid off, with the first employee being laid off in June 2006 . (Ex. D – Company's 30(b)(6) Dep. at 112.02-112.17; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71; Ex. I – Rodriguez Dep. at 45.12-45.15; Ex. T – Letter from Dorries to EEOC of 11/20/06 and EEOC's Notes dated 11/13/06– KL75-77.) Plaintiff **ADMITS** the remaining statements contained in paragraph 18.

19.     In an April 3, 06, e-mail Joseph announced an April 19, 06 first quarter financial and operations meeting and assigned Lyons to report the status of the labor reduction. Ex_;Ex.K,Rsp.#55-58. Joseph's presentation at the meeting, which Lyons helped create, showed Best's labor cost increase and Best's goals for the next review of reducing direct labor from 28 to 23. See Ex.N; Ex.K,Rsp.#60,61. Lyons attended this meeting and was aware of this goal. Ex.K,Rsp.#55-65.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 19.

20.     The implementation of the plan decreased Best's overall employee count from 36 in the 1st quarter of 06 to 35 in the 2nd quarter; to 34 in the 3rd quarter; to 27 in the 4th quarter; and to 26 in the 1st quarter of 07. See Ex.I; Ex.F,p.128,l.7-p.129,l.14.Ex.D,p.176,l.24-p.181,l.8; Ex.C,p.112,l.124-p.116,l.12; Ex.H, p.84,l.22-p.86,l.3. Payroll records show that between January

13 and December 15 of 06, Best eliminated 11 laborers. Ex.H,p.87,l2-p.89,l.22; See Ex.O.

During this period Best utilized temporary workers to cover business spikes, and hired some

temporaries and others as employees, while decreasing the overall number of laborers per Best's

goal. Ex.D,p.113,l.12-p.115,l.8;p.161,l.4-p.163,l.4;Ex.C,p.99,l.18-p.100,l.18;p.118,l.4-22; Ex I.

Of all employees terminated in 06, Plaintiff had the least seniority, having worked for Best for

less than 11 months. Ex.H,p.90,l.19-p.91,l.16;p.92,l.8-p.94,l.22;See,Ex.P.

      **RESPONSE:** Plaintiff **ADMITS** that Best Pallet continued to hire new employees

throughout 2006 despite Joseph's plan to reduce the workforce.  Plaintiff also **ADMITS** the

remaining statements contained in paragraph 20.

      21.     In deciding Plaintiff should be terminated, Lyons relied on multiple factors,

including his Disciplinary Notices, poor performance and insubordination, and Best's goal of

reducing labor from 28 to 23. Ex.D,p.57,l.13-p.58,l.7;p.76,l.18-21;p.82,l.13-p.83,l.6;p.108,l.11-

23;p.200,l.25-p.202,l.13;Ex.K,Rsp.#55-65.

      **RESPONSE:**  Plaintiff **OBJECTS** to paragraph 21 on the basis that it constitutes ipse

dixit statements, also known as the "bare assertion fallacy."[1]  Plaintiff **DENIES** the statements

contained in paragraph 21.  (Ex. D – Company's 30(b)(6) Dep. at 112.02-112.17, 211.13-214.03;

Ex. C – Huber Dep. at 51.17-52.07, 53.08-53.13; Ex. G – Employee Contact List Provided by

Best Pallet to EEOC – KL71; Ex. I – Rodriguez Dep. at 45.12-45.15; Ex. H – Loudermilk Dep.

at 150.19-151.17, 193.18-193.23, 254.24-255.18, 260.13-260.15; Ex. T – Letter from Dorries to

---

[1] In addition to this instance, Defendants rely on ipse dixit statements, also known as the "bare assertion fallacy" in
several place in their Rule 56.1 statement of facts and accompanying memorandum of law.  The bare assertion
fallacy is a fallacy taught in any introductory logic course and may be summarized as follows:

Fact 1: X claims statement A.
Fact 2: X claims that X is not lying.
Conclusion:  Therefore, A is true.

See http://en.wikipedia.org/wiki/Bare_assertion_fallacy.  See also http://en.wikipedia.org/wiki/Ipse_dixit.

EEOC of 11/20/06 and EEOC's Notes dated 11/13/06– KL75-77; Ex. V – Pl.'s 3rd Am.

Objections and Ans. to Defs.' 1st Set of Requests to Admit No. 21.)

22.     Plaintiff repeatedly testified that "automated assembly line" referred to in his

Complaint was the log shaver machine. Ex.A,¶12;Ex.B,p.46,l.16-p.48,l.11;p.131,l.10-

p.132,l.11;See,Ex.Q. In his Complaint and in response to Interrogatories Plaintiff refers to only

one "assembly line" and does so in the singular. Ex.A¶14,38;Ex.R,Ans.#6(a)&(b).

**RESPONSE:** Plaintiff **OBJECTS** to the evidence cited to support the statements

contained in paragraph 22 as the Amended Complaint is a legal document and Federal Rules of

Civil Procedure only require notice pleading.  Moreover, the fact that Plaintiff testified about

what was in his Amended Complaint is irrelevant because parties can amend their pleading based

upon the facts adduced during discovery.  See Bartholet v. Reishauer A.G. (Zurich), 953 F.2d

1073, 1078 (7th Cir. 1992) (complaints in a notice pleading system initiate the proceedings but

recede into the background as the case progresses).  Subject to and without waiving these

objections, Plaintiff **ADMITS** the statements contained in paragraph 22.

23.     Plaintiff didn't work by himself on one end of the log shaver, testifying that the

machine was manned with two people in the back and three people in the front, and that he

worked on the back end with a Hispanic laborer stacking boards. Ex.B, p.116,l.3-9;p.117l.1-25.

**RESPONSE:** Plaintiff **ADMITS** the statements contained in paragraph 23.

24.     The teardown machine is shaped like the letter "T".  Ex.B,p.26,l.12-14. Boards

cut from used pallets are conveyed from saws at the base to an operator stationed in the middle

of the top of the "T", who sends them either direction depending on size. Ex.B,p.26,l.15-

24;See,Ex.S & Ex.T. Plaintiff worked at the end of the top the "T" where he was to stack boards.

Ex.B,p.7,l.23-p.8,l.3; p.22,l.24-p.23,l.18;p.27,l.14-p.28,l.3.

**RESPONSE:** Plaintiff **DENIES** that the operator in the middle of the "T" sends the boards in either direction depending on size. (Ex. H – Loudermilk Dep. at 55.03-55.16.) Plaintiff **ADMITS** the remaining statements contained in paragraph 24.

25. During his deposition Plaintiff complained that after January of 06 the teardown machine was sometimes overstaffed or understaffed, prior to which he had "no complaints". Ex.B,p.28,l.4-11; p.59,l.17-p.60,l.8. Plaintiff testified that from January through April 06 on 1 or 2 days of the week the machine was staffed with him and another man on opposite ends of the "T" all day long, but that 2 or 3 days of the week during this period it was staffed with 2 or 3 men on the other end of the top of the "T" for two to three hours. Ex.B,p.42,l.23-p.43,l.12; p.61,l.1-25. Plaintiff also testified there were 60 days from March to April of 06 when he worked on one end of the top of the "T" and 2 men were on the other side, and that during this period Glen Jones occasionally helped him on his side. Ex.B,p.28,l.25-p.29,l.13;p.29,l.13-p.30,l.12.

**RESPONSE:** Plaintiff **ADMITS** that during his deposition Plaintiff complained that after January 2006 the teardown machine was sometimes overstaffed or understaffed, and that he testified that prior to January 2006 he had "no complaints." Plaintiff also **ADMITS** that from January through April 2006 on maybe one or two days of the week the machine was staffed with him and another man on opposite ends of the "T" all day long. Plaintiff also **ADMITS** that at least two or three days of the week during this period the machine was staffed with two or three men on the other end of the top of the "T" for two or three hours per day, and that the remaining hours of the day he would be required to run back and forth between the two ends of the top of the "T." (Ex. H – Loudermilk Dep. at 61.14-62.04.) Plaintiff also **ADMITS** that he testified there were sixty days from March to April of 2006 when he worked on one end of the top of the "T" and two men were on the other side, but states that he later clarified his testimony to reflect

that the sixty days occurred between January and April 2006. (Ex. H – Loudermilk Dep. at

52.17-52.24.) Plaintiff **ADMITS** that Glen Jones occasionally helped him.

26.     It was a "good thing" for Plaintiff and "made [his] job easier" when multiple men

worked on the opposite side of the "T", as it allowed him to stay on his side avoid going to the

other side to stack boards. Ex.B,p.54,l.1-p.55,l.15.  Jones agreed and testified Campos would

send Hispanic laborers to help Plaintiff, and they would occasionally shut down the saw which

would help Plaintiff catch up. Ex.J,p.53,l.14-p.54,l.1;p.107,l.16-p.108,l.16; p. 109,l.15-p.110,l.9;

p.138,l.3-9; p.143,l.3-13;p.145,l.12-17.  Smythe witnessed Hispanic employees helping Plaintiff,

but never Plaintiff helping them. Ex.F,p.134,l.18-135,l.3.

        **RESPONSE:** Plaintiff **OBJECTS** to paragraph 26 as argumentative.  Subject to and

without waiving these objections, Plaintiff **DENIES** that it was a "good thing" and "made his job

easier" when multiple men worked on the opposite side of the "T." (Ex. H – Loudermilk Dep. at

54.24-55.20.)  Plaintiff **ADMITS** that Jones testified that other employees would help

Loudermilk at the end of the day, and that the saw would occasionally be shut off.  Plaintiff

**DENIES** all remaining allegations contained in paragraph 26 because the saw was never turned

off in order to allow Plaintiff to catch up (Ex. K – Jones Dep. 60.25-61.17, 62.09-63.03,135.07-

135.22), and the Hispanic employees would not help Loudermilk during the day (Ex. H –

Loudermilk Dep. at 28.16-28.22, 58.15-58.23, 63.23-63.25, 256.07-256.11; Ex. K – Jones Dep.

at 90.20-90.24; 126.19-127.05, 138.03-138.24).

27.     Plaintiff claimed the operator in the middle of the "T" sent him excess boards,

departing from his initial testimony by claiming he followed no criteria for determining the

direction to send boards. Ex.B,p.26,l.15-24;p.27,l.7-13p.55,l.19-p.58,l.7. Jones testified

otherwise, demonstrating how each side cut different size boards, and that the operator followed

measurement instructions on a sheet. Ex.J,p.57,l.19-25;p.58,l.16-p.59,l.10;p.59,l.18-21;Ex.U.

Smythe agreed, testifying that the operator didn't have the discretion to overload either end, as

the direction he sent boards depended on the size and type of board he received and length it

would yield when cut. Ex.F,p.31,l.14-20;p.149,l.21-p.150,l.13;p.155,l.7-p.157,l.19. Campos'

agreed, as did Lyons who recalled Plaintiff being assigned to the side that received the least

boards. Ex.G,p.101,l.11-p.102,l.22; Ex.D,p.120,l.24-p.121,l.2;p.132,l.19-24;p.135,l.2-14.

    **RESPONSE:** Plaintiff **DENIES** that he departed from his original testimony because he

never testified originally that the man in the middle of the "T" sent the boards in either direction

based upon size. Rather, his original testimony was simply that the boards were cut into

different sizes and then were sent to either side. (Ex. H – Loudermilk Dep. at 26.15-27.13.)

Plaintiff **DENIES** that Jones testified that the man in the middle did not have the discretion to

choose which direction to send the boards. Rather, Jones testified that the man in the middle of

the "T" could put the board "on whichever side he wanted it on." (Ex. K – Jones Dep. at 59.08-

59.12.) Plaintiff **DENIES** that he was assigned to the side that received the least boards. (Ex. H

– Loudermilk Dep. at 55.15-57.14; Ex. C – Huber Dep. at 38.19-39.02.) Plaintiff **ADMITS** the

remaining statements contained in paragraph 27.

    28.    Plaintiff didn't have to cover both ends of the top of the "T" when Steve Smythe

Jr. worked there, and he would assist Plaintiff. Ex.B,p.62,l.2-13; Ex.J,p.37,l.17-p.38,l.5;p.92,l.7-

17;p.114,l.5-24;p.115,l.1- p.116,l.5; p.141,l.12-p.143,l.2; p.142,l.4-p.143,l.2;Ex.U. Smythe Jr.

worked full time from early February 06 until March 31, 06, except for during the week of

March 9, when he worked 31 hours. Ex P. Another laborer worked on the other end of the top of

the "T" from Plaintiff for 2 or 3 weeks, as did men normally assigned to other machines.

Ex.J,p.92,l.10-p.93,l.4. From 1/13/06 through 4/26/06 at least five of the laborers who worked on

the tear down machine when it was fully staffed were present. Ex.H,p.48,l.5-17;p.49,l.18-p.50,l.1;p.96,l.15-p.100,l.15;p.96,l.2-p.100,l.2; Ex.F,p.154,l.1-17; Ex.O.

      **RESPONSE:** Plaintiff **ADMITS** that he did not have to cover both ends of the top of the "T" when Steve Smythe Jr. worked on the tear-down machine with him. Plaintiff **ADMITS** that Steven Smythe Jr. worked at least forty hours per week from early February 2006 until March 31, 2006. Plaintiff also **ADMITS** that at least five laborers were present from January 13, 2006 through April 26, 2006. Plaintiff **DENIES** all remaining statements contained in paragraph 28 because Plaintiff frequently had to cover both ends of the top of the "T" between January 13, 2006 and April 26, 2006 because Steve Smythe Jr. and the other laborers were not assigned to work the tear-down machine. (Ex. K – Jones Dep. at 35.15-37.09, 133.13-135.20, 140.02-140.05; Ex. H – Loudermilk Dep. at 28.06-28.08, 255.24-256.02.)

      29.    When there weren't enough boards to keep two people busy one man would cover both ends of the top of the "T", including Hispanics and Whites, and Blacks were not specifically made to do so, as race wasn't used as a basis to determine job assignments.Ex.J,p.91,l.12-l.23;p.139,l.19-p.140,l.2;p.145,l.22-l.25;p.146,l.8-p.147,l.9;Ex.F,p.30,l.9-19;p.32,l.23-p.33,l.6;p.68,l.6-p.70,l.12;p.133,l.8-l.19;p.134,l.3-7; p.57,l.7-22;Ex.E,p.151,l.21-p.152,l.15;p.178,l.23-p.179,l.25;p.230,l.21-p.233,l.16. Campos never assigned Plaintiff to cover both ends because he couldn't keep up with his own side, but did assign Hispanics to do so. Ex.G,p.55,l.1-23;p.56,l.4-7;p.57,l.7-22.

      **RESPONSE:** Plaintiff **OBJECTS** to paragraph 29 as argumentative and on the basis that it constitutes ipse dixit, also known as the "bare assertion fallacy." Subject to and without waiving these objections, Plaintiff **ADMITS** that one man, specifically him, would cover both ends of the top of the "T." Plaintiff **DENIES** all remaining statements contained in paragraph

29. (Ex. K – Jones Dep. at 35.15-37.09, 133.13-135.20, 140.02-140.05; Ex. H- Loudermilk Dep. at 28.06-28.08, 255.24-256.02.; Ex. C – Huber Dep. at 62.06-62.19.)

30.     During breaks and at the end of the day Plaintiff always received help picking up boards.  Ex.B,p.31,l.17-25;p.40,l.23-p.42,l.3; p.122, l.24-p.123,l.24; Ex.J,p.54,l.4-23;p.95,l.13-17;p.96,l.6-13;p.97,l.18-p.99,l.21;p.127,l.10-l.14;p.136,l.12-14.

**RESPONSE:** Plaintiff **ADMITS** that he received help at the end of the day and during breaks, but not during the day.  (Ex. H – Loudermilk Dep. at 256.07-256.11; Ex. K – Jones Dep. at 90.20-90.24; 126.19-127.05, 138.03-138.24.)

31.     Plaintiff claims on 3 occasions he was disciplined for falling boards when Hispanics weren't, but couldn't identify the Hispanics who weren't disciplined and admitted seeing Campos talking to them and that he may have been disciplining them in Spanish. Comp¶18,19; Ex.B, p.147,l.20-p.148,l.4;p.148,l.5-12; Ex.K,Rsp.#74.   Hispanic employees were not disciplined like Plaintiff because they stayed at the machine and did their jobs correctly. Ex.J,p.120,l.6-p.121,l.16;p.122,l.9-p.123l.3.

**RESPONSE:** Plaintiff **DENIES** that Hispanic employees were not disciplined because they stayed at the machine and did their jobs properly.  (Ex. K – Jones Dep. at 136.21 – 138.02.) Plaintiff **ADMITS** the remaining statements in paragraph 31.

32.     Plaintiff claims Huber told Hispanic employees to "stay on" and observe him carefully, but didn't know how often this occurred or the identity of the employees. Ex.B,p.136,l.21-p.138,l.11;p.134,l.17-135,l.2.  Lyons and Smythe never heard anything about this, and  Huber testified he told Plaintiff's coworkers to not be on him. Ex.D,p.207,l.18-21;Ex.F,p.113,l.1-22;Ex.E,p.48,l.17-p.49,l.4;p.165,l.4-10.

**RESPONSE:** Plaintiff **ADMITS** that Huber told Hispanic employees to "stay on" and observe him. Plaintiff **DENIES** that he did not know how often this occurred or was unable to identify the employees Huber told because Plaintiff testified that Huber told Campos, Rosario, and probably Rosario's brother to stay on him every day after Plaintiff started complaining. (Ex. H – Loudermilk Dep. at 134.22-135.02.) Plaintiff **ADMITS** the remaining statements in paragraph 32.

33. Nobody at Best was prejudiced and discrimination wasn't tolerated. Ex.C,p.140,l.17-p.141,l.8;Ex.F.35,l.24-p.35,l.1; Ex.H,p.33,l.17-24;p.116,l.24-p.117,l.10;Ex.D,p.96,l.24-p.97,l.12.

**RESPONSE:** Plaintiff **OBJECTS** to paragraph 33 as argumentative and on the basis that it constitutes ipse dixit, also known as the "bare assertion fallacy," (see response to Paragraph 21) and because it calls for a legal conclusion. Subject to and without waiving these objections, Plaintiff **DENIES** the statements contained in paragraph 33. (Ex. K – Jones Dep. at 35.15-37.09, 60.25-61.17, 62.09-63.03, 90.20-90.24, 107.16-107.23, 126.19-127.05, 133.13-135.22, 136.21-138.24, 140.02-140.05; Ex. H- Loudermilk Dep. at 28.06-28.24, 58.15-58.23, 63.23-63.25, 121.04-121.08, 142.19-143.10, 146.13-146.17, 150.19-151.17, 255.24-256.02, 256.07-256.11, 256.15-256.20, 258.15-258.20; Ex. R – Loudermilk's Written Complaint – BP474-475; Ex. J – Company Payroll Records for 1/13/06-4/28/06; Ex. Q – Pl.'s 3rd Am. Objections and Ans. to Defs.' Interrog. No. 3; Ex. O – Disciplinary Notice dated 3/9/06 for Loudermilk – BP001; Ex N. – Disciplinary Notices dated 2/17/06 for Gutierrez and Flores – BP322 and BP323.)

34. Plaintiff testified that in response to a request by Lyons he wrote everything down about the discrimination he suffered at Best, wanting it to it to be as accurate and complete as

possible, and that he had no other complaints of discrimination. Ex.B,p.19,l.12-p.20,l.2;p.88,l.1-l.8;p.92,l.12-p.93,l.11;p.129,l.22-l.25. The focus of Plaintiff's written complaint is his belief that Campos lied about him and showed favoritism toward his "Hispanic buddies". Plaintiff's written complaint contains none of the allegations in the Complaint in this case, or which he clams to have complained to Huber and Lyons about verbally. Ex.B,p.184,l.24-p.188,l.17;Ex.V; Ex.K,Rsp.#41-54.

     **RESPONSE:** Plaintiff **OBJECTS** to the evidence cited to support the statements contained in paragraph 34 as the Amended Complaint is a legal document and the Federal Rules of Civil Procedure only require notice pleading. Moreover, the fact that Plaintiff testified about what was in his Amended Complaint is irrelevant because parties can amend their pleading based upon the facts adduced during discovery. See Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992) (complaints in a notice pleading system initiate the proceedings but recede into the background as the case progresses). Plaintiff also **OBJECTS** to paragraph 34 as argumentative. Subject to and without waiving these objections, Plaintiff **ADMITS** that in response to a request by Lyons he provided Lyons with a written complaint of discrimination. Plaintiff **DENIES** that the focus of his written complaint is his belief that Campos lied about him and showed favoritism toward his "Hispanic buddies." (Ex. R – Loudermilk's Written Complaint; Ex. H – Loudermilk Dep. at 257.14-258.03, 261.03-261.07.) Plaintiff DENIES tht his written Complaint does not encompass all instances of discrimination now being alleged under the rubric of favoritism being shown toward Hispanic employees. Id. Plaintiff **ADMITS** that he did not specifically include every minor fact or specific detail related to, and/or example of, his claims of race discrimination in his written complaint of discrimination.

35.     Lyons recalls Plaintiff giving him his written complaint in March or early April of 06, at which time he read it and investigated Plaintiff's allegations by speaking to Huber and Campos separately, each said they were false, their stories matched and he believed they were telling the truth. Ex.D,p.78,l.9-17;p.80,l.7-p.81,l.12;p.102,l.14-p.103,l.11;p.202,l.18-23.

**RESPONSE:** Plaintiff **DENIES** the statements contained in paragraph 35.  (Ex. D – Company's 30(b)(6) Dep. at 78.11-78.17; Ex. S – Notes from EEOC investigation dated 11/13/06 – KL85.)

36.     Plaintiff complained he was told he couldn't shut the log shaver off but couldn't identify those he claims were allowed to, describing them only as a younger group of Hispanics who were Campos' "buddies" and who told him he was too old to keep up.  Ex.B,p.118,l.17-p.119,1.21. Plaintiff testified that after two days he voluntarily returned to the teardown machine. Ex.B,p.121,l.25-p.122,l.11.  Only the operator on the opposite side of the log shaver from Plaintiff had the authority to shut it off, and did so only for emergencies, mechanical problems, breaks or while waiting for materials, and laborers weren't allowed to do so to catch up on stacking. Ex.F,p.98,l.17-p.102,l.19; Ex.E,p.161,l.23-p.162,l.9; p.225,l.6-9 Ex.G,p.106,l.18-p.107,l.12;p.172,l.8-21.

**RESPONSE:** Plaintiff **DENIES** that only the operator on the opposite side of the log shaver had the authority to shut off the log shaver, and did so only for emergencies, mechanical problems, breaks or while waiting for materials.  (Ex. H – Loudermilk Dep. at 119.25-121.08.) Plaintiff also **DENIES** that the log shaver was not turned off to allow laborers to catch up on stacking.  (Ex. H – Loudermilk Dep. at 119.25-121.08.)  Plaintiff **DENIES** that he could not identify the employees who were allowed to shut down the log shaver.  (Ex. H – Loudermilk Dep. at 119.25-120.02.)  Plaintiff **ADMITS** the remaining statement in paragraph 36.

37.     Plaintiff claimed he was called derogatory words in Spanish by his co-workers, but admitted he didn't speak Spanish or know what the words meant.  Ex.B,p.159,l.10-p.160,l.21.  Campos, whose first language is Spanish, but who speaks English fluently, testified Plaintiff was never called racially derogatory names in Spanish, name calling was in jest, Plaintiff called himself "hoto" (i.e. "fag") after grabbing a co-worker's rear, and called co-workers "f_ing Mexicans". Ex.G,p.3,l.23-p.4,l.7;p.149,l.18-p.160,l.2;Ex.E,p.44,l.19-p.45,l.6.Ex.G,p.142,l.8-p.144,l.24;p.149,l.14-p.160,l.2.

     **RESPONSE:** Plaintiff **OBJECTS** to paragraph 37 as argumentative.  Plaintiff **ADMITS** his reasonable belief that he was called derogatory words in Spanish by his co-workers, and that he does not speak Spanish.  Plaintiff **ADMITS** that Campos's first language is Spanish.  Plaintiff **DENIES** all remaining statements contained in paragraph 37.  (Ex. H – Loudermilk Dep. at 175.09-179.22, 253.01-254.13, 259.21-260.02, 263.22-264.13, 265.16-265.19.)

38.     Plaintiff admitted he didn't know whether the derogatory words were directed at him because of his race, and their only effect was to hurt his feelings because he didn't know what they were saying.  Ex.B,p.169,l.12-170,l.13;  p.174,l.7-23. Plaintiff admitted that in response to his complaints Huber told his Hispanic coworkers to stop name-calling at least 3 times, and had Campos do so as well.   Ex.B,p.176,l.7-p.179,l.21;p.181,l.10-p.182,l.3;Ex.K,Rsp.#77;Ex.E,p.44,l.19-p.45,l.6.

     **RESPONSE:** Plaintiff **ADMITS** that his feelings were hurt by the derogatory words, and that Huber and Campos told his Hispanic co-workers to stop the name calling.  Plaintiff **DENIES** that he did not know whether the derogatory words were directed at him because of his race.  (Ex. H – Loudermilk Dep. at 253.01-254.13, 263.22-264.13, 265.16-265.19.)

39.     Plaintiff claims that on 4/26/06 he gave Lyons his written complaint, Lyons didn't read or talk to Plaintiff about it, and told Plaintiff things weren't working out so they were going to terminate him.  Ex.B,p.239,l.15- p.240,l.7. Lyons recalls Plaintiff's termination decision as mutual, and that on 4/26/06 after reviewing the 4/26/09 Disciplinary Notice and seeing Plaintiff just standing there when everyone was working he approached and asked him "Kevin you really don't want to work here, do you" to which Plaintiff replied "no I do not want to work here". Ex.D,p.58,l.8-12;p.66,l.7-18;p.74,l.21-p.76,l.4;p.86,l.10-p87,l.12.

**RESPONSE:**  Plaintiff **OBJECTS** to paragraph 39 being included in Defendants' Rule 56.1 Statement of Facts as the statements contained in paragraph 39 on their own illustrate a genuine issue of material fact. Plaintiff also **OBJECTS** to paragraph 39 as being argumentative and on the basis that it constitutes ipse dixit, also known as the "bare assertion fallacy," (see response to Paragraph 21.   Subject to and without waiving these objections, Plaintiff **ADMITS** that he gave Lyons his written complaint of discrimination on April 26, 2006, and that immediately after receiving the written complaint Lyons told him that things were not working out so they were going to terminate him.  Plaintiff **DENIES** that Lyons did not read his written complaint.  (Ex. D – Company's 30(b)(6) Dep. at 77.17-78.23, 80.07-80.09.)  Plaintiff **DENIES** all remaining statements in paragraph 39.  (Ex. D – Company's 30(b)(6) Dep. at 78.11-78.17; Ex. S – Notes from EEOC investigation dated 11/13/06 – KL85; Ex. H – Loudermilk Dep. at 239.24-240.05, 249.17-249.25, 255.11-255.18.)

40.     Plaintiff's sole "pretext" claim is that Defendants' "downsizing" was false because other employees weren't terminated when he was. Ex.A,¶31-34,57-58;Ex.B, p.248,l.19-249,l.10. Plaintiff admitted Lyons relied on the 3/9/06 and 4/26/06 Disciplinary Notices when

terminating him, and that he didn't allege any of Lyons other reasons for his termination were

pretext. Ex.B,p.251,l. 7-17;Ex.K #25,26,27,28,29,30.

      **RESPONSE:** Plaintiff **OBJECTS** to paragraph 40 as argumentative and it calls for a

legal conclusion.  Plaintiff also **OBJECTS** to the evidence cited to support the statements

contained in paragraph 40 because he is not required to plead every fact or reason establishing

pretext in his Amended Complaint because federal courts use a notice pleading standard.

Subject to and without waiving these objections, Plaintiff **DENIES** the statements contained in

paragraph 40.  (Ex. D – Company's 30(b)(6) Dep. at 112.02-112.17, 211.13-214.03; Ex. C –

Huber Dep. at 51.17-52.07, 53.08-53.13; Ex. G – Employee Contact List Provided by Best Pallet

to EEOC – KL71; Ex. I – Rodriguez Dep. at 45.12-45.15; Ex. H – Loudermilk Dep. at 150.19-

151.17, 193.18-193.23, 254.24-255.18, 260.13-260.15; Ex. T – Letter from Dorries to EEOC of

11/20/06 and EEOC's Notes dated 11/13/06– KL75-77; Ex. V – Pl.'s 3rd Am. Objections and

Ans. to Defs.' 1st Set of Requests to Admit No. 21.)

### PLAINTIFF'S LOCAL RULE 56.1(B)
### STATEMENT OF ADDITIONAL MATERIAL FACTS

      1.      Plaintiff, Kevin Loudermilk was employed by Defendant Best Pallet Company,

LLC ("Best Pallet" or "Company") as a general laborer from June 1, 2005 until he was

terminated on April 26, 2006.  (Ex. A – Ans. to Am. Compl. ¶ 7.)  Loudermilk's race is African

American.  (Ex. A – Ans. to Am. Compl. ¶7; Ex. B - Defs' Ans. to Pl.'s Req. to Admit No. 2.)

Loudermilk's performance met the Company's standards during his employment.  (Ex. C –

Huber Dep. at 51.17-52.07.)

      2.      Defendant Best Pallet is located in Loves Park, Illinois, (Ex. A – Ans. to Am.

Compl. ¶ 8) and is in the pallet industry (Ex. D – Company's 30(b)(6) Dep. at 33.20-34.01).  In

August 2005, the Company was bought by its current owners, Joseph Messer and Thomas Stilp.

(Ex. C – Huber Dep. at 15.25-16.03.) Messer and Stilp own multiple companies, including Best Pallet, through their holding company, Messer & Stilp Holdings. (Ex. D – Company's 30(b)(6) Dep. at 13.15-13.25, 15.17-16.07; Ex. E – Joseph Dep. at 9.23-10.10.) While each company is set up independently, the companies have many shared employees (Ex. D – Company's 30(b)(6) Dep. at 12.09-14.25; Ex. E – Joseph Dep. at 9.23-10.14), and regularly hold joint meetings at Messer & Stilp's office in Chicago, Illinois (Ex. D – Company's 30(b)(6) Dep. at 91.18-93.01, 163.25-164.22; Ex C – Huber Dep. at 21.13-22.08; Ex. E – Joseph Dep. at 33.08-34.06, 37.09-37.23).

3.      Following the purchase of the Company in August 2006, the Company's former owner, Bradley Huber, remained employed as its on-site floor manager. (Ex. D – Company's 30(b)(6) Dep. at 20.10-20.20; Ex. C – Huber Dep. at 31.06-31.09.) Huber had the authority to terminate employees. (Ex. D – Company's 30(b)(6) Dep. at 23.24-24.03.) Huber supervised Loudermilk. (Ex. B – Defs' Ans. to Pl.'s Req. to Admit No. 11; Ex. D – Company's 30(b)(6) Dep. at 39.17-39.20.) Huber testified during his deposition that Loudermilk's performance met Company standards. (Ex. C – Huber Dep. at 51.17-52.07.) Huber also testified that he did not tell Lyons, or anyone else with the Company, that Loudermilk should be fired. (Ex. C – Huber Dep. at 53.08-53.13.)

4.      Defendant Dan Lyons was hired by Best Pallet as the Vice President of Business Operations in October 2005. (Ex. D – Company's 30(b)(6) Dep. at 12.03-12.05, 15.07-15.09.) Lyons had the authority to terminate employees. (Ex. D – Company's 30(b)(6) Dep. at 23.20-23.23.)

5.      Juan Campos was Loudermilk's direct supervisor. (Ex. D – Company's 30(b)(6) Dep. at 39.17-39.20; Ex. F – Campos Dep. at 25.22-25.24.) Campos had the authority to

discipline Loudermilk.  (Ex. F – Campos Dep. at 25.19-25.21.)  Campos is Hispanic.  (Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)  Campos was friends with the Hispanic employees that worked with Loudermilk.  (Ex. F – Campos Dep. at 39.03-39.10.)

6. During his employment Loudermilk was primarily assigned to work on the Company's tear-down machine.  (Ex. D – Company 30(b)(6) Dep. at 40.09-40.10; Ex. H – Loudermilk Dep. at 7.01-10.14.)  Loudermilk's co-workers on the tear-down machine were primarily Hispanic.  (Ex. C – Huber Dep. at 44.04-44.15; Ex. I- Rodriguez Dep. at 48.10-48.19, 54.21-56.11; Ex. J – Company Payroll Records for 1/13/06-4/28/06.)  Loudermilk was the only African-American employee that was assigned to work in his area.  (Ex. C – Huber Dep. at 44.16-44.18; Ex. I – Rodriguez Dep. at 56.12-56.15; Ex. J – Company Payroll Records for 1/13/06-4/28/06.)  Loudermilk also worked for a short period of time on the grinder and log shaver.  (Ex. H – Loudermilk Dep. at 8.08-9.20, 118.03-118.06)

7. The tear-down machine is shaped like the capital letter "T."  (Ex. D – Company's 30(b)(6) Dep. at 119.22-120.07; Ex. C – Huber Dep. at 38.15-38.18; Ex. K – Jones Dep. at 34.14-35.01.)  Normally, two employees work the two saws on the base of the "T," while three employees are supposed to work along the top of the "T."  (Ex. C – Huber Dep. at 37.13-40.05; Ex. F – Campos Dep. at 89.08-89.14; Ex. L – Diagram of Tear-Down Machine; Ex. M – Smythe Dep. at 30.05-30.12.)  The employee working the middle of the top of the "T" sorts the boards that are cut by the saws on the base of the "T."  (Ex. C – Huber Dep. at 35.18-37.03; Ex. D – Company 30(b)(6) Dep. at 132.25-133.02; Ex. M – Smythe Dep. at 30.20-32.05.)  He will send the boards either to the right or to the left on the machine (Ex. C – Huber Dep. at 36.10-37.04; Ex. D – Company 30(b)(6) Dep. at 132.17-133.02; Ex. M – Smythe Dep. at 31.21-32.05), and the employees on the two ends of the top of the "T" are required to stack the boards.  (Ex. C –

Huber Dep. at 34.25-35.17; Ex. D. – Company's 30(b)(6) Dep. at 134.01-134.05; Ex. M – Smythe Dep. at 18.03-18.07.)

8.     According to Huber and Smythe, if one of the saws on the base of the "T" was not being used, the Company may staff the top of the "T" with only one employee to cover both ends of the top of the "T."  (Ex. C – Huber Dep. at 37.08-37.12, 39.25-40.03, 62.06-62.19; Ex. M. – Smythe Dep. at 30.13-30.19, 32.09-33.03.)  Smythe testified that this occurred only about five percent of the time.  (Ex. M – Smythe Dep. at 32.23-33.06, 60.18-60.20.)  According to Huber and Smythe, one employee would not cover both ends of the top of the "T" if both saws on the base of the "T" were being used.  (Ex. C – Huber Dep. at 37.08-37.12, 39.25-40.03, 62.06-62.19; Ex. M – Smythe Dep. at 30.13-30.19.)

9.     Glen Jones is a former employee of Best Pallet.  (Ex. D – Company's 30(b)(6) Dep. at 47.14-47.18; Ex. K – Jones Dep. at 132.01-132.04).  Jones worked one of the saws on the base of the "T" of the tear-down machine during Loudermilk's employment.  (Ex. K – Jones Dep. at 35.08-35.13.)

10.     Jones testified that Loudermilk primarily worked both ends of the top of the "T" of the tear-down machine by himself.  (Ex. K – Jones Dep. at 35.15-37.09, 133.13-135.20, 140.02-140.05.)  Both saws on the base of the "T" of the tear-down machine were running when Loudermilk worked both ends of the top of the "T" by himself.  (Ex. K – Jones Dep. at 35.15-37.09, 133.13-135.20, 140.02-140.05.)  Loudermilk also testified that he had to work both ends of the top of the "T" by himself.  (Ex. H – Loudermilk Dep. at 28.06-28.08, 255.24-256.02.)

11.     Loudermilk testified that the tear-down machine was also frequently staffed with multiple Hispanic employees working on one end of the top of the "T," while he would be forced to work by himself on the other end.  (Ex. H – Loudermilk Dep. at 28.09-28.24.)  Jones

confirmed during his deposition that he observed this staffing arrangement of the tear-down machine during his employment. (Ex. K – Jones Dep. at 107.16-107.23, 138.21-138.24.)

12.     The Hispanic employees would assist each other throughout the day, but would not help Loudermilk during the day. (Ex. H – Loudermilk Dep. at 28.16-28.22, 58.15-58.23, 63.23-63.25, 256.07-256.11; Ex. K – Jones Dep. at 90.20-90.24; 126.19-127.05, 135.02-135.22, 138.03-138.24.) The Hispanic employees were allowed to shut down the machines in order to allow each other to catch up on stacking boards, but they would not shut down the machine for Loudermilk to catch up. (Ex. H – Loudermilk Dep. at 121.04-121.08, 146.13-146.17, 258.15-258.20; Ex. K – Jones Dep. at 60.25-61.17, 135.07-135.22.) In fact, Jones testified that he was specifically told by Huber that he could not shut down the machine to allow Loudermilk to catch up. (Ex. K – Jones Dep. at 62.09-63.03.)

13.     Loudermilk was often disciplined while his Hispanic co-workers were not. (Ex. H – Loudermilk Dep. at 142.19-143.10, 146.13-146.21; Ex. K – Jones Dep. at 136.21 – 138.02.) Huber verbally disciplined Loudermilk for allowing boards to fall. (Ex. H – Loudermilk Dep. at 142.19-142.25, 256.15-256.20; Ex. K - Jones Dep. at 136.21 – 138.02.) Jones testified that it would be impossible for anyone, not just Loudermilk, to keep up with stacking the boards because it was a two-person job that Loudermilk was being forced to perform by himself. (Ex. K – Jones Dep. at 35.15-37.09.)

14.     Campos testified that the Company had a progressive discipline policy. (Ex. F – Campos Dep. at 28.10-28.23.) However, he could skip steps in the process and proceed directly to termination for severe charges, including fighting in the building. (Ex. F – Campos Dep. at 208.19-209.13.) Campos also testified that the normal procedure for writing up an employee is that he takes the employee with him to the Company's office. Rodriguez then fills out the

disciplinary warning from with the employee present, and Campos and the employee sign the form. If the employee denies the allegations, Campos will investigate the matter further. If Campos agrees with the employee after conducting the investigation, the employee will not have to sign the disciplinary form. Otherwise, the employee will be required to sign the disciplinary form. (Ex. F – Campos Dep. at 29.13-32.05.) Moreover, according to Campos, the warning is filled out right after the incident leading to the discipline occurs. (Ex. F – Campos Dep. at 32.06-32.09.) The warning is then placed in the employee's personnel file. (Ex. F – Campos Dep. at 32.10-32.21.)

15.     Campos did not immediately fire two Hispanic employees that were caught fighting in the building. (Ex. N – Disciplinary Notices dated 2/17/06 for Gutierrez and Flores – BP322 and BP323.)

16.     On March 9, 2006, Campos gave Loudermilk a written warning for allegedly refusing to do his job and for insulting his foreman, Aristeo Gutierrez. (Ex. F – Campos Dep. at 58.16-60.20; Ex. O – Disciplinary Notice dated 3/9/06 for Loudermilk – BP001.) Loudermilk denied the allegations contained in the written warning. (Ex. H – Loudermilk Dep. at 150.19-151.17; Ex. F – Campos Dep. at 61.13-61.19; Ex. O – Disciplinary Notice dated 3/9/06 for Loudermilk – BP001.) Campos did not conduct a follow up investigation into the allegation. (Ex. F – Campos Dep. at 61.17-62.05.) Loudermilk also denies signing the March 9, 2006 disciplinary notice. (Ex. H – Loudermilk Dep. at 151.19-152.01.) Huber also testified that the March 9, 2006 disciplinary notice was false because Gutierrez was not Loudermilk's foreman. (Ex. C – Huber Dep. at 55.16-56.02.)

17.     Campos completed a disciplinary notice for Loudermilk dated April 26, 2006 for taking unauthorized pictures in the facility. (Ex. F – Campos Dep. at 69.07-69.21; Ex. P –

Disciplinary Notice dated 4/26/06 for Loudermilk – BP476.)  The picture taking incident occurred on April 25, 2006 – the day before Campos allegedly completed the disciplinary notice. (Ex. F – Campos Dep. at 70.03-70.08.)  Loudermilk denies ever being shown a copy of the April 26, 2006 disciplinary notice.  (Ex. H – Loudermilk Dep. at 193.18-193.23, 260.13-260.15.) Loudermilk was taking the pictures in case he needed them for the EEOC.  (Ex. H – Loudermilk Dep. at 195.02-195.05.)  Loudermilk spoke with Lyons about the picture taking around 11:00 a.m. on the morning of the incident.  (Ex. H – Loudermilk Dep. at 196.08-196.14.)  Therefore Lyons knew about the picture taking the day of the incident, which was before the day Loudermilk was terminated.  (Ex. H – Loudermilk Dep. at 196.08-196.14, 262.09-262.17.)

18.    Loudermilk was not assigned any overtime hours between January 2006 and April 2006.  (Ex. J – Company Payroll Records for 1/13/06-4/28/06; Ex. Q – Pl.'s 3rd Am. Objections and Ans. to Defs.' Interrog. No. 3.)  Loudermilk was the only employee working his position on the tear-down machine that was not assigned any overtime hours during that period.  (Ex. J – Company Payroll Records for 1/13/06-4/28/06; Ex. Q – Pl.'s 3rd Am. Objections and Ans. to Defs.' Interrog. No. 3.)

19.    Loudermilk specifically told Lyons and Huber when he complained to them that he thought he was being subjected to  race discrimination.  (Ex. H – Loudermilk Dep. at 253.06-253.08, 253.24-254.05, 257.14-257.18; Ex. F – Campos Dep. at 213.11-213.15.)

20.    In March 2006, Loudermilk complained to Huber about his Hispanic co-workers calling him derogatory names in Spanish.  (Ex. H – Loudermilk Dep. at 175.25-177.18, 252.13-253.08; Ex. C – Huber Dep. at 50.14-50.16; Ex. F – Campos Dep. at 213.11-213.15.) Loudermilk believed that the derogatory names were being directed at him because of his race. (Ex. H – Loudermilk Dep. at 253.01-254.13, 259.21-260.02, 263.22-264.13, 265.16-265.19.)

Following Loudermilk's complaint, Huber spoke with Campos. (Ex. F – Campos Dep. at 53.06-53.12, 212.24-213.03; Ex. H – Loudermilk Dep. at 179.07-179.18.) Campos admitted during his deposition that the Hispanic co-workers called Loudermilk Spanish names such as "Negro" and "Prieto" (Ex. F – Campos Dep. at 51.04-51.07). Moreover, according to Campos, who is fluent in Spanish (Ex. F – Campos Dep. at 3.23-4.04), "Negro" means black and "Prieto" refers to someone who is light dark skinned (Ex. F – Campos Dep. at 52.17-52.23). Loudermilk's co-worker continued to direct derogatory names at him in Spanish after he complained to Huber. (Ex. H – Loudermilk Dep. at 177.21-178.05, 253.19-253.22.)

21.     Loudermilk also complained to Huber in March 2006 about the fact that he believed the Hispanic employees were being favored. (Ex. H – Loudermilk Dep. at 11.10-12.12 253.09-253.15.) In particular, Loudermilk complained that he was being forced to work by himself, while the Hispanic employees had help. (Ex. H – Loudermilk Dep. at 11.10-12.12 253.09-253.15, Ex. C – Huber Dep. at 62.06-62.19.) Huber admitted during his deposition that he remembers Loudermilk making this complaint. (Ex. C – Huber Dep. at 62.06-62.19.) Jones also complained to Huber that Loudermilk should not have to do the job by himself because one man could not handle the job. (Ex. K – Jones Dep. at 101.05-101.11, 106.01-106.05.) However, Huber did nothing to rectify the situation. (Ex. H – Loudermilk Dep. at 253.16-253.25; Ex. K – Jones Dep. at 105.18-105.25.)

22.     Loudermilk complained to Huber and Lyons about discrimination together during the first or second week of April 2006. (Ex. H – Loudermilk Dep. at 19.07-19.11, 257.14-257.18] He also complained on April 24, 2006 to them. (Ex. H – Loudermilk Dep. at 67.25-68.18, 69.10-69.16, 75.02-75.08, 76.05-76.17, 77.08-77.25, 254.14-254.18.)

23.     On April 25, 2006, Loudermilk complained to Lyons about being discriminated against.  (Ex. H – Loudermilk Dep. at 86.21-88.06, 91.08-91.13.)  Lyons responded by telling Loudermilk to put his complaint in writing.  (Ex. H – Loudermilk Dep. at 86.21-88.06, 91.08-91.13.)  Loudermilk complied with Lyons' request, and presented Lyons with a written complaint of discrimination the next day, April 26, 2006.  (Ex. H – Loudermilk Dep. at 92.02-92.09.)

24.     Loudermilk's written complaint explicitly stated that he felt "Juan Campos discriminated against [him]," "[Campos] has shown favoritism toward his Hispanic buddies," and that "if [he] has to [he] will take this complaint to the E.E.O.C."  (Ex. R – Loudermilk's Written Complaint – BP474-475.)

25.     Lyons admits to reading Loudermilk's written complaint of discrimination when he received it.  (Ex. D – Company's 30(b)(6) Dep. at 77.21-78.02, 80.07-80.09.)  Lyons immediately fired Loudermilk upon receiving Loudermilk's written complaint of discrimination.  (Ex. H – Loudermilk Dep. at 254.24-255.18.)

26.     Lyons was at Best Pallet on April 25, 2006 and April 26, 2006.  (Ex. D – Company's 30(b)(6) Dep. at 194.05-195.05.)

27.     Following his termination, Loudermilk filed a timely charge of discrimination with the EEOC against Best Pallet.  (Ex. A – Ans. to Am. Compl. ¶ 3.)

28.     During the EEOC investigation, Lyons admitted to the EEOC that he received Loudermilk's written complaint of discrimination sometime the same week that he fired Loudermilk.  (Ex. D – Company's 30(b)(6) Dep. at 78.11-78.17; Ex. S – Notes from EEOC investigation dated 11/13/06 – KL85.)  However, during his deposition, Lyons changed his

testimony, claiming instead that he received the written complaint from Loudermilk sometime in March 2006.  (Ex. D – Company's 30(b)(6) Dep. at 78.07-78.17.)

29.    Best Pallet and Lyons admitted to the EEOC that Loudermilk was fired.  (Ex. D – Company's 30(b)(6) Dep. at 83.09-85.25; Ex. W – Statement from Lyons to EEOC – KL57; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)  Best Pallet did not tell the EEOC that Loudermilk was "laid off," or "quit," even though it identified other employees as being laid off and/or quitting.  (Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)

30.    Best Pallet and Lyons now claim that Loudermilk told Lyons that he no longer wanted to work for the Company and voluntarily quit.  (Ex. D – Company's 30(b)(6) Dep. at 67.01-67.12, 104.24-105.12.)  Loudermilk denies that he quit his employment with Best Pallet. (Ex. H – Loudermilk Dep. at 249.20-249.25.)

31.    Loudermilk was the only employee terminated on April 26, 2006.  (Ex. A – Ans. to Am. Compl. ¶¶ 33, 57; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)

32.    The Company continued to hire new direct employees between March and May 2006 (Ex. D – Company's 30(b)(6) Dep. at 112.02-112.17; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71; Ex. I – Rodriguez Dep. at 45.12-45.15), after the alleged decision to downsize had been made (Ex. D – Company's 30(b)(6) Dep. at 55.15-55.20; Ex. E – Joseph Dep. at 101.21-102.04).  For example, the Company hired a Hispanic laborer on April 12, 2006, and another laborer May 24, 2006.  (Ex. D – Company's 30(b)(6) Dep. at 112.08-112.17; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)

33.     Joseph testified that the Company would not be hiring temporary employees on as direct employees of Best Pallet during a reduction in force.  (Ex. E – Joseph Dep. at 100.03-100.24)

34.     The Company told the EEOC that its downsizing did not commence until June 2006.  (Ex. T – Letter from Dorries to EEOC of 11/20/06 and EEOC's Notes dated 11/13/06–KL75-77.)  The Company only identified three employees to the EEOC as being affected by the reduction in force.  (Ex. T – Letter from Dorries to EEOC of 11/20/06 and EEOC's Notes dated 11/13/06– KL75-77.)  Lyons testified during his deposition that the reduction in force began with Loudermilk.  (Ex. D – Company's 30(b)(6) Dep. at 62.09-62.11.)

35.     The EEOC issued a "cause finding" in favor of Loudermilk and against Best Pallet at the conclusion of its investigation.  (Ex. A – Ans. to Am. Compl. ¶ 4.)  Loudermilk filed his Complaint at Law within ninety (90) days after receiving his Right to Sue letter from the EEOC.  (Ex. U – Right to Sue Letter.)

36.     A majority of Best Pallet's workforce is Hispanic.  (Ex. B - Defs' Ans. to Pl.'s Req. to Admit No. 37; Ex. G – Employee Contact List Provided by Best Pallet to EEOC – KL71.)


Dated: January 21, 2010                          Respectfully submitted,

Alejandro Caffarelli, #06239078
Bradley Manewith, #06280535              KEVIN LOUDERMILK
Caffarelli & Siegel Ltd.
Two Prudential Plaza
180 North Stetson Ste. 3150
Chicago, IL  60601                                By: /s/ Alejandro Caffarelli
Tel. (312) 540-1230                                    Attorney for Plaintiff
Fax (312) 540-1231

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that he caused a copy of the attached, Plaintiff's Objections and Responses to Defendants' 56.1(a)(3) Statement of Material Facts and Plaintiff's 56.1(b)(3) Statement of material Facts, to be served upon the parties below by electronically filing with the Clerk of the U.S. District Court of the Northern District of Illinois on January 21, 2010.

Joseph S. Messer
Nicole M. Johnson
Messer & Stilp Ltd.
166 W. Washington St., Suite 300
Chicago, Illinois 60602

Courtesy copies delivered to chambers of Judge Reinhard via Federal Express.

/s/ Alejandro Caffarelli
Alejandro Caffarelli
Caffarelli & Siegel Ltd.
Two Prudential Plaza
180 N. Stetson, Suite 3150
Chicago, IL 60601